IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

ELWOOD H. JONES JR.
    PRO SE PETITIONER

    V

MARGARET BAGLEY / WARDEN
        RESPONDENT

CASE NO. C-1-01-564

JUDGE THOMAS M. ROSE

MAGISTRATE JUDGE MERZ

## PRO SE SUPPLEMENTAL BRIEF

NOW COMES PRO SE PETITIONER-ELWOOD H. JONES JR. RESPECTFULLY REQUESTING LEAVE OF THIS HONORABLE COURT TO SUPPLEMENT THE RECORD WITH ATTACHED PRO SE SUPPLEMENTAL BRIEF. PETITIONER-ELWOOD H. JONES JR. RESPECTFULLY REQUESTS THIS HONORABLE COURT TO ACCEPT ON MOTION FOR [AN] EVIDENTIARY HEARING, ALONG WITH THAT OF SAID COUNSEL[S] (I.E., JAMES D. OWEN, AND GREGORY MEYERS) SUBMISSIONS PER THE AFOREMENTIONED MATTER & CAPTIONED CASE.

IN THE INTEREST OF JUSTICE,
THIS SUPPLEMENTAL BRIEF SHOULD BE ACCEPTED AS PART OF THE RECORD.

RESPECTFULLY SUBMITTED,

*[signature]*

ELWOOD H. JONES JR.
#339-441 2-HSE 2050
P.O. BOX 788
MANSFIELD, OHIO 44901

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

ELWOOD H. JONES JR.      CASE NO. C-1-01-564
     PRO SE PETITIONER
                         JUDGE THOMAS M. ROSE
        V
MARGARET BAGLEY / WARDEN
       RESPONDENT        MAGISTRATE JUDGE MERZ

PRO SE SUPPLEMENTAL BRIEF
[TO SAID COUNSEL]
ON MOTION FOR AN EVIDENTIARY HEARING

   I ELWOOD H. JONES JR. [PRO SE PETITIONER] REQUEST THIS HONORABLE COURT TO ACCEPT THIS SUPPLEMENTAL PRO SE BRIEF AS PART OF THE SAID HABEAS CORPUS APPLICATION IN CASE NO. C-1-01-564.

   THE FEDERAL DISTRICT COURT HAS BROAD POWER IN HABEAS CORPUS PROCEEDINGS ON BEHALF OF A PERSON IN CUSTODY [PURSUANT TO STATE COURT JUDGEMENT] TO HOLD AN EVIDENTIARY HEARING TO DETERMINE THE FACTS: WHEREBY NEWLY DISCOVERED EVIDENCE IS ALLEGED IN A HABEAS CORPUS APPLICATION, EVIDENCE OF WHICH COULD NOT HAVE REASONABLY BEEN PRESENTED TO THE STATE TRIAL (PURSUANT TO 28 U.S.C. §2241).

   PRO SE PETITIONER-JONES ALLEGED THAT HIS TRIAL AND SENTENCE WERE CONSTITUTIONALLY TAINTED BY PROSECUTORIAL MISCONDUCT IN WITHHOLDING EXCULPATORY-IMPEACHMENT EVIDENCE. THE UNITED STATES SUPREME COURT (QUOTING, BRADY V. MARYLAND, 373 U.S. 83, 87 [1963]) HELD THAT, "THE SUPPRESSION [BY THE PROSECUTION] OF EVIDENCE FAVORABLE TO AN ACCUSED UPON REQUEST VIOLATES DUE PROCESS, WHERE THE EVIDENCE IS MATERIAL TO EITHER GUILT OR TO PUNISHMENT -- IRRESPECTIVE OF THE GOOD FAITH OR BAD FAITH OF THE PROSECUTION." THE PROSECUTION MUST ALSO PROVIDE IMPEACHMENT EVIDENCE TO THE DEFENSE WHEREUPON SUCH EVIDENCE SHOWS BIAS OR INTEREST ON THE PART OF THE STATES' WITNESSES, AND WHERE IT CAN "MAKE THE DIFFERENCE BETWEEN CONVICTION AND ACQUITTAL." (SEE, UNITED STATES V. BAGLEY, 473 U.S. 667, 676 [1985]) REASONABLE JURISTS COULD CONCLUDE THAT PRO SE PETITIONER-JONES HAS ESTABLISHED A VIOLATION OF BRADY AND ITS PROGENY. SEE, BANKS V. REYNOLDS, 54 F.3d 1508.

