

MR. ELWOOD H. JONES JR.
A339-441  D-5-27
378 COITSVILLE-HUBBARD RD.
YOUNGSTOWN, OH 44505-4635

MR. GARY W. CRIM
-ATTORNEY AT LAW-
943 MANHATTEN AVE.
DAYTON, OH 45406-5141

NOVEMBER 1, 2006

MR. MICHAEL L. MONTA
-ATTORNEY AT LAW-
3625 OLD SALEM ROAD
DAYTON, OH 45415-1427

DEAR MR. CRIM, MR. MONTA:

FIRST LET ME EXPRESS, I RECEIVED YOUR LETTER OF OCTOBER18, 2006, ON OCTOBER 24, 2006, ALONG WITH A COPY OF THE FOLLOWING MATERIAL:

   A COPY OF THE STATE'S REPLY TO THE TRAVERSE PETITION, DOCUMENT NO. #82, FILE 10/3/2006;

   A COPY OF THE MOTION FOR EVIDENTIARY HEARING, DOCUMENT NO. #85, FILED 10/16/2006.

NOW I AM JUST RECUPERATING FROM BEING UNDER THE WEATHER WITH A REAL BAD HEAD COLD OR A TOUCH OF THE FLU, SO PLEASE BEAR WITH ME IF MY WORDS SEEM DISCOMBOBULATED IN THIS LETTER IN ANY MANNER AS I SPEAK ON THE FOLLOWING MATTERS ABOVE RELATING TO #1, STATE'S REPLY TO THE TRAVERSE PETITION AND #2, THE MOTION FOR EVIDENTIARY HEARING.

THE NEXT LINE OF BUSINESS I WANT TO DISCUSS IN THIS LETTER WITH THE BOTH OF YOU CONCERNING MY LETTER OF SEPTEMBER 29, 2006. THAT READS IN PART: MR. CRIM, MR. MONTA, IF IN GOOD CONSCIENCE, EITHER ONE OR BOTH OF YOU CANNOT SIGN ON TO THE PRO-SE MOTION IN QUESTION, REPRESENTING MY BEST INTEREST IN APPEAL AND ABIDE BY MY WISHES, I WOULD ASK YOU NOTIFY THE COURT OF THE MATTER AND RECUSE YOURSELF FROM THIS CASE NO LATER THAN OCTOBER 6, 2006.

SINCE YOUR LETTER OF OCTOBER 18, 2006, DOES NOT MENTION OR ADDRESS THE MATTER AT ALL WITH RESPECT TO EITHER ONE OR BOTH OF YOU RECUSE YOURSELF FROM THIS CASE NO LATER THAN OCTOBER 6,2006,....WOULD IT BE FAIR FOR ME TO SAY UPON NOTICING THAT BOTH OF YOU WENT AHEAD AND SUBMITTED A MOTION FOR EVIDENTIARY HEARING IN MY CASE AFTER OCTOBER 6, 2006, THE DATE I ASKED YOU TO RECUSE YOURSELVES IF YOU COULDN'T REPRESENT MY BEST INTEREST ON APPEAL AND ABIDE BY MY WISHES THAT:

   1. THAT THE **BOTH** OF **YOU** ARE WILLING TO **FOCUS** ON AND **ESTABLISH** AND **ABSOLUTE CLEAR RECORD ON CLARITY** BEFORE THE **COURT** ADDRESSING **CONCEIVABLE CLAIMS** IN THE COURT **GRANTED** ME AN **EVIDENTIARY HEARING** FOR AN EXAMPLE OF WHAT I

AM SPEAKING ABOUT. "THE HAMILTON COUNTY PROSECUTOR'S OFFICE'S ACTIONS THWARTING MR. JONES' ATTEMPTS TO ORGANIZE A COHERENT-DEFENSE AND CAUSED MR. JONES AND COUNSEL MR. JULIUS F. SANKS AND MS. CATHERINE ADAMS, TO PREPARE MR. JONES' DEFENSE **BEHIND A VEIL OF IGNORANCE** UPON ANALYZING THE WITHHELD EXCULPATORY AND IMPEACHABLE EVIDENCE FOUND WITHIN THE HAMILTON COUNTY PROSECUTOR'S FILES THAT CLEARLY PRESENT A SIGNIFICANT CHALLENGE TO THE PROSECUTION'S THEORY ON FIVE (5) DIFFERENT LEVELS. FOLLOWING **DEPOSITIONS** OF HAMILTON COUNTY PROSECUTORS, **MARK PIEPMEIR,** FEBRUARY 1, 2006, AND **SETH TIEGER,** FEBRUARY1, 2006, AND DEFENSE ATTORNEYS **JULIUS F. SANKS,** MARCH 7, 2006 and **CATHERINE ADAMS,** MARCH 14, 2006, GRANTED BY THIS COURT?"