   SUBSEQUENT TO THE SAID SUPPRESSION[S] BY THE PROSECUTION, [BETWEEN JUNE & SEPTEMBER OF 2001] TWO FORMER BLUE ASH OFFICERS WITH HONORABLE INTENTIONS SOUGHT OUT ON A PATH TO LOCATE THE ATTORNEYS OF ELWOOD H. JONES JR. (THE PETITIONER HEREIN). THEIR SEARCH LED THEM TO THE HAMILTON COUNTY PUBLIC DEFENDERS OFFICE, WHERE THEY SPOKE WITH JOE DETERMAN AND LOUIS F. STRIGARI: INFORMING MR. DETERMAN AND MR. STRIGARI THAT THEY HAD PERSONAL KNOWLEDGE OF INFORMATION THAT MAY HELP IN THE APPEAL PROCEEDINGS OF ELWOOD H. JONES JR.

(1)

THE HAMILTON COUNTY PUBLIC DEFENDERS OFFICE CONTACTED THE OHIO PUBLIC DEFENDERS OFFICE OF GREG MEYERS, AND RELAYED THE INFORMATION TO ASSISTANT JENNIFER HITES (APPOINTED COUNSEL FOR PETITIONER THEREIN). DUE TO THE INFORMATION SUPPLIED BY SAID FORMER BLUE ASH OFFICERS, THE PRO SE PETITIONER AND SAID COUNSEL LEARNED THAT THE STATE OF OHIO WITHHELD THE FOLLOWING INFORMATION AND EVIDENCE FROM JONES AND HIS COUNSEL DURING HIS TRIAL:

SEE, SECTIONS (1), (A)(1), (A)(2), (A)(3), (B), (B)(1), (C) & (D)
FOR GROUNDS FOR RELIEF:
THE PROSECUTION DENIED ELWOOD JONES HIS RIGHTS TO DUE PROCESS, CONFRONTATION, THE PRESENTATION OF A DEFENSE AND A FAIR TRIAL, BY FAILING TO DISCLOSE FAVORABLE EVIDENCE THAT MANY CRIMES HAD OCCURRED AT THE EMBASSY SUITES HOTEL BY EITHER EMPLOYEES OR GUESTS, AND THAT OTHER PEOPLE EMPLOYED BY THE HOTEL HAD CRIMINAL RECORDS.

ONE OF THE STATE'S CENTRAL THEMES AGAINST MR. JONES ASKED THE JURY TO INFER [FROM THE FACT THAT HE WAS A CONVICTED CRIMINAL EMPLOYED BY THE EMBASSY SUITES WHO HAD ACCESS TO A PASS-KEY FOR THE GUEST ROOMS] THAT MR. JONES PERPETRATED THE CRIME[S]. IN OTHER WORDS, THAT HE HAD OPPORTUNITY, PROPENSITY AND MOTIVE TO COMMIT THE CRIMES. MR. JONES' DEFENSE WAS THAT HE DID NOT COMMIT THE MURDER. THIS ASSERTION OF DEFENSE COULD HAVE BEEN FURTHER ADVANCED BY THE PRESENTATION OF EVIDENCE THAT THE EMBASSY SUITES HOTEL ROUTINELY HIRED MANY EMPLOYEES WITH CRIMINAL RECORDS; AND THAT THE EMBASSY SUITES HOTEL GUESTS WERE ROUTINELY VICTIMS OF CRIMES.