2, MR. CRIM, MR. MONTA, IF NOT, MY DECISION I SPOKE OF IN MY LETTER OF SEPTEMBER 29, 2006, STILL REMAINS THE SAME. SO MAKE NO MISTAKE IF I AM FORCED TO REPRESENT MYSELF ON THE REMAINING PORTIONS OF MY FEDERAL APPEAL. I AM WILLING TO DO SO SINCE THIS IS MY LIFE AT STAKE.

MR. CRIM, MR. MONTA, I HAVE A FEW REQUESTS I WOULD LIKE TO MAKE IN PREPARING FOR THE SAID EVIDENTIARY HEARING:

    A. I AM REQUESTING YOU CONTACT MR. DALE DORING THE PRIVATE INVESTIGATOR ASSIGNED TO THIS CASE BY THE FEDERAL DISTRICT COURT. HAVE HIM VISIT THE HAMILTON COUNTY CORONER'S LAB AND RE-INTERVIEW TECHNICIANS BILL DEAN, MIKE TRIMPE, AND JOAN DAWSON BURKE, CONCERNING THE TEST RESULTS #ID. NO 252 ON SEPTEMBER 15, 94, ELWOOD JONES JR. GAVE BLOOD AND IT WAS SENT TO "MICROBIOLOGY REFERENCE LAB" 3645 CENTRAL PARKWAY, CINCINNATI, OHIO 45223 - TO BE TESTED FOR HEPATITIS "B". THE TEST RESULTS UNDER ID. NO: 252 FOR ELWOOD H. JONES JR. CAME BACK "NEGATIVE" FOR HEPATITIS "B". THE QUESTION SHOULD BE ...WHO ORDERED THIS TEST DONE? AND WAS A COPY OF THE TEST RESULTS TURNED OVER AS A PART OF THE CORONER AND CASE FILES INTO THE INVESTIGATION OF THE MURDER OF MS. NATHAN TO THE HAMILTON COUNTY PROSECUTOR'S OFFICE?

    B. HAVE MR. DORING GO BACK AND RE-INTERVIEW POTENTIAL WITNESSES AND GET **AFFIDAVITS** TO SUPPORT MY CLAIMS OF DETECTIVE JOHN LADD OF THE BLUE ASK POLICE DEPARTMENT AS TO WHAT HE DID WITH THE INFORMATION GENERATED FROM INTERVIEWING DEMETRIUE WILLIAMS AND NORMAN RYAN DESCRIBING A "DARK COMPLEXION BLACK GUY" AND A "WHITE GUY WITH GRAY HAIR," LEAVING MS. NATHAN'S ROOM, WHERE UPON SCREAMS WERE HEARD, <u>ONE OF THE GUYS HAD A WALKIE-TALKIE IN HIS HAND THAT MORNING LEAVING MS. NATHAN'S ROOM</u>, AND DID HE SHARE THIS INFORMATION WITH THE HAMILTON COUNTY PROSECUTOR'S OFFICE AS A PART OF HIS "CASE FILES" DURING THE INVESTIGATION OF THE MURDER OF MS. NATHAN THAT OCCURRED ON 9/3/1994, BETWEEN 7:30 A.M. AND 8:00 A.M. AT THE EMBASSY SUITES HOTEL.

    C. I AM REQUESTING THAT YOU HAVE MR. DORING ALSO GET AN **AFFIDAVIT** FROM **MR. L. STRIGARI** AND **MR. J. DETERMAN** CONCERNING THEIR MEETING WITH **TWO FORMER BLUE ASK OFFICERS, DAVE HOFFMAN** AND **JOE SCHURE,** CONTACT MR. JOSEPH L. DETERMAN CHIEF INVESTIGATOR FOR THE HAMILTON COUNTY PUBLIC DEFENDER'S OFFICE AND TOLD HIM THEY HAVE SOME INFORMATION CONCERNING ELWOOD H. JONES JR.'S CASE MAYBE HELPFUL AND A MEETING WAS SET UP FOR THE FORMER BLUE ASH OFFICERS TO COME INTO THE OFFICE ON JUNE 14, 2001 THE FORMER BLUE ASH OFFICERS DAVE HOFFMAN AND JOE SCHURE STATED TO MR. STRIGARI AND MR. DETERMAN WHILE IN THE LOCKER ROOM CHANGING CLOTHS. A CONVERSATION AROSE FROM ANOTHER OFFICER "CONCERNING THE SEARCH AND FINDING OF THE PENDANT," STATING OFFICER STOKES SEARCHED JONES' CAR <u>PRIOR TO GETTING THE SEARCH WARRANT.</u> HE FOUND THE PENDANT AND THEN DRAFTED THE SEARCH WARRANT. AFTER BACKING AWAY FROM FINDING THE <u>PENDANT</u> FOR ANOTHER

OFFICER TO FIND.