(1) UNCOVERED FROM THE FILES OF THE BLUE ASH POLICE DEPARTMENT AND THE HAMILTON COUNTY PROSECUTORS OFFICE WERE QUESTIONNAIRS SENT OUT TO THE GUESTS WHO STAYED AT THE EMBASSY SUITES HOTEL SURROUNDING THE TIME [OF SEPTEMBER 2nd & 3rd, 1994] OF MS. NATHAN'S MURDER. THE INFORMATION FROM THE GUEST QUESTIONNAIRS SHOW THERE WERE A NUMBER OF INCIDENTS REPORTED BY GUESTS. THERE WAS SOMEONE TRYING TO GET INTO THESE ROOMS WITH A KEY DURING THE TIME-LINE THAT MS. NATHAN ARRIVED AT THE HOTEL ON SEPTEMBER 2nd, 1994 [AT 4:00P.M.], THROUGH THE TIME-LINE THAT HER BODY WAS FOUND ON THE FLOOR OF THE HOTEL ROOM AT 8:00A.M. ON SEPTEMBER 3, 1994. THIS INFORMATION CLEARLY SHOWS THE PROSECUTION AND POLICE WERE FULLY AWARE OF THE FACT THAT THERE WAS A TEAM OF THIEVES WORKING IN THE HOTEL FROM FRIDAY AFTERNOON (SEPTEMBER 2, 1994 [AT 4:00P.M.]) THROUGHOUT THE NIGHT, AND INTO SATURDAY MORNING (8:45A.M.) SEPTEMBER 3, 1994. AS-WELL, THESE GUEST QUESTIONNAIRS SHOW THAT 75% OF THE REPORTS DESCRIBE A "WHITE SUSPECT" TRYING TO GET INTO THE GUESTS' ROOMS; AND "A SUSPICIOUS PERSON" LEAVING THE HOTEL. NOW, EITHER THE BLUE ASH POLICE AND HAMILTON COUNTY PROSECUTORS OFFICE DISREGARDED THESE REPORTS FROM THE GUESTS AS NOT BEING TRUE AND ACCURATE DESCRIPTIONS; OR A DESCRIPTION OF A WHITE MALE SUSPECT WAS GIVEN A "FREE PASS" IN THIS HOMICIDE INVESTIGATION.

GUESTS WERE NEVER EXCLUDED AS POTENTIAL SUSPECTS, DESPITE THE POLICE & PROSECUTIONS KNOWLEDGE VIA A STATEMENT OF GREG HENRY: "WHEN A <u>GUEST</u> OR <u>EMPLOYEE</u> NEEDED A KEY, DUE TO LOSS OR BREAKAGE, ONE WAS MADE — NO <u>QUESTIONS</u> <u>ASKED</u>, AND NO RECORDS KEPT OF THE PERSON[S] REQUESTING ADDITIONAL KEYS."

(A)(1) VIRGIL RHODES' [AN EMBASSY SUITES SECURITY GUARD] STATEMENT [FOUND WITHIN THE PROSECUTORS' AND BLUE ASH POLICE DEPARTMENTS' FILES] WAS IMPORTANT TO MY DEFENSE AND SHOULD HAVE BEEN TURNED OVER TO MY LAWYERS, FOR TWO REASONS: VIRGIL RHODES AND DANNY BOWMAN [FROM MAINTENANCE] FOUND THE VICTIMS DOOR (ROOM

(2)

#237) AJAR AND THE ROOM VACANT AT 10:30P.M. ON SEPTEMBER 2, 1994 (I.E., THE SAME TIME THAT MS. SCHUB AND MS. KAPLAN STATED THAT AROUND 10:00P.M. THEY ALL RETURNED TO THEIR ROOM [#237] AND STAYED UNTIL THE NEXT MORNING, SEPTEMBER 3, 1994). THIS INCIDENT WAS REPORTED AND LOGGED IN BY TWO EMBASSY SUITES EMPLOYEE'S ON SEPTEMBER 2, 1994 [AT 11:00P.M.]. THE BLUE ASH POLICE DEPARTMENT REVIEWED THIS INCIDENT AS IT COULDN'T HAVE HAPPENED, SINCE MS. SCHUB AND MS. KAPLAN SAID THEY WERE ALL IN THE ROOM AT 10:30P.M. ON SEPTEMBER 2, 1994.

VIRGIL RHODES EXPRESSED HIS CONCERN ABOUT THE KEY SECURITY, AND STATES THAT THERE IS ONE SET OF KEYS WHICH ARE PASSED FROM FIRST TO SECOND & THIRD SHIFTS. THERE HAVE BEEN NUMEROUS INCIDENTS WHERE THE MASTER-KEY IS EITHER REPORTED LOST, BROKEN, OR MISSING; AND IT HAS BEEN REPLACED WITHOUT ANY INVESTIGATION. VIRGIL RHODES STATES THAT PATRONS OFTEN LEAVE ROOM KEYS IN THE ROOM WHEN THEY LEAVE, AND HOUSEKEEPING FAILS TO TURN THEM IN. ON ONE OCCASION, VIRGIL RHODES FOUND 15 - 17 KEYS ON VARIOUS CARTS WHICH HAD NOT BEEN TURNED INTO THE FRONT DESK. IF THE HOUSEKEEPING TAKES THE KEYS FROM A ROOM, THAT PERSON CAN USE THE KEY LATER. VIRGIL STATES THAT HE HAS REPORTED THE LACK OF KEY SECURITY NUMEROUS TIMES, BUT HIS REPORTS HAVE FALLEN ON DEAF EARS.