NOW IF THE ABOVE AFFIDAVITS CANNOT BE DONE FOR SOME REASON OR ANOTHER, THEN I AM REQUESTING THAT THE **FOLLOWING PEOPLE NAMED** BE **ADDED** TO THE LIST OF **WITNESSES** TO APPEAR BEFORE THE **COURT** ON MY BEHALF ARE **THEO-SATELLITE T.V.: #1, MR. LOUIS STRIGARI, #2, MR. JOSEPH R. DETERMAN, #3, DAVE HOFFMAN** AND **#4, JOE SCHURE.**

AFTER THE STATE'S REPLY TO THE SAID TRAVERSE PETITION, THERE ARE A FEW AREAS I FEEL NEED TO BE RE-DRESSED WITH CLARITY AND THE FOLLOWING QUESTIONS SHOULD BE ASKED OF MY TRIAL ATTORNEYS, MR. SANKS ND MS. ADAMS, IF WE ARE GRANTED THE EVIDENTIARY HEARING, AND OF HAMILTON COUNTY PROSECUTOR MARK PIEPMEIR AND SETH TIEGER:

    1. MR. SANKS AND MS. ADAMS, WERE YOU EVER GIVEN OR SHOWN SEVERAL FAMILY **PHOTOS** OF MS. NATHAN WEARING THE ALLEGED STOLEN PENDANT SUPPOSEDLY FOUND IN THE TOOLBOX IN THE TRUNK OF MR. JONES' CAR BY BLUE ASH OFFICER BRAYS? FROM HAMILTON COUNTY PROSECUTORS PIEPMEIR OR TIEGER?

    2. MR. SANKS AND MS. ADAMS, CAN YOU EXPLAIN TO THIS COURT THE REASON PROSECUTOR PIEPMEIR GAVE FOR THE CONFLICTING DESCRIPTIONS OF THE PENDANT IN THE AFFIDAVIT OF THE SEARCH WARRANT AS A **TYPO ERROR** ONLY BY THE **OFFICERS**?

PROSECUTOR MARK PIEPMEIR, ON SEPTEMBER 15, 1994, AN INTERVIEW WAS CONDUCTED WITH THE SON AND DAUGHTER-IN-LAW (I.E. VAL AND ELKE) OF THE VICTIM (MS. NATHAN); TO WHICH THEY BOTH DESCRIBED MS. NATHAN'S NECKLACE AS BEING SILVER-IN-COLOR, WITH THREE (3) DIAMONDS. IN FACT, THE SON STATED THAT HE WAS ALMOST CERTAIN THAT IT WAS NOT GOLD. QUESTIONS:

    1. GIVEN THE PARTICULAR/SPECIFIC DESCRIPTION(S) OBTAINED AND REQUIRED AS A PREREQUISITE FOR THE SEARCH WARRANT, WHICH WAS SUBSEQUENTLY CONSISTENT WITH THE PARTICULAR DESCRIPTION GIVEN BY THE SON AND DAUGHTER-IN-LAW -- HOW WERE THOSE CONSISTENT DESCRIPTIONS SUMMARILY VOIDED AND SUBSEQUENTLY SUBSTITUTED FOR THE GOLD PENDANT THAT IS/WAS ABSOLUTELY INCONSISTENT WITH THOSE CONSISTENT DESCRIPTIONS GIVEN PRIOR TO SEEING THE GOLD PENDANT?

    2. MOREOVER, GIVEN THE SON'S ABILITY TO LOOK-OVER, REVIEW AND/OR DISCERN AND IDENTIFY HIS MOTHER'S PENDANT FROM FAMILY PHOTOS OF HIS MOTHER WEARING HER PENDANT: WHY WEREN'T THOSE PARTICULAR **PHOTOS** TURNED OVER TO **MR. JONES' DEFENSE** SO THAT THEY COULD OTHERWISE VERIFY AND/OR ENLARGE SAID PHOTO FOR THEMSELVES TO LOOK-OVER, REVIEW AND COMPARE THE PENDANT THAT MS. NATHAN WAS ACTUALLY WEARING IN THOSE FAMILY **PHOTOS**, TO THE ALLEGED GOLD PENDENT?

PER THE VERY SAME SEPTEMBER 15, 1994 INTERVIEW CONDUCTED WITH THE VICTIM'S SON AND DAUGHTER-IN-LAW, CLARIFICATION WAS ESTABLISHED THROUGH A PHONE CALL TO IRA NATHAN (I.E., VAL NATHAN'S UNCLE) DURING THE OFFICERS VISIT, THAT MS. NATHAN'S PENDANT WAS NOT CUSTOM-CRAFTED FROM HIS MOTHER'S ENGAGEMENT RING AS WAS THOUGHT -- AS HE WAS IN POSSESSION OF THAT VERY RING. QUESTIONS:

    1. GIVEN THE **AFOREMENTIONED** INFORMATION, ON WHAT SET OF FACTS DID YOU CONTINUE TO PRESENT AND ARGUE TO THE JURY THAT MS. NATHAN'S PENDANT WAS **CUSTOM-CRAFTED** --- DESPITE "UNCLE IRA'S" **CONFIRMATION** OVER THE PHONE THAT, **HE IN-FACT HAS HIS MOTHER'S ENGAGEMENT RING** THAT THEY (I.E., MS. NATHAN'S SON AND/OR DAUGHTER-IN-LAW) MISTAKENLY THOUGHT MS. NATHAN'S PENDANT WAS SUPPOSEDLY

CUSTOM-CRAFTED FROM?