(A)(2) THIRD SHIFT HOUSEKEEPER, LAVERN WALKER'S STATEMENT [FOUND WITHIN THE PROSECUTORS' AND BLUE ASH POLICE DEPARTMENTS' FILES] WAS IMPORTANT TO MY DEFENSE AND SHOULD HAVE BEEN TURNED OVER TO MY LAWYERS:

ON SEPTEMBER 7, 1994, AT 2300 HRS, R/O INTERVIEWED LAVERN WALKER. SHE STATED THAT ON SATURDAY MORNING (09/03/94), BETWEEN 0600 AND 0630 HRS, SHE WAS STARTLED BY A WHITE MALE WHO SHE STATES WAS "SNEAKING" AROUND THE HALL BY THE POOL AREA OF THE HOTEL WHERE SHE WAS CLEANING WINDOWS. SHE STATES THAT THE SUSPECT HAD BEEN SEEN BY HER BETWEEN 0100 AND 0300 HRS WITH ART (THE MAINTENANCE MAN). SHE WAS AWARE THAT ART AND A PLUMBER WERE FIXING A LEAK IN ROOM #547, AND SHE ASSUMED THAT THE MAN WAS THE PLUMBER. SHE STATED THAT HIS ACTIONS AT 0600-0630 WERE VERY SUSPICIOUS, AND SHE BELIEVES HE SHOULD BE CHECKED OUT. R/O CONTACTED ART AT EMBASSY, WHO CONFIRMS HE ASSISTED THE PLUMBER WITH A LEAK IN ROOM #547. HE STATES THEY BEGAN WORK AT ABOUT 0100 HRS, AND AS FAR AS HE KNEW, THE PLUMBER LEFT THE HOTEL AT 0430 HRS. HE STATES THAT HE WOULD BE EXTREMELY SURPRISED TO FIND OUT THE PLUMBER WAS STILL THERE AT 0600 HRS. HE GAVE R/O THE INFORMATION ON THE PLUMBER, AND HE HAS BEEN ID'D AS MICHAEL G. McDOWELL (D-O-B 05/25/60; S-S-N 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; CTL #842030; PS #792-0681). (HE HAS DOMESTIC VIOLENCE HISTORY; DC's; NCR's; ASSAULT, AND PBS's. A MESSAGE WAS LEFT ON HIS ANSWERING MACHINE BY R/O.)

ART STATES THAT HE WAS PUT IN TOUCH WITH McDOWELL BY A PERSONAL FRIEND, WHICH WAS ANOTHER EMBASSY SUITE EMPLOYEE, NAMED MARK FLUGGS (WITH A CRIMINAL RECORD FOR DISCHARGING FIREARMS, FELONIOUS ASSAULT, AND FELONIOUS ASSAULT ON A POLICE OFFICER). THE INCIDENT WITH RESPECT TO M. G. McDOWELL WAS REVIEWED AS IT DIDN'T HAPPEN AND, LAVERN WALKER WAS "SEEING THINGS". THIS MAN WAS NEVER ASKED TO COME TO THE BLUE ASH POLICE DEPARTMENT, AND NEVER QUESTIONED, OR A SEARCH WARRANT ISSUED ON HIS HOME AND CAR, NOR HIS WIFE BROUGHT IN FOR QUESTIONING AS-WELL. INFACT, THIS INFORMATION OR MR. McDOWELL'S NAME IS <u>NOWHERE</u> MENTIONED IN THE RECORDS THAT HE WAS EVEN IN THE HOTEL WORKING THE NIGHT OF SEPTEMBER 2, 1994, OR IN THE MORNING OF SEPTEMBER 3, 1994.