   2. AND WHAT ABOUT THE AFOREMENTIONED INFORMATION DID YOU OSTENSIBLY CONCLUDE WAS IMMATERIAL AND THUS NOT WORTHY AND/OR NECESSARY TO TURN OVER TO MR. JONES UNDER THE RULES OF DISCOVERY?

PROSECUTOR PIEPMEIR, MS. NATHAN WAS ACCOMPANIED BY TWO PEOPLE AT THE EMBASSY SUITES HOTEL, TO WHICH SHE SHARED A ROOM WITH, ROOM NO. 237. QUESTION:

   1. PLEASE STATE FOR THE RECORD THE NAMES OF THESE TWO PEOPLE; AND SPECIFICALLY, WHAT THEIR RESPECTIVE RELATIONSHIPS WERE TO MS. NATHAN (I.E. FRIENDS).

AFFIRMED ON SEPTEMBER 8, 1994, MS. ELAINE SHUB'S CONFIRMATION "THAT THE NECKLACE THAT THE VICTIM HAD BEEN WEARING AND WAS NOW MISSING HAD THREE (3) DIAMONDS." QUESTIONS:

   1. IN COMPARISON TO THE PARTICULARILY (OF 3 DIAMONDS) DESCRIBED IN THE SEARCH OBVIOUSLY BE FAIR AND ACCURATE TO MAKE THE DETERMINATION THAT THOSE DESCRIPTIONS ARE CONSISTENT WITH EACH OTHER, CORRECT?

   2. DID MS. ELAINE SHUB OR MR. JOSEPH KAPLAN PROVIDE ANY DESCRIPTIONS OF MS. NATHAN'S PENDANT PRIOR TO THE SEPTEMBER 15, 1994, SEARCH WARRANT, OTHER THAN THE CONFIRMATION OF THREE (3) DIAMONDS ON THE 8TH TO DETECTIVE LADD?

AS LEAD PROSECUTOR, PLEASE STATE FOR THE RECORD OFFICER MICHAEL BRAY'S ASSIGNMENTS OF RESPONSIBILITY, RELATIVE TO THE SECURITY, DISSEMINATION AND/OR DEVELOPMENT OF ANY AND ALL EVIDENCE UTILIZED (OR NOT) IN THE PROSECUTION OF MR. JONES IN THIS CASE.

IN A LETTER TO YOU, FROM OFFICER MICHAEL BRAY, HE COMMUNICATED SOME INFORMATION TO YOU CONCERNING THE ALTERATION AND/OR **MANIPULATION** OF PHOTOS OF MS. NATHAN BEING DEPICTED WEARING THE ALLEGED GOLD PENDANT. QUESTIONS:

   1. FIRST AND FOREMOST: WHERE THE FAMILY PHOTOS OF MS. NATHAN WEARING HER PENDANT, WITHOUT YET HAVING BEEN ENLARGED, ENABLED THE SON TO LOOK-OVER AND/OF REVIEW AND COMPARE HIS MOTHER'S PENDANT (I.E. FROM THE FAMILY PHOTOS) TO THE ALLEGED GOLD PENDANT -- WHAT EXACTLY WAS THE NECESSITY OF MANUFACTURING A PICTURE OVERLAYING THE ALLEGED GOLD PENDANT ON MS. NATHAN?

   2. MOREOVER, HAVING THEN ENLARGED PHOTO OF THE ALLEGED GOLD PENDANT THAT WAS THEN OVERLAID ON MS. NATHAN'S PHOTO (SO AS TO OSTENSIVELY DEPICT MS. NATHAN WEARING THE ALLEGED GOLD PENDANT) -- WHY WEREN'T THE PHOTOS SIMPLY PRESENTED TO THE JURY AS SUCH (I.E., WITHOUT THE OVERLAY), SO THAT THE JURY (BEING THE TRIER OF FACT) COULD OTHERWISE LOOK-OVER, DISCERN AND/OR IDENTIFY FOR THEMSELVES WHETHER OR NOT THE ALLEGED GOLD PENDANT INFACT WAS THE SAME PENDANT THAT MS. NATHAN WAS WEARING IN THE FAMILY PHOTOS DEPICTING HER WEARING HER [ACTUAL] PENDANT (WHICH WAS CONSISTENTLY DESCRIBED AS BEING SILVER-IN-COLOR, UNTIL THE ALLEGED GOLD PENDANT WAS PRODUCED)?