(3)

(A)(3) SIXTY-EIGHT INCIDENTS TOOK PLACE WITHIN THE EMBASSY SUITES HOTEL FROM THE TIME THAT MR. JONES TOOK A LEAVE OF ABSENCE ON SEPTEMBER 5, 1994; AND WERE STILL GOING ON THE DAY THAT MR. JONES' TRIAL STARTED ON OCTOBER 12, 1996. EIGHTEEN OF THEM WERE THEFTS [OF MONEY AND JEWELRY] FROM GUESTS' ROOMS, FROM SEPTEMBER 6, 1994, UNTIL DECEMBER 30, 1994. TWO WERE ASSAULTS, THERE WERE AGGRAVATED BURGLARIES, PROSTITUTION, DRUG TRAFFICKING, AND ETC. MOST NOTABLY FOLLOWING THE SEPTEMBER 3, 1994 MURDER OF MS. NATHAN, A CRIMINAL ACTION TOOK PLACE ON DECEMBER 27, 1994 WHEN A GUEST REPORTED THAT SOMEONE ATTEMPTED TO GAIN ENTRANCE WITH A KEY INTO HER ROOM.

(B) NORMAN RYAN & DEMETRIUS WILLIAMS' STATEMENTS, AS-WELL AS DETECTIVE LADD'S "HAND WRITTEN NOTES" [FROM THE INTERVIEWS WITH THE TWO EMPLOYEES ON SEPTEMBER 3, 1994] WAS IMPORTANT TO MY DEFENSE, AND SHOULD HAVE BEEN TURNED OVER TO MY LAWYERS FOR THE FOLLOWING REASONS: DETECTIVE LADD WAS GIVEN CLEAR AND FULL DESCRIPTIONS OF A "DARK COMPLEXION GUY" AND A "WHITE GUY WITH GRAY HAIR" LEAVING MS. NATHAN'S ROOM; WHEREUPON SCREAMS WERE HEARD, SAID WITNESSES LOOKED UP, AND SAW A DARK COMPLEXION GUY AND A WHITE GUY LEAVING THE ROOM. ONE OF THE GUYS HAD A WALKIE-TALKIE IN HIS HAND THAT MORNING. THE PROSECUTION HAS SAID THAT THE MURDER WEAPON [INVOLVED IN THIS CASE] WAS A "WALKIE-TALKIE AND CASE". HERE WE HAVE INFORMATION GIVEN TO THE POLICE [IN A FULL DESCRIPTION] OF TWO GUYS LEAVING THE ROOM (ONE WITH A WALKIE-TALKIE), SURROUNDING THE TIME-LINE OF MS. NATHAN'S MURDER. THIS INFORMATION WAS IMPORTANT TO MY DEFENSE AND SHOULD HAVE BEEN TURNED OVER TO MY LAWYERS.

(B)(1) THE STATEMENTS OF NORMAN RYAN & DEMETRIUS WILLIAMS, AS-WELL AS THE HAND WRITTEN NOTES OF DETECTIVE LADD DEMONSTRATE THAT TWO INDIVIDUALS WERE OBSERVED [UPON THE SCREAM FROM THE VICTIM] LEAVING THE VICTIMS' ROOM: ONE GOING LEFT, AND ONE (CARRYING A WALKIE-TALKIE) GOING RIGHT.

HAD THESE STATEMENTS BEEN DISCLOSED, DEFENSE COUNSEL WOULD HAVE BEEN ABLE TO ATTACK THE MOST FUNDAMENTAL PORTIONS OF THE STATE'S CASE... E.G., THE ALLEGED MURDER WEAPON BEING A WALKIE-TALKIE, AND ALTERNATE SUSPECTS.

IN A RECENT DECISION BY THE DISTRICT COURT [JAMISON V. COLLINS, 100 F.SUPP.2d, 647, 698 (S.D.OHIO 200)] THE DISTRICT COURT RULED THAT THE SUPPRESSION [BY PROSECUTOR PIEPMEIRE] OF ALTERNATE SUSPECTS WAS A VIOLATION OF DUE PROCESS, AND REVERSED FOR A NEW TRIAL.

(C) UNCOVERED FROM THE FILES OF THE BLUE ASH POLICE AND PROSECUTIONS' FILES WERE DOCUMENTS SHOWING THAT MS. NATHAN HAD HEPATITIS B.