   3. WHY DID YOU PRESENT AN ALTERED AND **MANIPULATED PICTURE** TO THE JURY OF THE ALLEGED GOLD PENDANT OVERLAID ON MS. NATHAN -- AS IF IT WEREN'T AN ALTERED PICTURE, BUT RATHER AN AUTHENTIC ENLARGEMENT?

4. PER OFFICER MICHAEL BRAY'S COMMUNICATION WITH YOU CONCERNING THE WORK DONE WITH THE PHOTOS OF MS. NATHAN, ETC. -- **DID YOU CLARIFY WITH THE COURT THE ALTERATION OF THE PHOTOS,** AS OFFICER BRAY INFORMED YOU TO? AND IF **SO, WHY WASN'T MR. JONES' DEFENSE NOTIFIED?**

NEXT I SEE HOW THE ATTORNEY GENERAL IS TRYING TO CONFUSE THE ISSUE CONCERNING #1, INDIVIDUALS WERE OBSERVED TRYING TO GAIN ENTRANCE INTO GUEST ROOMS WITH A KEY DURING THE TIME-LINE THAT MS. NATHAN ARRIVED AS THE HOTEL ON SEPTEMBER 2, 1994, AND THROUGHOUT THE NIGHT INTO THE TIME-LINE THE BODY OF MS. NATHAN WAS FOUND ON THE FLOOR OF HER HOTEL ROOM, 237, AT 8:00 A.M., SEPTEMBER 3, 1994 WITH THE REPORT CONCERNING THE TRANSIENT MAN STANDING OUTSIDE THE HOTEL OPENING THE LOBBY DOOR FOR HOTEL GUESTS AND ANOTHER INCIDENT SUPPOSEDLY INVOLVED HOTEL WORKERS NOT ADEQUATELY IDENTIFYING THEMSELVES BEFORE ATTEMPTING TO ENTER A ROOM.

**NOW WHAT** I NEED FOR YOU AND MR. MONTA TO DO FOR ME IF I AM GRANTED THIS HEARING IS TO CLEARLY DEMONSTRATE A PATTERN THAT THE BLUE ASH POLICE DEPARTMENT WERE GIVEN NUMBER OF LEADS DEALING WITH "SUSPECTS" AND ALTERNATE SUSPECTS IN THE HOMICIDE OF MS. NATHAN IN ROOM 237 OF THE EMBASSY SUITES HOTEL ON SEPTEMBER 3, 1994, AND **NEVER** LOOKED INTO THE LEADS.

A. INFORMATION CLEARLY SHOWS THE SUSPICIOUS INDIVIDUALS TRYING TO GET INTO GUEST ROOMS **DOES NOT FIT THE DESCRIPTION OF MR. JONES;**

INFORMATION CLEARLY DOES NOT SAY SUSPICIOUS INDIVIDUALS OBSERVED BY GUESTS TRYING TO GET INTO THEIR ROOMS WITH A KEY WAS AN **EMBASSY SUITES EMPLOYEE.** NOT DOES THE INFORMATION REFER TO AS OBSERVED BY GUESTS SEEING SUSPICIOUS INDIVIDUALS AS ONE OF EMBASSY SUITE HOTEL EMPLOYEES.

B. THIS INFORMATION CLEARLY DEMONSTRATES TWO GUESTS STAYING ON THE SAME FLOOR WITH MS. NATHAN REPORTED INDIVIDUALS WERE TRYING TO GET INTO THEIR ROOM.

NO. 1, SIDNEY GITTELMAN, HOTEL ROOM #203, BATES STAMPED 1177-78, READS AS FOLLOWS;

SIDNEY GITTELMAN
BETWEEN 1 AM AND 2 AM SATURDAY MORNING SEPT 3 THE PHONE RANG --UPON ANSWERING THE INDIVIDUAL HUNG UP

ON FRIDAY AFTERNOON BETWEEN 3:30 PM 4PM (SEPT 2) I OBSERVED TWO MEN TRYING MY DOOR KNOW -- THE OBSERVATION WAS THROUGH A CURTAIN -- SO I COULD NOT SEE THEM CLEARLY -- I COULD NOT TELL IF THEY WERE BLACK OR WHITE -- BUT THEY WERE BOTH TALL, I AM 5'10" THEY WERE AT LEST 6' OR MORE.

NO. 2, SHANNON PARIS, HOTEL ROOM #202 BATES STAMPED 1159, READS AS FOLLOWS:

SHANNON PARIS
2. AN AFRICAN AMERICAN MALE WAS AT MY DOOR SAT AFTERNOON HE ASKED ME IF THERE WAS A SHOWER DOOR JAM IN MY ROOM.

4. THIS MAN WAS TRYING MY KNOB WITH KEYS -- I HAD THE 2 EXTRA LOCKS ON THE DOOR -- OTHERWISE I BELIEVE HE WOULD HAVE GOTTEN IN. HE KNOCKED BRIEFLY AND SOON AFTER WAS TRYING TO OPEN THE DOOR. I HAD YELLED MY HUSBAND'S NAME 2-3 TIMES & HE DIDN'T RELPY -- NOR DID HE IDENTIFY HIMSELF AS

MAINTINENCE.