ACCORDING TO THIS DOCUMENT (I.D. #1229-81) AND ACCESSION (NO. H-377-94) FROM MICROBIOLOGY REFERENCE LABORATORY [DATED SEPTEMBER 8, 1994], IT IS CLEARLY SHOWN THAT MS. NATHAN TESTS POSITIVE FOR HEPATITIS B: THIS INFORMATION WAS ALSO LISTED ON DEATH RECORDS AND AUTOPSY REPORTS OF MS. NATHAN. THIS TEST RESULT COULD HAVE BEEN USED TO SHOW THAT MS. NATHAN SUFFERED FROM HEPATITIS B -- AN INFECTIOUS DISEASE. RELEVANT, AND MOST NOTABLY IMPORTANT IS THAT UPON CONTACT WITH HER ASSAILANT, THEY WOULD HAVE BEEN INFECTED BY WAY OF BLOOD AND BODILY FLUID TRANSFER. ONE OF THE MOST COMPELLING ASPECTS OF THE STATE'S CASE WAS THE TESTIMONY OF DR. McDONOUGH (A HAND SURGEON), WHO TESTIFIED THAT THE PRESENCE OF EIKENSILS CORRODENS IN MY LEFT INDEX FINGER INDICATED THAT THE INJURY OCCURRED AS A RESULT OF COMING INTO CONTACT WITH THE MOUTH OF THE VICTIM. MS. NATHAN WAS NEVER TESTED TO SEE IF SHE CARRIED EIKENALLA IN HER MOUTH. HAVING BEEN PROVIDED WITH SAID DOCUMENTS, JONES' LAWYERS WOULD HAVE

BEEN ABLE TO CHALLENGE DR. McDONOUGH'S TESTIMONY, THEREBY SHOWING THAT THERE'S NO EVIDENCE (WHATSOEVER) THAT THE VICTIM'S ORAL CAVITY CONTAINED THE EIKENALLA BACTERIUM. YET, THE TEST RESULTS WOULD HAVE CLEARLY SHOWN THAT MS. NATHAN HAD HEPATITIS B: MR. JONES DOES NOT HAVE HEPATITIS, AND THE POLICE AND PROSECUTORS WERE FULLY AWARE OF THAT (ACCORDING TO THIS SECOND SET OF TEST RESULTS FOUND WITHIN THE FILES DATED 09/15/94, I.D. NO. 252 "NEGATIVE FOR HEPATITIS B").

(C)(1) THE SUPPRESSION OF THE SCIENTIFIC TEST PERFORMED UPON MS. NATHAN [DEMONSTRATING SHE TESTED POSITIVE FOR HEPATITIS B] ALLOWED THE STATE'S INFERENCES PUT FORTH TO GO UNCHALLENGED, AND EFFECTIVELY DENIED MR. JONES AND HIS LAWYERS THE ABILITY TO INTRODUCE EXPERT TESTIMONY. MR. JONES DID NOT HAVE HEPATITIS B: THE PROSECUTION IN THIS CASE WAS FULLY AWARE OF THAT FACT AFTER HAVING MR. JONES' BLOOD TESTED, ACCORDING TO TEST RESULTS THEREIN SUPPRESSED.

(D) THE PROSECUTIONS' CLAIM THAT I MADE A NUMBER OF INCONSISTENT STATEMENTS AS TO MY WHEREABOUTS THE MORNING IN QUESTION ARE NOT SUBSTANTIATED BY OTHER EMPLOYEES WHO WERE AT WORK THAT MORNING.

THESE STATEMENTS FROM EMPLOYEES [FOUND WITHIN THE BLUE ASH POLICE DEPARTMENTS' AND PROSECUTORS' FILES, AND GIVEN IN A NUMBER OF INTERVIEWS TO PROSECUTOR MARK PIEPMEIRE, PROSECUTOR SETH TIEGER, SGT. SCHAFFER, SGT. LILLEY, OFFICER STOKES, OFFICER J. BOYATT AND OFFICER HARTINGER] SHOULD HAVE BEEN TURNED OVER TO MY LAWYERS. STATEMENTS (#37 - 76) CLEARLY SHOW THAT I WAS SEEN BY A NUMBER OF EMPLOYEES (DURING THE TIME-FRAME OF THE HOMICIDE ON THE FIRST FLOOR) IN THE COMP BREAKFAST AREA AND THE BREAK ROOM. WHEN READING EACH ONE OF THESE EMPLOYEE STATEMENTS WITHHELD BY THE PROSECUTION, A NUMBER OF INCONSISTENCIES ARE CLEARLY SHOWN, PUTTING ME IN TWO PLACES AT THE SAME TIME. ONE STATEMENT BY WILLIAMS EVEN PUT ME WITH AN EMPLOYEE NAMED TONYA MITCHELL BETWEEN 7:00 AND 7:30A.M., LEAVING OUT THE BACK KITCHEN DOOR. THIS EMPLOYEE, ACCORDING TO OFFICER J. BOYATTS INTERVIEW (ON 05/15/95) CLEARLY STATED SHE WAS NOT EVEN WORKING ON 09/03/94.