NO. 3 MR. THOMAS CRATIN, HOTEL ROOM #107 BATES STAMPED 1169, STATED THAT BETWEEN 3 A.M. THROUGH 4 A.M. ON SATURDAY MORNING SEPTEMBER 3, 1994 SOMEONE ATTEMPTED TO ENTER HIS ROOM.

(IN FACT MATERIALS UNCOVERED FROM THE PROSECUTOR'S FILES SHOW SUSPICIOUS INDIVIDUALS WERE OBSERVED TRYING TO GET INTO GUEST ROOMS ON ALL FLOORS THROUGHOUT THE NIGHT -- INTO THE TIME-LINE THE BODY OF MS. NATHAN WAS FOUND ON HER FLOOR IN HER HOTEL ROOM.) AND ACCORDING TO MS. SHANNON PARIS' QUESTIONNAIRE, AN AFRICAN-AMERICAN MALE WAS TRYING TO OPEN THE DOOR TO HER ROOM SATURDAY AFTERNOON WHILE BLUE ASH POLICE OFFICERS WERE CONDUCTING THEIR INVESTIGATING THE HOMICIDE OF MS. NATHAN, SEPTEMBER 3, 1994.

NO. 4, ACCORDING TO DOCUMENTS UNCOVERED AND WITH-HELD, SHOW THE POLICE NEVER **INTERVIEWED THE DOCTOR**, OR THE FEMALE NURSES RUSHED TO MS. NATHAN'S SIDE AND RENDERED EMERGENCY MEDICAL TREATMENT, THE MORNING OF SEPTEMBER 3, 1994 --- "BUT" INSTEAD, THE RECORD SHOWS, BLUE ASH POLICE DEPARTMENT --- SENT A QUESTIONNAIRE OUT TO THE DOCTOR, AND ONE OF THE NURSES, 25 DAYS LATER ASKING QUESTIONS AS TO WHAT THEY SAW AND HEARD THAT MORNING.

"FOR AN EXAMPLE, **ONE OF THE GUESTS NAMED LINDA MOTUSHAMI REPLIED TO THE QUESTIONNAIRE ASKING — "WHY DIDN'T YOUR POLICE FORCE INTERVIEW THE HOTEL GUEST RIGHT AWAY WHEN PEOPLE'S MEMORIES OF THE DAY'S EVENTS WERE CERTAINLY FRESHER THAN ONE (1) MONTH LATER."**

MR. CRIM, MR. MONTA, AT THIS TIME I AM REQUESTING THAT THE BOTH OF YOU FOCUS ON PRESENTING A TWO-PART BRADY CLAIM WITH RESPECT TO THE ABOVE SECTIONS #A, #B, AND *B-1, 2, 3, 4, DEMONSTRATING IF GRANTED THE SAID HEARING:

    A. THE STATE'S MISCONDUCT IN WITHHOLDING EXCULPATORY MATERIALS DEPRIVED ME OF THE RIGHT TO CONFRONT THE CASE AGAINST ME;

    B. HAMILTON COUNTY PROSECUTORS PIEPMEIR AND TIEGER [SOLICITED FALSE TESTIMONY BY PROFFERED TESTIMONY OF BLUE ASH POLICE OFFICERS AND SGT. LILLEY]. IN THE FASHION OF [UN]SUBSTANTIATED INVESTIGATORY WORK WHICH PREJUDICIALLY INFERRED THAT, THEY CONDUCTED THEIR INVESTIGATION SO THOROUGHLY ON SEPTEMBER 3, 1994, INTERVIEWING GUESTS WHO STAYED IN THE HOTEL THAT DAY IN QUESTION. B-4, CLEARLY SHOW GUESTS WERE NOT INTERVIEWED THE MORNING OF SEPTEMBER 3, 1994, OR THAT AFTERNOON OF SEPTEMBER 3, 1994. THAT THE PROSECUTION DELIBERATELY MISREPRESENTED THE TRUTH IN THIS CASE AND VIOLATED MY DUE PROCESS RIGHT TO A FAIR TRIAL.

NOW I BELIEVE THE ATTORNEY GENERAL IN THIS CASE HELP MY ARGUMENT IN THEIR REPLY TO THE TRAVERSE ON PAGE 13 and 14, STATING PROSECUTORS FILES SHOW DEMETRIUS WILLIAMS WAS INTERVIEWED BY AUTHORITIES ON 5/13/95 (ABOUT 8 MONTHS AFTER THE FACT) SPECIFICALLY AS TO WHAT HE SAW THAT MORNING OF SEPTEMBER 3, 1994, AND WHEN AND WHERE HE SAW ME. SEE BATES STAMPED INTERVIEW 0000729. SEE NARRATIVE OF DEMETRIUS WILLIAMS ON 5/13/1995:

DEMETRIUS MADE THE FOLLOWING OBSERVATIONS:

    1) **ABOUT 0630 HRS. DEMETRIUS SAW JONES MOVING CHAIRS FROM THE AREA OF**

THE "BOARDROOM" NEAR THE NW SIDE OF THE BUILDING, TOWARD THE AREA FROM OF THE DINING ROOM. HE WAS MOVING THEM ON A SMALL 2 WHEEL CART.