THESE STATEMENTS ALSO SHOW THAT THE POLICE AND PROSECUTORS HELPED EMPLOYEES CHANGE THEIR STATEMENTS, AND OVERLOOKED INCONSISTENCIES OR PREVIOUS STATEMENTS OF EMPLOYEES AS TO THEIR WHEREABOUTS AND WHAT THEY SAW: AS LONG AS THE EMPLOYEES WERE SAYING WHAT THEY "WANTED" THEM TO SAY.

**LEGAL AUTHORITY SUPPORTING THIS GROUND FOR RELIEF:**
U.S.CONST., AMENDS. V, VI, VIII, IX AND XIV; BRADY V. MARYLAND, 373 U.S. 83 (1963); KYLES V. WHITLEY, 514 U.S. 419 (1995); NAPUE V. ILLINOIS, 360 U.S. 264 (1959); GIGLIO V. UNITED STATES, 405 U.S. 150 (1972).

**LEGAL AUTHORITY SUPPORTING THIS GROUND FOR RELIEF:**
U.S.CONST., AMENDS. V, VI, VIII, IX AND XIV; OHIO CONST., ART. 1, §§ 1, 2, 5, 9, 10, 16 AND 20; BRADY V. MARYLAND, 373 U.S. 83 (1963); KYLES V. WHITLEY, 514 U.S. 419 (1995); NAPUE V. ILLINOIS, 360 U.S. 264 (1959); GIGLIO V. UNITED STATES, 405 U.S. 150 (1972); STRICKLAND V. WASHINGTON, 466 U.S. 688 (1984); KENTUCKY V. STINCER, 482 U.S. 730 (1987); DAVIS V. ALASKA, 415 U.S. 306 (1974); GROSECLOSE V. BELL, 130 F.3d 1161 (6th CIR. 1997); RICKMAN V. BELL, 131 F.3d 1150 (6th CIR. 1997); WORKMAN V. TATE, 957 F.2d 1339 (6th CIR. 1992); BLACKBURN V. FOLTZ, 828 F.2d 1177 (6th CIR. 1987); BANKS V. REYNOLDS, 54 F.3d 1508; JAMISON V. COLLINS, 100 F.SUPP.2d, 647, 698 (2000); AND UNITED STATES V. BAGLEY, 473 U.S. 667, 676 (1985).

--- FINAL CONCLUSION ---

NONE OF THIS INFORMATION WAS DISCLOSED TO MR. JONES, NOR TO HIS COUNSEL AT TIME OF TRIAL; WHICH IS THEREBY A DIRECT RESULT OF THE STATES FAILURE TO DISCLOSE [SOME OR ALL OF THIS] INFORMATION WITHIN THE SAID [PRO SE] SUPPLEMENTAL BRIEF

A REASONABLE JURIST COULD CONCLUDE THAT THE STATE'S FAILURE TO DISCLOSE [SOME OR ALL OF] THE AFOREMENTIONED INFORMATION -INFACT- HAD A MATERIAL AND ADVERSE AFFECT ON THE ABILITY OF MR. JONES' TRIAL COUNSEL TO CONDUCT AN APPROPRIATE INVESTIGATION FOR THE FACT-FINDING PHASE OF THE CASE; WHICH WOULD'VE [THEREBY] ENABLED COUNSEL TO EFFECTIVELY CROSS-EXAMINE THE STATE'S KEY WITNESSES AND ADEQUATELY PRESENT MR. JONES' DEFENSE (INCLUDING, MOST IMPORTANTLY, HIS CLAIM[S] OF INNOCENCE) TO THE JURY. SEE, BANKS V. REYNOLDS, 54 F.3d 1508.