    2) APPROX. 0700 HRS. BUTCH HELPED OUT IN COMP. BREAKFAST FOR ABOUT 5 MIN. - NO LONGER.

    3) BETWEEN 0700-0730HRS. DEMETRIUS SAW BUTCH AND MRS. METCALFS DAUGHTER, TONYA MITCHELL PARTING COMPANY IN THE KITCHEN. BUTCH WAS READY TO LEAVE OUT THE BACK KITCHEN DOOR (WHICH LEADS TO THE LONG HALL ON THE N. SIDE OF THE BUILDING) AND HE DID LEAVE.

** DEMETRIUS DOSE NOT KNOW WHY BUTCH WOULD SAY HE WAS IN COMP. BREAKFAST WHEN HE WASN'T. FROM THIS POINT ON DEMETRIUS DID'T SEE BUTCH ANY MORE UNTIL THEY WERE TOGETHER ON THE 2ND FLOOR. HE NOTED BUTCH HAD ONLY HIS KEYS AND RADIO WITH HIM AND THAT BUTCH ALWAYS WORE A LOT OF COLOGNE....TO THE POINT THAT YOU COULD SMELL THE TRAIL HE LEFT BEHIND. DEMETRIUS WAS NEVER AWARE THAT BUTCH HAD INJURED HIS HAND IN ANY WAY.

    A. NO WHERE IN THE SAID STATEMENT OF DEMETRIUS WILLIAMS ON 5/13/95, WHILE BLUE ASH OFFICER HARTINGER WAS CONDUCTING THE INTERVIEW OF A POTENTIAL WITNESSES IN A MURDER CASE.

    1. DID OFFICER HARTINGER PRESENTED TO D. WILLIAMS OR MENTION ANY PRIOR STATEMENTS THAT HE MADE TO THE POLICE, WHEREIN HE STATED THE ACCURACY OR INACCURACY OF HIS STATEMENTS BEFORE 5/13/95;

    2. THE ATTORNEY GENERAL'S ARGUMENT IN THEIR REPLY TO THE TRAVERSE IS SIMPLE ANY PRIOR STATEMENTS THAT MR. D. WILLIAMS GAVE THE POLICE SUCH AS MR. D. WILLIAMS STATEMENT TO DET. JOHN LADD ON SEPTEMBER 3, 1994, IS VOID REGARDING GIVEN THE FACT IT WAS THE DAY OF THE MURDER -- WHEN HIS MEMORY WAS THE FRESHEST.

NARRATIVE OF DEMETRIUS WILLIAMS' STATEMENT ON SEPTEMBER 3, 1994 AND THE NOTES OF DET. LADD FROM THE INTERVIEWS DEMETRIUS WILLIAMS GAVE A FULL DESCRIPTION OF A "DARK COMPLEXION BLACK MAN AND A WHITE GUY WITH GREY HAIR LEAVING MS. NATHAN'S ROOM -- UPON WHICH TIME THEY HEARD THE SCREAMS OF MS. SCHUB." MOREOVER, "ONE OF THE GUYS (I.E. THE DARK COMPLEXION BLACK GUY HAD A BROWN SHIRT; THICK, WITH A STMACH) CARRYING A WALKIE-TALKIE, LEAVING MS. NATHAN'S ROOM GOING RIGHT" -- ISN'T OBVIOUS THAT THE SAID DESCRIPTION OF A DARK COMPLEXION BLCAK MAN CARRYING A WALKIE-TALKIE (LEAVING MS. NATHAN'S ROOM, ETC.), WAS NOT THAT OF MR. JONES?

    3. THE ATTORNEY GENERAL SOMEHOW SEEMS TO OVER LOOK ANOTHER IMPORTANT DOCUMENT IN THE PROSECUTOR'S FILES THAT SHOWS MR. DEMETRIUS WILLIAMS ON 5/13/1995 INTERVIEW BY AUTHORITIES WAS A HONEST MISTAKE -- AS TO WHAT HE SAW THAT MORNING OF SEPTEMBER 3, 1994, AND WHEN AND WHERE HE SAW ME THAT DAY. THE DOCUMENT IN QUESTION CLEARLY SHOW DEMETRIUS WILLIAMS HAD HIS DAYS MIXED UP ABOUT WHEN HE SAW ME BETWEEN 7:00 A.M. and 7:30 A.M. ON SEPTEMBER 3, 1994.