THE INCONSISTENCIES EVIDENT IN THE EMPLOYEES UNDISCLOSED STATEMENTS TO THE POLICE [MADE DAYS AND WEEKS AFTER THE MURDER] ARE MOST GLARING AND UNDERSCORE THE EXTENT TO WHICH THE DEFENSE WAS HAMSTRUNG BY THE PROSECUTOR'S IMPROPER GAMESMANSHIP. THE INCONSISTENCIES ARE NOT ONLY MATERIAL, THEY ARE EXCULPATORY. FURTHERMORE, SUCH NONDISCLOSURE UNDERMINES THE CONFIDENCE IN THE VERDICT AGAINST MR. JONES, AND DENIED HIM AN AVENUE TO EFFICACIOUSLY ESTABLISH REASONABLE DOUBT.

IN EVALUATING THESE BRADY CLAIMS, IT IS IMPORTANT TO RECALL THAT THE STATE'S CASE AGAINST MR. JONES WAS ENTIRELY CIRCUMSTANTIAL: NO FORENSIC EVIDENCE LINKED MR. JONES TO THE MURDER OF MS. RHONDA NATHAN; AND DESPITE THE GRUESOME & VIOLENT NATURE OF THE CRIME, NO-ONE SAW MR. JONES HAVE ANY CONTACT WITH THE VICTIM -- NOR DID ANYONE SEE HIM ENTER OR LEAVE THE VICTIMS ROOM. CO-WORKERS WHO OBSERVED MR. JONES AFTER THE MURDER SAW NO EVIDENCE OF BLOOD ON HIS CLOTHING, NOR ANY SIGN OF PARTICIPATION IN A STRUGGLE [TR. 1038-1044; 1064-1082; 1448-1454]. MR. JONES WAS INTERVIEWED BY POLICE AS PART OF THE GENERAL INVESTIGATION, AND NO SIGN OF BLOOD OR STRUGGLE WAS OBSERVED BY DETECTIVE LADD ON SEPTEMBER 3, 1994 [TR. 1468-1472].

THUS, THE STATE'S CASE RELIED EXCLUSIVELY ON PIECING TOGETHER BITS OF CIRCUMSTANTIAL EVIDENCE PREJUDICIALLY GATHERED FOR THE SOLE PURPOSE OF ATTEMPTING TO CREATE PROOF BEYOND A REASONABLE DOUBT THAT MR. JONES WAS THE KILLER. HOWEVER, BY DEPRIVING MR. JONES OF SEVERAL MEANINGFUL OPPORTUNITIES TO EFFECTIVELY CHALLENGE THE STATE'S [SAID] PROOF AND OTHERWISE UNDERMINE THE CREDIBILITY & VERACITY OF THE STATE'S WITNESSES (AS THE STATE SO DID BY FAILING TO DISCLOSE MATERIAL & EXCULPATORY INFORMATION), THE STATE DENIED MR. JONES HIS RIGHT TO A FAIR TRIAL, AND THEREBY OBTAINED A TAINTED VERDICT UNWORTHY OF CONFIDENCE. CERTAINLY A REASONABLE JURIST COULD SO CONCLUDE THE MATERIALITY HEREIN STATED, THUS ENTITLING MR. JONES TO A HEARING ON HIS BRADY CLAIMS (SEE, BANKS, 54 F.3d 1508, AND KYLES V. WHITLEY, 514 U.S. 419 [1995]). PETITIONER-JONES RECOGNIZES THAT, "MATERIALITY REVIEW DOES NOT INCLUDE SPECULATION..." SUCH REVIEW DOES, HOWEVER, "RECOGNIZE THAT EVIDENCE IN THE HANDS OF A COMPETENT DEFENSE ATTORNEY MAY BE USED TO UNCOVER OTHER LEADS AND DEFENSE THEORIES." (SEE, BOWEN, 799 F.2d at 612) THUS, THE COURT MAY DRAW REASONABLE INFERENCES AS TO WHAT THESE OTHER LINES OF DEFENSE MAY HAVE BEEN.

RESPECTFULLY SUBMITTED,

*[signature: Elwood H. Jones Jr.]*

CERTIFICATE OF SERVICE

A COPY OF THE FOREGOING PRO SE SUPPLEMENTAL BRIEF WAS SENT BY REGULAR U.S. MAIL TO: GREGORY W. MEYERS; JAMES D. OWEN; AND ATTORNEY GENERAL HEATHER GOSSELIN, ON JULY 22, 2004.

*[signature]*

ELWOOD H. JONES JR.

(7)