THE INFORMATION CONTAINED WITHIN TANYA MITCHELL'S STATEMENTS CLEARLY SHOW TANYA MITCHELL WAS NOT WORKING ON THE DATE OF THE HOMICIDE AND DEMETRIUS WILLIAMS DID NOT SEE TANYA MITCHELL AND BUTCH JONES PARTING COMPANY IN THE KITCHEN BETWEEN 7:00 A.M. AND 7:30 A.M. ON SEPTEMBER 3, 1994.

NARRATIVE OF TANYA MITCHELL INTERVIEWED BY OFFICER STOKES, BATES STAMPED 0000840, ON 5/15/95, AT 1300 HRS. EMBASSY EMPLOYEE COOK WHO IS ALSO EARLINE METCALF'S DAUGHTER. TANYA WAS NOT WORKING ON THE DATE OF THE HOMICIDE. SHE WAS OFF ON FRI 9-2 AND SAT 9-3, RETURNING TO WORK ON SUN 9-4, SHE STATED THAT SHE SAW BUTCH, WHO ALSO WORKED THE DAY AFTER THE HOMICIDE, SUN 9-4, BUT THAT SHE DID NOT NOTICE ANYTHING AMISS. SHE DOES RECALL SEEING HIS LEFT HAND BANDAGED, RECALLING THAT IT WAS WRAPPED IN GAUZE AND DID NOT APPEAR TO HAVE HAD ANY PROFESSIONAL ATTENTION GIVEN TO IT. SHE STATES THAT HER SISTER, ANDRA MITCHELL, ALSO EARLENE'S DAUGHTER, HAD SEEN THE EXPOSED INJURY TO JONES' HAND SOMETIME BETWEEN SAT 9-3 AND TUES 9-6 (THE DAY JONES WAS ADMITTED TO HOSPITAL).

THE POINT I AM MAKING, THE ATTORNEY GENERAL IN THIS CASE HAS OPEN THE DOOR FOR US TO BRING INTO THIS HEARING PRIOR STATEMENTS FOUND IN THE PROSECUTOR'S FILES THAT WERE NEVER TURNED OVER TO MY LAWYERS BEFORE AND DURING MY TRIAL FOR ANY PRIOR INCONSISTENCIES IN THEIR STATEMENTS WHEN SHE REFERRED TO DEMETRIUS WILLIAMS INTERVIEWED BY AUTHORITIES ON 5/13/95.

FOR A GOOD EXAMPLE MR. CRIM, TAKE SUSAN FRIEND'S TESTIMONY AND PRIOR STATEMENTS IN MAKING THE ARGUMENT TO THE COURT: (WITHIN THE RECOVERED MATERIALS SUPPRESSED BY THE PROSECUTION, WAS A STATEMENT FROM SUSAN FRIEND (DATED SEPTEMBER 20, 1994) -- WHICH IS INCONSISTENT WITH HER STATEMENT ALMOST NINE (9) MONTHS LATER ON MAY 3, 1995. SPECIFICALLY, ON SEPTEMBER 20, 1994, SUSAN FRIEND STATED THAT SHE ONLY SEEN ME ONE TIME ON THE DAY OF THE OFFENSE ("AND THAT WAS TO GET A WALKIE-TALKIE"). IN HER INTERVIEW OF MAY 3, 1995, HOWEVER, SHE STATES SEEING ME FIRST UPON HER ARRIVAL TO WORK; AFTER WHICH SHE SAYS SHE WENT TO "HOUSEKEEPING AND GOT HER WALKIE-TALKIE." SHE THEN STATED THAT SHE NEXT SEEN ME "IN THE BACK HALLWAY OF THE HOTEL AT APPROXIMATELY 1:30-2:30 P.M." (WITH TWO OTHER EMPLOYEES). SUSAN FRIEND ALSO STATES THAT SHE SAID -- "NO ONE COULD LEAVE UNTIL THEY TALKED TO THE POLICE." WHERE IS MS. FRIENDS STATEMENT FROM 9/3/94 THEN??

MR. CRIM, AS I BRING THIS LETTER TO A CLOSE FOR NOW, I WOULD HIGHLY APPRECIATE IF YOU AND MR. HOLMA UNDERSTAND I AM NOT TRYING TO GET EITHER ONE OF YOU TO RUBBER STAMP ISSUES I PUT BEFORE YOU. I HOPE WE CAN WORK TOGETHER AND RESPECT EACH OTHERS VIEWS, EVEN IF WE DON'T ALWAYS AGREE WITH EACH OTHER. COMMUNICATION, UNDERSTANDING, AND HONESTY ARE **ALL** I AM ASKING FOR AS A CLIENT.

RESPECTFULLY SUBMITTED,

MR. ELWOOD H. JONES JR.
A339-441  D-5-27
878 COITSVILLE-HUBBARD RD.
YOUNGSTOWN, OH 44505-4635


cc: CHIEF MAGISTRATE JUDGE MICHAEL R. MERZ
    MR. DALE DORNING
    MR. LOUIS STRIGARI
    MR. JOSEPH R. DETERMAN

-8-