IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ELWOOD H. JONES,

       Petitioner,

v.

MARGARET BAGLEY, Warden,

       Respondent.

Case No. 1:01-cv-564

District Judge Thomas M. Rose

Chief Magistrate Judge

    Michael R. Merz,

### *Elwood H. Jones's Post-Hearing Traverse*

MICHAEL L. MONTA No. 0032777
Trial Counsel
3625 Old Salem Road
Dayton, Ohio 45415
(937) 890-6921

and

GARY W. CRIM No. 0020252
943 Manhattan Avenue
Dayton, Ohio 45406-5141
(937) 276-5770

Attorneys for Elwood H. Jones

## *Table of Contents*

*Table of Contents* .............................................................................. i

*Table of Authorities* ...................................................................... xi

*Introduction* ......................................................................................... 1

    *i.  Obligation of Trial Counsel* ..................................... 2

    *ii. Prejudice from trial counsel* ................................... 3

    *iii.   Obligation of Government Counsel* .................... 4

    *iv.Prejudice from Brady Violations.* ....................... 6

*Statement of the Case* ................................................................... 7

  *Nature of the Case* .................................................................... 7

  *Statement of Facts* .................................................................... 9

  *Overview* ........................................................................... 9

**1. The Crime.** ............................................................................... 9

**2. The Crime Scene.** ................................................................. 9

**3. Evidence Against Elwood Jones.** ................................. 10

**4. Evidence Discovered by Since Trial.** ........................ 10

    **a) Blue Ash Police Department reports of regular similar criminal activity at the Embassy Suites Hotel.** .................. 10

    **b) Evidence impeaching the discovery of the pendant by Officer Bray.** ............................................................. 11

    **c) Testimony characterized Mr. Jones's hand injury as a "fist-to-mouth" injury was junk science.** .................... 12

**B. The State's Evidence at Trial.** ....................................... 13

    **1. The Pendant.** ........................................................... 13

    **2. Mr. Jones at the Embassy Suites on the day of the crime.** 16

    **3. State's reliance on Jones's own physician.** ....................... 17

    **4. Introduction of Jones's Prior Conviction and Other Bad Acts Evidence.** .............................................. 19

**C. Evidence the Jury Should have Heard.** .......................... 20

    **1. Interviews of Nathan Family about the various other description of the pendant.** ............................ 21

    **2. Presence of hepatitis.** ............................................ 25

   **3. Hotel Guests and employees descriptions of other intruders. ...............................................26**

   **4. Reports of Regular Similar Criminal Activity at the Embassy Suites Hotel. ...........................................29**

   **5. Evidence Impeaching the Discovery of the Pendant by Officer Bray. .............................................31**

   **6. Dr. Solomkin's Expert Opinion. ...........................................35**

*Argument* ..........................................................................42

**First Ground for Relief: Juror misconduct during Mr. Jones's capital sentencing hearing denied him a fair and impartial determination of his sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States ....................................................42**

*Petitioner abandons this claim* ........................................................42

**Second Ground for Relief: Prosecutors introduced improper evidence and used improper arguments throughout Mr. Jones's trial. Defense counsel frequently failed to object to the prosecutors' improper tactics; they failed to challenge some constitutionally infirm evidence with a motion to suppress; and they permitted prejudicial attacks on Mr. Jones's character, going so far as to impugn their own client's character with inadmissible evidence. Throughout the pre-trial and trial proceedings, the trial court failed to ensure that only constitutionally fair and reliable evidence was admitted and arguments made. As a result, Mr. Jones's constitutional rights to effective assistance of counsel, a fair trial, and to be free from an arbitrary and capricious death sentence were violated. .............42**

   **A. Improper Evidence Admitted and Testimony Adduced During Trial ...........................................43**

      **1. The fact that Mr. Jones exercised his right to counsel was improperly admitted to make him look guilty. ................................................. 43**

Standard of Review ................................................................ 43
Procedural Default................................................................ 43
Clearly established United States Supreme Court law........................ 43
Merits................................................................................ 43

### 2. The fact that the Grand Jury indicted Mr. Jones was improperly admitted to make him look guilty. .................................................... 47

Standard of Review ................................................................ 47
Procedural Default................................................................ 47
Clearly established United States Supreme Court law........................ 48
Merits................................................................................ 48

### 3. The fact that Mr. Jones had prior criminal convictions was improperly admitted to make him look guilty. ............................................... 49

Standard of Review ................................................................ 49
Procedural Default................................................................ 50
Clearly established United States Supreme Court law........................ 51
Merits................................................................................ 51

### 4. Inadmissible and unreliable medical opinions and other evidence related to Mr. Jones's hand injury was admitted.................................. 54

Standard of Review ................................................................ 54
Procedural Default................................................................ 55
Clearly established United States Supreme Court law........................ 55
Merits................................................................................ 55

### 5. Inadmissible and unreliable evidence was admitted under the guise of "forensic expert testimony" about bruises on Mrs. Nathan's body. .................................................... 56

Standard of Review ................................................................56
Procedural Default................................................................57
Clearly established United States Supreme Court law.........................57
Merits...............................................................................57

### 6. Defense counsel failed to challenge the use of evidence acquired in violation of Mr. Jones's constitutional right to be free from unlawful searches and seizures. ..................................... 60

Petitioner abandons this claim............................................................60

### B. Prosecutors' Improper Closing Argument during the Culpability Phase...............................................................60

Standard of Review ................................................................60
Procedural Default................................................................61
Clearly established United States Supreme Court law.........................61
Merits...............................................................................61

### C. Prosecutors' Improper Closing Argument during the Mitigation Phase ...............................................................67

Standard of Review ................................................................67
Procedural Default................................................................67
Clearly established United States Supreme Court law.........................67
Merits...............................................................................67

### D. Conclusion .....................................................................69

**Third Ground for Relief: The fairness of Mr. Jones's trial and the reliability of his convictions and death sentence were undermined by the absence of exculpatory and impeachment evidence that the prosecution should have disclosed. In the alternative, defense counsel were ineffective for failing to discover the exculpatory and impeachment evidence................70**

### A. Evidence of Serious Irregularities with the Blue Ash Police Department's Evidence Records..........................................71

Standard of Review ....................................................................... 71
Procedural Default........................................................................ 71
Clearly established United States Supreme Court law.......................... 72
Merits.......................................................................................... 72

**B. Evidence of Criminal Acts and Suspicious Employees at the Embassy Suites Hotel.......................................... 79**
Standard of Review ....................................................................... 79
Procedural Default........................................................................ 80
Clearly established United States Supreme Court law.......................... 80
Merits.......................................................................................... 80

**C. Other Undisclosed Materials Cast Further Doubt on the Reliability of the Outcome of Mr. Jones's Trial and Suggest that Additional Undisclosed Information May Still Exist. ..83**
Standard of Review ....................................................................... 83
Procedural Default........................................................................ 83
Clearly established United States Supreme Court law.......................... 83
Merits.......................................................................................... 84

*1. The pendant..................................................... 84*
*2. Complaints of Guests about intruders............... 87*
*3. Potential Witnesses......................................... 90*
*4. Hepatitis ....................................................... 93*

*D. Conclusion ...................................................... 93*

**Fourth Ground for Relief: Mr. Jones's defense counsel were ineffective when they failed to adequately investigate and prepare to confront state's witness, Dr. McDonough, and when they failed to effectively prepare their own expert, Dr. Solomkin, regarding Mr. Jones's hand injury and the nature of Eikenella corrodens. ................................................................... 94**
Standard of Review ....................................................................... 94
Procedural Default........................................................................ 95
Clearly established United States Supreme Court law.......................... 95
Merits.......................................................................................... 95

**A. Dr. Solomkin Thoroughly Refutes McDonough's Opinions and Renders McDonough's Testimony Constitutionally Unreliable. ........................................................... 97**

**B. No Foundational Facts for Dr. McDonough's Opinion about Whether Mr. Jones or Mrs. Nathan Were Infected with Eikenella.** ............................................................... 102

**C. Failure to Confront with Evidence That Ohio's Bureau of Worker's Compensation Paid Mr. Jones's Claim based on Dr. McDonough's Records.** ................................................. 104

**D. Conclusion** ....................................................................... 105

**Fifth Ground for Relief: Mr. Jones's trial counsel violated his right to effective assistance of counsel by failing to effectively investigate, discover, research, and utilize exculpatory and impeachment evidence and legal arguments which would have seriously undermined the prosecution's ability to carry its burden of proof and procure a death sentence.** ........................ 106

**A. Defense Counsel Failed to Adequately Investigate and Prepare to Confront Key Medical Testimony from State's Witness Dr. McDonough, and When They Failed to Effectively Prepare Their Own Expert, Dr. Solomkin.** ...... 106

*Standard of Review* ............................................................... 106
*Procedural Default* ............................................................... 107
*Clearly established United States Supreme Court law* ....................... 107
*Merits* ................................................................................ 108

**B. Failure to Investigate History of Crimes at Embassy Suites Hotel** ................................................................................ 108

*Standard of Review* ............................................................... 108
*Procedural Default* ............................................................... 109
*Clearly established United States Supreme Court law* ....................... 109
*Merits* ................................................................................ 109

**C. Failure to Investigate a Pair of Shoes the Prosecution Tied to Mr. Jones** ....................................................................... 110

*Standard of Review* ............................................................... 110
*Procedural Default* ............................................................... 111
*Clearly established United States Supreme Court law* ....................... 111
*Merits* ................................................................................ 111

**D. Failure to Adequately Investigate an Alternate Suspect Theory** .............................................................................. 113

Standard of Review ............................................................ 113
Procedural Default............................................................ 114
Clearly established United States Supreme Court law........................ 114
Merits........................................................................ 114

**E. Failure to Investigate a Fiber Found in Mr. Jones's Hand Wound. ........................................................ 114**
Standard of Review ............................................................ 114
Procedural Default............................................................ 115
Clearly established United States Supreme Court law........................ 116
Merits........................................................................ 116

**F. Failure to Utilize an Opportunity for Ongoing Investigation During Trial ...................................... 116**
Standard of Review ............................................................ 116
Procedural Default............................................................ 117
Clearly established United States Supreme Court law........................ 117
Merits........................................................................ 118

**G.    Conclusion ........................................................ 118**

**Sixth Ground for Relief: Elwood Jones was denied the right to counsel when Attorney Sanks abdicated his role as defense counsel. ...................................................... 119**
Petitioner abandons this claim............................................. 119

**Seventh Ground for Relief: Mr. Jones's constitutional right to a fair, non- arbitrary and reliable capital sentencing hearing were violated by his counsel's failure to investigate mitigation evidence and the trial court's refusal to permit the presentation of a viable "residual doubt" mitigation argument. ................... 119**
Standard of Review ............................................................ 119
Procedural Default............................................................ 120
Clearly established United States Supreme Court law........................ 120
Merits........................................................................ 120

**Eighth Ground for Relief: Systematic flaws in Hamilton County's methods for selecting grand jurors, grand jury forepersons, and petit jury venires yielded racial, gender, and socio-economic biases inimical to Mr. Jones's constitutional rights. His rights were further violated when the prosecution excluded all African-Americans from his jury. Mr. Jones's counsel failed to effectively**

**challenge these unconstitutional systemic factors; failed to raise an obvious challenge; failed to conduct an effective voir dire; and failed to raise effective challenges to venire persons. ......122**

**A. The Composition of the Grand Jury that Indicted Mr. Jones Failed to Comply with Constitutional Requirements ....... 122**

*Standard of Review* .......................................................................... 122

*Procedural Default* ......................................................................... 123

*Clearly established United States Supreme Court law* ........................ 124

*Merits* .............................................................................................. 124

**B. The Selection of the Foreperson of the Grand Jury that Indicted Mr. Jones Failed to Comply with Constitutional Requirements .................................................................. 125**

*Standard of Review* .......................................................................... 125

*Procedural Default* ......................................................................... 126

*Clearly established United States Supreme Court law* ........................ 126

*Merits* .............................................................................................. 127

**C. The Composition of the Petit Jury Venire and the Jurors Empanelled for Mr. Jones's Trial Failed to Comply with Constitutional Requirements ............................................. 128**

*Standard of Review* .......................................................................... 128

*Procedural Default* ......................................................................... 129

*Clearly established United States Supreme Court law* ........................ 130

*Merits* .............................................................................................. 130

**D. The Prosecution's Use of Peremptory Challenges to Exclude all African-American Citizens from Mr. Jones's Petit Jury Creates a Strong Presumption of Racial Animus. 131**

*Standard of Review* .......................................................................... 131

*Procedural Default* ......................................................................... 132

*Clearly established United States Supreme Court law* ........................ 132

*Merits* .............................................................................................. 133

**E. Defense Counsel failed to Conduct an Effective Voir Dire, and They Failed to Challenge a Biased Juror. ................. 135**

*Standard of Review* ............................................................ 135
*Procedural Default* ............................................................. 135
*Clearly established United States Supreme Court law* ........................ 135
*Merits* ........................................................................ 135

**F. Defense Counsel Violated Mr. Jones's Constitutional Rights by Failing to Raise an Obvious Challenge, and by Failing to Challenge the Systemic Deficiencies in the Way Hamilton County Selects Grand Jurors, Grand Jury Forepersons, and the Venire for Petit Juries.** ............ 137
*Standard of Review* ............................................................ 137
*Procedural Default* ............................................................ 138
*Clearly established United States Supreme Court law* ........................ 138
*Merits* ........................................................................ 139

**G. Conclusion** ............................................................... 139

**Ninth Ground for Relief: Multiple errors in the jury instructions at both phases of Mr. Jones's trial violated his constitutional rights to a fair trial, effective assistance of counsel, and to be free from an arbitrary and capricious death sentence** .............................. 140

**Tenth Ground for Relief: Mr. Jones's appellate counsel violated his right to effective assistance of appellate counsel by failing to raise obvious errors, which if raised, would have rendered his conviction and death sentence unreliable. These constitutional violations rendered Mr. Jones's conviction and death sentence unreliable.** ................................................................... 153

**Eleventh Ground for Relief: Elwood Jones is innocent** ................. 168

**Twelfth Ground for Relief: The proportionality review that the appellate courts must conduct pursuant to OHIO REV. CODE § 2929.05 is fatally flawed. Therefore, Elwood Jones's death sentence must be vacated pursuant to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution** ..... 171
*Petitioner abandons this claim* ............................................... 171

**Thirteenth Ground for Relief: Elwood Jones's death sentence is constitutionally infirm because Ohio's capital punishment system operates in an arbitrary, capricious, and discriminatory manner in violation of the Fifth, Sixth, Eighth ,and Fourteenth Amendments.** ............................................................. 171

*Petitioner abandons this claim*............................................................ 171

**Fourteenth Ground for Relief: The cumulative effects of the errors and omissions presented in this habeas petition constitute constitutional violations which merit relief.** ...............................**171**

*Conclusion*........................................................................................ 173
*Certificate of Service*....................................................................... 173

*Table of Authorities*

**Cases**

*Anders v. California,*
   386 U.S. 738 (1967) ............................................... 49, 60, 69, 141

*Angel v. Overberg,*
   682 F2d 605 (6th Cir.1982) ...................................................... 61

*Batson v. Kentucky,*
   476 U.S. 79 (1986) ......................................... 132, 134, 135, 166

*Beraer v. United States,*
   295 U.S. 78 (1935) .................................................................. 69

*Byrd v. Collins,*
   209 F.3d 486 (6th Cir. 2000) ................................................... 62

*Cage v. Louisiana,*
   498 U.S. 39 (1992) ........................................................ 144, 147

*Caldwell v. Mississippi,*
   472 U.S. 320 (1985) .............................................. 121, 150, 151

*Campbell v. Louisiana,*
   523 U.S. 392 (1998) .............................................................. 124

*Carter v. Texas,*
   177 U.S. 442 (1900) ............................................................. 124

*Castaneda v. Partita,*
   430 U.S. 482 (1977) ....................................................... 124, 125

*Cincinnati v. Emerson,*
   20 Ohio St.2d 59 (1969) ....................................................... 165

*Cross v. Ledford,*
   161 Ohio St. 469, 120 N.E.2d 118 (1954) ................................ 145

*Darden v. Wainwright,*
   477 U.S. 168 (1986) ......................................................... passim

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993) ......................................................... 60, 98

*Donnelly v. DeChristoforo,*
   416 U.S. 637 (1974) ......................................................... passim

*Doyle v. Ohio,*
   426 U.S. 610 (1976) ......................................................... passim

*Eddings v. Oklahoma,*
   455 U.S. 104 (1982)......................................................150, 165
*Edwards v. Arizona,*
   451 U.S. 477 (1981)..............................................69, 155, 159
*Evitts v. Lucey,*
   469 U.S. 387 (1985)..........................................49, 60, 69, 141
*Francis v. Franklin,*
   471 U.S. 307 (1985)....................................... 147, 148, 163
*Gardner v. Florida,*
   430 U.S. 349 (1977)..............................................................69
*Giglio v. United States,*
   405 U.S. 150 (1972)............................................................. 5
*Godfrey v. Georgia,*
   446 U.S. 420 (1990)..............................................................69
*Gregg v. Georgia,*
   428 U.S. 153 (1976)..........................................49, 60, 69, 141
*Griffin v. Illinois,*
   351 U.S. 12 (1956)............................................49, 60, 69, 141
*Groseclose v. Bell,*
   130 F.3d 161 (6th Cir. 1997)...............................................106
*Henderson v. Sargent,*
   926 F.2d 706 (8th Cir. 1991)...............................................156
*Herrera v. Collins,*
   506 U.S. 390 (1993)............................................................169
*Hill v. Mitchell,*
   400 F.3d 308 (6th Cir. 2005)..........................................passim
*Holland v. United States,*
   348 U.S. 121 (1954)............................................................146
*In re Winship,*
   397 U.S. 358 (1970)....................................... 144, 163, 169
*Kumho Tire Co,. Inc. v. Carmichael,*
   526 U.S. 137 (1999)......................................................60, 98
*Kyles v. Whitley,*
   514 U.S. 419 (1995)........................................................5, 6
*Lockett v. Ohio,*
   438 U.S. 586 (1978)......................................................150, 165
*Lockhart v. Fretwell,*
   506 U.S. 364 (1993)..........................................................passim

*Maples v. Stegall,*
    340 F.3d 433 (6th Cir.2003)................................................passim
*Miller-El v. Dretke,*
    545 U.S. 231 (2005).................................................................135
*Monk v. Zelez,*
    901 F.2d 885 (10th Cir. 1990)...............................................146
Moore *v. Illinois,*
    408 U.S. 786 (1972) (dissent)..................................................... 5
*Murray v. Canier,*
    477 U.S. 478 (1986).................................................................169
*Napue v. Illinois,*
    360 U.S. 264 (1959)..................................................................... 5
*Ohio Adult Parole Authority v. Woodard,*
    523 U.S. 272 (1998)..................................... 49, 60, 69, 141
*Paprocki v. Foltz,*
    869 F.2d 281 (6th Cir. 1989)....................................................62
*Pennsylvania v. Ritchie,*
    480 U.S. 39 (1987)........................................................................ 5
*Penson v. Ohio,*
    488 U.S. 75 (1989)........................................ 49, 60, 69, 141
*Rickman v. Bell,*
    131 F.3d 1150 (6th Cir. 1997).................................................106
*Roe v. Baker,*
    316 F.3d 557 (6th Cir. 2002).....................................................62
*Rompilla v. Beard,*
    545 U.S. 374 (2005)...........................................................4, 136
*Sandstrom v. Montana,*
    442 U.S. 510 (1979)....................................... 147, 148, 163
*Sawver v. Whitley,*
    505 U.S. 333 (1992)..........................................................5, 6, 169
*Schlup v. Delo,*
    513 U.S. 298 (1995)...................................... 69, 169, 170
Scon v. Anderson,
    Case No. 1:95CV2037 (N.D. Ohio Sept. 20, 1998)....................165
*Scurry v. United States,*
    347 F.2d 468 (D.C. Cir. 1965).................................................146
*Sims v. Livesay,*
    970 F.2d 1575 (6th Cir. 1992).................................................156

*State v. Brooks,*
   75 Ohio St. 3d 148, 661 N.E.2d 1030 (1996). ............ 3, 4, 62, 164
*State v. Combs,*
   100 Ohio App.3d 90, 101, 652 N.E.2d 205, 211 (1995),......passim
*State v. D'Ambrosio,*
   67 Ohio St.3d 185, 191, 616 N.E.2d 909, 915 (1993) ...... 161, 162
*State v. Eiding,*
   57 Ohio App. 2d 111, 385 N.E.2d 1332 (1978). .........................46
*State v. Gilliard,*
   40 Ohio St. 3d 226, 234,533 N.E.2d 272, 281 (1988) ..............151
*State v. Jones,*
   2000 WL 1886307 (Ohio App.), *aff'd*, 91 Ohio St. 3d 376, 745
   N.E.2d 421 (2001)..................................................................... 8
*State v. Jones,*
   90 Ohio St. 3d 403, 739 N.E.2d 300 (2000). .............................. 7
*State v. McGuire,*
   80 Ohio St.3d 390, 686 N.E.2d 1112 (1997) ...........................152
*State v. Nabozny,*
   54 Ohio St. 2d 195, 375 N.E.2d 784 (1978) ...........................146
*State v. Wickline,*
   50 Ohio St.3d 114, 552 N.E.2d 913 (1990) .............. 156, 157, 159
*State v. Wogenstahl,*
   75 Ohio St.3d 344, 662 N.E.2d 311 (1996) ........................68, 164
*State. v. Watson,*
   61 Ohio St.3d 1, 572 N.E.2d 97 (1991)...................................151
*Strickland v. Washington,*
   466 U.S. 668 (1984)...........................................................passim
*Strickler v. Green,*
   527 U.S. 263 (1999).......................................................5, 6, 83
*Taylor v. Louisiana,*
   419 U.S. 522 (1975).............................................................130
*United States v. Agurs,*
   427 U.S. 97 (1976)................................................................ 5
*United States v. Colon,*
   835 F.2d 27 (2d Cir. 1987) ...................................................146
*United States v. Conley,*
   523 F.2d 650 (8th Cir. 1975)................................................146
*United States v. Noon,*
   913 F.2d 20 (1st Cir. 1990) ..................................................146

*United States v. Pinckney,*
   551 F.2d 1241 (D.C. Cir. 1976) ..............................................146
*Wiggins v. Smith,*
   539 U.S. 510 (2003)....................................................3, 4, 136
*Williams v. Taylor,*
   529 U.S. 362 (2000)..........................................................passim
*Woodson v. North Carolina,*
   428 U.S. 280 (1976)..........................................................passim
*Workman v. Tate,*
   957 F.2d 1339 (6th Cir. 1992)..............................................106

**Statutes**

18 U.S.C. § 2254.......................................................................... 5
OHIO R. CRIM. P. 30..................................................................165
OHIO R. EVID. 104 .....................................................................60
OHIO R. EVID. 401 ...............................................................60, 157
OHIO R. EVID. 402 ...............................................................60, 157
OHIO R. EVID. 404 .......................................................156, 157, 159
OHIO R. EVID. 405 ....................................................................157
OHIO R. EVID. 608 ....................................................................157
OHIO R. EVID. 609 .........................................................51, 53, 157
OHIO REV. CODE § 2901.05 .....................................................passim
OHIO REV. CODE § 2903.01 ...............................................141, 163
OHIO REV. CODE § 2929.03 .......................................147, 148, 149
OHIO REV. CODE § 2929.04 .......................................7, 68, 149, 165
OHIO REV. CODE § 2953.21 ......................................................... 8
U.S. CONST. amend. V.............................................................passim
U.S. CONST. amend. VI............................................................passim
U.S. CONST. amend. VIII .........................................................passim
U.S. CONST. amend. XIV .........................................................passim

**Other Authorities**

*American Bar Association Guidelines for the Appointment and*
   *Performance of Counsel in Death Penalty Cases*, 93, Guideline
   11.4.1.A (1989). .........................................................2, 3, 136
*American Bar Association Guidelines for the Appointment and*
   *Performance of Counsel in Death Penalty Cases*, Commentary to
   Guideline  (2003) ..................................................................153

## Introduction

The Petition in this case was filed in 2001 by one set of attorneys. The Traverse is being filed six years later by a completely different set of attorneys. The state of *habeas-corpus* jurisprudence has moved on from what it was five years ago. The ways that issues are pursued has evolved.

Present counsel would have grouped the claims a bit differently. The Petition has put claims about the inadequacy of counsel in several different areas. Regardless of the placement this Court must analyze them together to determine materiality. These claims present the *Brady* claims primarily in

The Claims about appellate counsel are in Ground Ten. Appellate inadequacy is not the basis for independent relief. Rather it serves as the basis for excusing the procedural default if the claims should have been raised on direct appeal.

Petitioner is abandoning a number of Grounds for Relief and sub claims: Ground for Relief No. One; Ground for Relief No. Two, sub part A.6, Ground for Relief No. Six; Ground for Relief No. Seven as it relates to the inadequacy of counsel to investigate mitigation evidence; Ground for Relief No. Nine, parts 1-11, and 15; Ground for Relief No. Ten, sub parts 10-13; Ground for Relief No. Twelve; and Ground for Relief No. Thirteen.

We have referred to exhibits and depositions that have been added by expanding the record. The Blue Ash Police Department records were produced by order of this Court and are referred to as "BAPD" with a page reference. The Hamilton County Prosecuting Attorney files were produced and are referred to as "HamPros" with a page number. The Hamilton County Coroner files were

produced by order of this Court and are consecutively numbered, as are the other two files. The trial court record is not consecutively paginated but is paginated by volume and referred to as Roman numeral "App." page number.

### i. *Obligation of Trial Counsel*

Defense counsel's obligation to investigate and the timing of the investigation in capital cases were clear years before Petitioner's trial:

> Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.[1]

The United States Supreme Court has relied on these guidelines in determining the standard of conduct for counsel in capital cases.[2]

The American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases discuss this investigation in some detail.[3] Such an investigation must begin as soon as the lawyers meet their capitally-charged defendant. They must begin to collect information relevant to the sentencing phase. This would include medical history, including mental and physical illness or injury, alcohol and drug use, birth trauma and development delays. It would also include an educational history, including cognitive limitations and learning disabilities. The investigation should also include an employment history, including type and length of service, training, and con-

---

[1] *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 93, Guideline 11.4.1.A (1989).
[2] *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). *See also Williams v. Taylor*, 529 U.S. 362, 396 (2000), citing other American Bar Association standards on criminal justice for the adequacy of counsel. Such an investigation takes time.
[3] *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 93, Guideline 11.4.1.D.2 (1989).

duct. The investigation should include a family and social history. The first source of this information is the client but it must include securing the various confidential records to document the history. An important component of this investigation is the responsibility to, "obtain names of collateral persons or sources to **verify, corroborate, explain and expand** upon the information obtained [from the client]."[4]

The failure to examine the evidence, particularly the brief case, presented the jury with significant evidence that prejudiced Petitioner. When a single juror can prevent a death sentence, the United States Supreme Court applies that standard. In Petitioner's case a single juror could have prevented a death sentence.[5] In *Wiggins v. Smith*, 539 U.S. 510, 510 (2003), the United States Supreme Court applied this standard to the Maryland death penalty.

This Court must review the information presented cumulatively.[6] There is a reasonable probability that the added information would have changed the mind of at least one juror.

### ii. Prejudice from trial counsel

Prejudice exists when, but for counsel's failures, there is a reasonable probability of a different outcome. This Court said:

> Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, **altering the entire evidentiary picture**, and some will have had an isolated, trivial effect.

---

[4] *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 93, Guideline 11.4.1.D.2.E (1989).
[5] *State v. Brooks*, 75 Ohio St. 3d 148, 661 N.E.2d 1030 (1996).
[6] *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000).

*Strickland v. Washington*, 466 U.S. 668, 695-96, (1984), (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 390 (2005). In evaluating the conduct of counsel, the Court must examine and reweigh all of the available evidence in mitigation against the aggravating circumstances.

> In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.[7]

This has been the law since *Strickland*:

> When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.[8]

Not a single judge reviewing this case has reweighed the available mitigation evidence against the aggravators.

It does not take much in Ohio to change the picture of a capital defendant: a single juror can prevent a death verdict in a capital case.[9] If only a single juror would have voted differently, Petitioner would have been entitled to a life sentence.[10]

Thus is weighing the prejudice of the failings of Petitioner's trial counsel, the Court must weigh all of the evidence, not just a particular piece.

### iii. Obligation of Government Counsel

When the defendant makes a request for discovery of specific information or evidence and that evidence is material, i.e. "might have affected the outcome

---

[7] *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).
[8] *Strickland v. Washington*, 466 U.S. at 695.
[9] *State v. Brooks*, 661 N.E.2d 1030 (Ohio 1996).
[10] *See Wiggins v. Smith*, 539 U.S. 510, 513 (2003).

of the trial," the State is constitutionally obligated to turn over the requested material.[11] Regardless of whether there has been a specific request for the information, the State is constitutionally obligated to turn exculpatory information over to the defense.[12] The *Brady* decision marked the abandonment of the concept of the criminal trial as a sport or contest in favor of the State 's obligation to seek justice.[13]

This obligation to disclose exists whether the evidence is in the hands of the prosecutor, law enforcement officers or other agents of the state.[14] It is equally unimportant whether the state withholds exculpatory evidence purposefully or through inadvertence. "[T]he good faith or bad faith of the prosecution," is irrelevant.[15]

The State must disclose promises for special consideration of any sort made in exchange for testimony.[16] His obligation must be met even if the prosecutor presenting the case is unaware of the promises. Knowledge of one agent of the state will be attributed to the government as a whole.[17]

In *Strickler v. Green*, 527 U.S. 263 (1999), the petitioner had not raised a *Brady* claim in state court because the information at issue had not been revealed at that time. The information was revealed only after the case went into federal court under 18 U.S.C. § 2254. The District Court granted relief on the claim. The Fourth Circuit reversed on the theory that the claim was procedu-

---

[11] *Brady v. Maryland*, 373 U.S. 83 (1967).
[12] *United States v. Agurs*, 427 U.S. 97 (1976).
[13] *Brady*, 373 U.S. at 87-88.
[14] *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 (1987); Moore *v. Illinois*, 408 U.S. 786 (1972) (dissent).
[15] *Brady*, 373 U.S. at 87.
[16] *Napue v. Illinois*, 360 U.S. 264 (1959).
[17] *Kyles*, 514 U.S. at 438; *Giglio v. United States*, 405 U.S. 150 (1972).

rally defaulted. The United States Supreme Court held that the claim was not procedurally defaulted because the petitioner had established cause for failing to raise the *Brady* claim earlier: (a) the prosecution withheld exculpatory evidence; (b) petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (c) the state confirmed petitioner's reliance on the open file policy by asserting during state habeas proceedings that petitioner had already received everything known to the government.

### iv. Prejudice from Brady Violations.

A Petitioner does not have to show that the disclosure of the evidence would have resulted in an acquittal. A Petitioner does not have to show that after discounting the undisclosed evidence there would have been insufficient evidence to support a verdict of guilty. The Court must view all of the suppressed evidence in order to judge whether it is material.[18] The Supreme Court articulated the test:

> Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[19]

Again the Court must weigh all of the added information.

---

[18] *Kyles v. Whitley*, 514 U.S. 419, 434-37 (1995).
[19] *Strickler v. Greene*, 527 U.S. 263, 290 (1999); *Kyles v. Whitley*, 541 U.S. at 435.

## Statement of the Case

### Nature of the Case

Elwood Jones was indicted under case number B-950878, in an indictment charging two separate counts of capital murder, involving the same victim. Each count was accompanied by death penalty specifications under OHIO REV. CODE § 2929.04(A)(7), that the offense was committed during the course of the offenses of Aggravated Robbery and Aggravated Burglary. The indictment also contained counts of Aggravated Burglary (count 3) and Aggravated Robbery (count 4) each with a prior conviction specification.

A jury trial commenced on November 12, 1996. On November 26, 1996, the jury returned verdicts of guilty as to all counts and all death specifications. The prior-offense specifications were determined by the court pursuant to a stipulation and verdicts were entered as to those specifications also. After a mitigation hearing on the sole issue of residual doubt, the jury returned a unanimous recommendation that the death penalty be imposed with regard to counts one and two of the indictment. On January 9, 1997, the Court accepted the jury's recommendation and sentenced Mr. Jones to death on the Aggravated Murder counts, and to 15-25 years with 15 years actual incarceration on the remaining felony counts. *State v. Jones*, No. B-9508578, Hamilton County C.P. (Entry of sentence, 1/9/97; Opinion, 1/14/97).

On August 28, 1998, the First District Court of Appeals denied Mr. Jones's appeal.[20] Likewise, the Ohio Supreme Court denied Mr. Jones's direct appeal.[21]

---

[20] *State v. Jones*, No. C-970043, 1998 Ohio App. LEXIS 3938 (August 28, 1998).
[21] *State v. Jones*, 90 Ohio St. 3d 403, 739 N.E.2d 300 (2000).

Mr. Jones filed a timely Application to Reopen the Direct Appeal under OHIO R. APP. P. 26, based on the ineffective assistance of appellate counsel. The court of appeals dismissed the application; the Ohio Supreme Court affirmed the dismissal on April 25, 2001.[22]

On April 3, 1999, Mr. Jones filed his OHIO REV. CODE § 2953.21 petition for post-conviction relief. He filed amendments to his post-conviction petition on June 14, 1999 and June 18, 1999. The State filed a motion to dismiss the petition and submitted an "Amended Proposed Findings of Fact, Conclusions of Law, and Entry Dismissing Petition to Vacate." On June 3, 1999, the trial court denied Mr. Jones relief on his petition, and adopted the State's Findings of Fact and Conclusions of Law Entry verbatim. State v. Jones, No. B-9508578, Hamilton County C.P. (October 25, 1999).

The court of appeals denied relief on the post-conviction petition.[23] The Ohio Supreme Court denied jurisdiction to hear his post-conviction appeal. State v. Jones, No. 01-318 (May 2, 2001). On September 5, 2001, this Court stayed the execution of Mr. Jones's death sentence. (Docket # 6).

---

[22] *State v. Jones*, 2000 WL 1886307 (Ohio App.), *aff'd*, 91 Ohio St. 3d 376, 745 N.E.2d 421 (2001).
[23] *State v. Jones*, 2000 WL 1886307, (Ohio App.).

*Statement of Facts*

*Overview*

## 1.  The Crime.

On September 3, 1994, Rhoda Nathan was sharing a hotel room at the Blue Ash Embassy Suites Hotel with two other guests, Joe Kaplan and Elaine Schub. She remained in the room when the other two went out for breakfast around 7:30 a.m. When they returned to the room at approximately 8:00 a.m., they found Mrs. Nathan lying on the floor just inside the door. She was nude and unconscious, and appeared to be bleeding from the mouth.[24] Mrs. Nathan later died of multiple blunt force trauma injuries to the head and torso.[25]

## 2. The Crime Scene.

Mrs. Schub's screams upon discovering her friend's body brought a number of hotel employees and guests to the scene, including Elwood Jones.[26] Several guests with medical backgrounds performed CPR and attempted to aid Mrs. Nathan until paramedics arrived.[27] Shortly thereafter, Blue Ash police reported to the scene where they found the scene already "contaminated" by numerous hotel and medical personnel. Officer Bray, from the Blue Ash police department, noticed that the room did not appear to be ransacked, and that there were two purses on the wet bar next to the bathroom, and a purse, a wallet and some jewelry on the stand in the back bedroom where Mrs. Nathan

---

[24] Tr. 135-36; Depositions of Joe Kaplan and Elaine Schub, Vols. 25, 26.
[25] Tr. 1383-1389.
[26] Tr. 863-64, 1059, 1344.
[27] Tr. 861-867.

9

slept.[28] When Mrs. Schub requested her purse, an officer gave it to her, and she informed him that money was missing.[29] At that point the room was declared to be crime scene, and secured. A crime team processed the room. A necklace, which witnesses said was always worn by Mrs. Nathan, could not be found in the room.[30]

### 3. Evidence Against Elwood Jones.

Mr. Jones was employed at the Embassy Suites Hotel on the morning of September 3, 1994. Approximately one year later, he was arrested for the murder of Mrs. Nathan. The State's case against Mr. Jones was very circumstantial. It consisted of three categories of evidence: 1) testimony from Blue Ash Police Officer Bray that he discovered the pendant from Mrs. Nathan's necklace in a toolbox in the trunk of Mr. Jones's car; 2) the State's "expert" testimony, including evidence of an injury to Mr. Jones's finger on the day of the homicide; and 3) evidence of Mr. Jones's prior criminal record, and other bad acts unrelated to this crime.

### 4. Evidence Discovered by Since Trial.

#### a) Blue Ash Police Department reports of regular similar criminal activity at the Embassy Suites Hotel.

The prosecution's case against Mr. Jones relied heavily upon his prior convictions, inviting the jury to infer that because of his criminal history he committed the crimes. However, Blue Ash Police Department (BAPD) reports dis-

---

[28] Tr. 1185-87, 1251.
[29] Tr. 1186.
[30] Tr. 950-959, 1033-1037.

covered by post-conviction counsel would have effectively rebutted this evidence, and showed that the police failed to adequately investigate the Nathan homicide.[31] The reports indicate that the Embassy Suites Hotel routinely hired people with criminal records, hotel guests were routinely the victims of theft crimes, and that hotel guests were often involved themselves in theft, prostitution and drug crimes. Importantly, shortly after the Nathan homicide a guest reported that someone attempted to gain entrance into her room with a key. The BAPD investigation discovered an unauthorized employee with an access key to the room. This is an example of a crime occurring after Mr. Jones was no longer employed by the hotel, which would have substantially bolstered the defense that he was innocent and the police failed to conduct an adequate investigation.

### b) Evidence impeaching the discovery of the pendant by Officer Bray.

Post-conviction counsel uncovered numerous inconsistencies in the testimony by Officer Bray and other law enforcement handling the evidence, and the actual BAPD property tags which they discovered post-trial.[32] For instance, there are no property tags for the keys to Mr. Jones's car, although other items seized from Mr. Jones were tagged and logged into the property room. Therefore, it is unclear how many sets of keys to Mr. Jones's car existed, and who had access to them and could have planted the pendant in the trunk of the car. Further, according to Bray's testimony, his search of Mr. Jones's car occurred on 9/14/94, after Criminalist Burke concluded her search. However a property

---

[31] Post-Conviction Exhibit YY.
[32] Post-Conviction Exhibit L.

tag for the blood samples he purportedly found during this search appears to have originally been dated, 9/13/94, then changed to 9/15/95. From the property tags discovered by post-conviction counsel, an arguable a number of people could have planted the pendant in Mr. Jones's car, including Officer Bray or the actual killer.

### c) Testimony characterized Mr. Jones's hand injury as a "fist-to-mouth" injury was junk science.

One of the most compelling aspects of the State's case was the testimony of Dr. McDonough, a hand surgery specialist, linking Mr. Jones's hand wound to the face wound inflicted on Mrs. Nathan. Dr. McDonough testified that the presence of Eikenella corrodens in Mr. Jones's injury indicated that the injury occurred as a result of coming into contact with the mouth of the victim. Post-conviction counsel had Dr. Solomkin review all of the evidence, including Dr. McDonough's testimony. Dr. Solomkin concluded that Dr. McDonough's conclusions and opinions were based on junk science, and rather than testifying as neutral expert, he testified as a agent for the State.[33] Dr. Solomkin had testified by a deposition taken before Dr. McDonough testified. When Dr. Solomkin testified, he did not know of Dr. McDonough's opinion that the presence of Eikenella made the injury a fight bite:

> Q. Dr. Solomkin, at the time of your deposition, did you know or was it conveyed to you or did you have any idea that Dr. McDonough would say that his opinion within a reasonable degree of medical certainty the infection was caused by a clenched fist, clenched injury because of the presence of Eikenella Corrodens?
> A. No, I didn't know that.[34]

---

[33] Post-Conviction Exhibit G.
[34] Hearing, pp. 57-58.

12

## B. The State's Evidence at Trial.

### 1. The Pendant.

Officer Bray testified at trial that he found the pendant to Mrs. Nathan's necklace in a toolbox in the trunk of Mr. Jones's car on September 14, 1994. The events leading up to this discovery, as adduced at trial are as follows. On September 12, 1994, Sgt. Robert Lilley, Officer Joe Boyatt, and Loveland Police Officer Steve Moster went to Earlene Metcalf's home to interview her about working with Mr. Jones the morning of September 3rd. When the police arrived at Ms. Metcalf s home, they also found Mr. Jones present. Both Mr. Jones and Mrs. Metcalf were considered by the police as suspects in Mrs. Nathan's murder, but this information was not provided to either party.[35]

Mr. Jones and Earlene Metcalf accompanied Blue Ash Police officers to police headquarters.[36] Prior to being questioned and in compliance with an officer's request, Mr. Jones emptied his pockets and left his belongings, including his car keys and a handkerchief, outside the closed interrogation room. After being interrogated, Mr. Jones was allowed to leave but the police did not return his belongings to him. At least some of the items emptied from Mr. Jones's pockets were eventually logged into the Blue Ash Police Department's property room and recorded on Property Receipt Tags.

While Mr. Jones and Mrs. Metcalf were at police headquarters, other Blue Ash Police Department officers, including Officer Michael Bray and Burdick, were conducting a consent search on Metcalf s home.[37]

---

[35] Suppression Tr. 93.
[36] Tr. 1315, 1338.
[37] Tr. 1198.

Mr. Jones's maroon Pontiac was parked in front of the Metcalf residence. While Bray was searching inside the residence, Officer Moster was assigned to watch Mr. Jones's car.[38] Moster was relieved by another officer for approximately one and a half hours, until he returned to the Metcalf residence at 755 p.m. and where he remained until 8:15 p.m.[39] Moster testified at trial that he did not remember seeing the vehicle being towed while he was there.[40]

Blue Ash Police Officer Boyatt returned to the Metcalf residence at 8 p.m. to seize Mr. Jones's car.[41] Boyatt did not recall whether he obtained the keys for Jones's vehicle from an officer at the police station or from officers at the Metcalf residence.[42] Boyatt accompanied the car and wrecker to the Blue Ash Police Department that evening.[43] Boyatt testified that he helped Sgt. Lilley secure the car, and handed the car keys over to Lilley.[44] Lilley also testified that he was at the station to receive the car and keys from Boyatt.[45] Officer Stokes, however, testified that he was at the station to receive the vehicle, and he helped secure it in the station's garage.[46]

Sgt. Lilley gave Mr. Jones's car keys to Officer Bray around 4 a.m. on September 13th.[47] Officer Bray placed the keys inside a folder in an unlocked drawer of his desk.[48]

---

[38] Tr. 1600.
[39] Tr. 1597-98.
[40] Tr. 1600-01.
[41] Tr. 1313-17.
[42] Tr. 1326-27.
[43] Tr. 1201, 1205-1206.
[44] Tr. 1318.
[45] Tr. 1353-54.
[46] Suppression Tr. 85.
[47] Tr. 149.
[48] Tr. 1207,1290.

14

On September 14, Officer Bray testified that he had accompanied a wrecker, which transported Mr. Jones's car to the Hamilton County Coroner's Office.[49] On September 14, 1994, Joan Dawson Burke, a criminalist with the Hamilton County Coroner's Office, examined Mr. Jones's automobile for traces of blood. After conducting a visual examination of the car, Burke was unable to find any traces of blood within the car.[50]

After Criminalist Burke completed her search of the vehicle, Blue Ash Police Officer Bray proceeded to conduct an additional search of Mr. Jones's car.[51] According to Officer Bray's testimony, he discovered three samples that appeared to be blood that Criminalist Burke was unable to detect. Nonetheless, the samples subsequently came back negative for blood from the coroner's office.[52] Officer Bray also recovered a black leather briefcase, which also contained Mr. Jones's criminal history. The officer also found a key ring containing a master key to Embassy Suites, and a toolbox from Mr. Jones's trunk.[53] Importantly, within the toolbox, Officer Bray discovered the pendant introduced at trial. He said that it was in plain view on the top of a tool tray in the toolbox.[54]

Over one year later, Mr. Jones was arrested by the Blue Ash Police Department. Upon his arrest, Mr. Jones was informed by Sgt. Lilley that he was under arrest for the murder of Nathan. Sgt. Lilley then placed in front of Mr. Jones a

---

[49] Tr. 1209.
[50] Tr. 933.
[51] Tr. 1212.
[52] Tr. 1230.
[53] Tr. 1215-1216, 1319-20.
[54] Tr. 1219, 1222.

photo of a pendant lying in his toolbox.—alleged to be from the victim.[55] At that point, Mr. Jones made a statement denying prior knowledge of the pendant.[56]

During trial defense counsel presented the testimony of Mr. Johnson. Mr. Johnson testified that he had worked on Mr. Jones's car the afternoon of September 4, 1994. He stated that the trunk to Mr. Jones's car was very neat, and that he used the tools in Mr. Jones's toolbox to repair the car. He did not see any pendant in the toolbox.[57] Through the testimony of a police officer about Johnson's prior criminal record, the State sought to impeach Mr. Johnson's credibility after he left the stand.[58]

### 2. Mr. Jones at the Embassy Suites on the day of the crime.

On September 3, 1994, Elwood Jones arrived at work at 5:00 a.m. with Earlene Metcalf. After cleaning a banquet room, Mr. Jones went to the dumpster to deposit large bags of trash. He slipped down the stairs located by the dumpster, and cut his left index finger on the dumpster as he landed.

Mr. Jones's duties that morning took him to various places throughout the building. However, no one saw him have any contact with the victim, nor did anyone see him enter or leave the victim's room. Co-workers who observed Mr. Jones immediately after discovery of Mrs. Nathan's body did not see any evidence of blood on his clothing, any sign of participation in a struggle, or note anything out of the ordinary.[59] The police also interviewed Mr. Jones that afternoon as part of their protocol to interview all (or nearly all) employees on du-

---

[55] M. Tr. 111.
[56] M. Tr. 111.
[57] Tr. 1582-85.
[58] Tr. 1578.
[59] Tr. 1038-1044, 1064-1080, 1448-1454.

16

ty that morning. No sign of blood, struggle or nervousness was observed by the police during their interview of Mr. Jones.[60]

As the result of the injury to his hand at the dumpster, Mr. Jones reported the injury, and filed a Worker's Compensation Claim. Extensive swelling and pain in this hand eventually led Mr. Jones to Bethesda Care Outpatient on September 6, 1994. From there, Mr. Jones was referred to Bethesda Hospital for emergency care. Dr. John McDonough conducted emergency surgery on Mr. Jones's hand that same day. Cultures of Mr. Jones's wound taken during this procedure revealed moderate beta hemolytic Streptococcus Group A, moderate alpha hemolytic Streptococcus and moderate probable Eikenella species. Mr. Jones remained in the hospital until September 10, 1994. He returned to Dr. McDonough's office on September 12, 1994 for additional treatment, and then for a final evaluation of his hand on October 19, 1994.

Between seven to ten days after Mr. Jones was discharged from the hospital, two detectives from the Blue Ash Police Department contacted and interviewed Dr. McDonough. Dr. McDonough was interviewed by the police on two more occasions.[61]

### 3. State's reliance on Jones's own physician.

The State relied upon the testimony of Dr. John McDonough to identify the cause of the injury to Mr. Jones's hand. Without objection, Dr. McDonough testified that Mr. Jones told him he injured his hand in the course of performing routine job duties; nonetheless, Dr. McDonough opined for the jury that the

---

[60] Tr. 1468-1472.
[61] Tr. 1027.

17

injury was a clenched-fist bite wound (a "fight bite") consistent with Mr. Jones's clenched fist striking Mrs. Nathan in the mouth.[62] Dr. McDonough further testified that the presence of Eikenella corrodens bacterium in the culture from Mr. Jones's hand infection led him to conclude that this wound was a bite wound.[63] In addition to this testimony, Dr. McDonough was permitted to present a slide show to the jury of pictures of hand and other injuries he fairly routinely gives to medical students, over the objection of defense counsel.[64] The slide-show lecture during his testimony included pictures of a woman with her ear bitten off, a description of these types of injuries as a result of aggressive behavior, and references to AIDS transmission.[65]

Mr. Jones's counsel attempted to rebut the testimony of Dr. McDonough through the infectious-disease-expert testimony of Dr. Joseph Solomkin. Dr. Solomkin, however, was not adequately prepared for his testimony. He received a few, incomplete medical records for his review immediately prior to his video-deposition testimony. Dr. Solomkin's deposition was taken prior to trial, and therefore, he did not have the opportunity to review McDonough's purported medical conclusions and opinions before offering his own testimony.[66]

The State relied upon "expert" testimony to attempt to link items recovered from Metcalf s home and the hotel to establish Mr. Jones as the perpetrator of the crime. The State introduced the testimony of four purported experts about the ostensible similarity between the victim's bruise patterns and physical ob-

---

[62] Tr. 1008.
[63] Tr. 1008.
[64] Tr. 994-95.
[65] Tr. 992-1000.
[66] Post-Conviction Exhibit G, Affidavit of Dr. Solomkin, ¶¶ 7, 20, VIII App. 370, 373.

jects in Mr. Jones's control at the time (i.e. a pair of shoes and a walkie-talkie.)[67] None of these witnesses were qualified to give opinions in the fields to which they testified. And none of these witnesses could render their opinions to a reasonable degree of scientific certainty.[68] As a result, their "expert" testimony was nothing more than unreliable laypersons' speculation cloaked in the garb of an inadmissible expert's opinion.

### 4. Introduction of Jones's Prior Conviction and Other Bad Acts Evidence.

To secure a conviction, the State made repeated references to Mr. Jones's prior criminal conviction, in an apparent effort to prejudice the jury.[69] References to Mr. Jones's prior criminal convictions were permitted despite the fact that Mr. Jones did not testify and his counsel had elected to have the trial court determine whether the prosecution proved the "prior offenses of violence" specifications on his indictment.[70] The State also admitted into evidence without objection the briefcase discovered in Mr. Jones's vehicle. The briefcase contained documents related to Mr. Jones's prior criminal convictions,[71] This briefcase included a variety of documents identifying Jones as a convicted felon:  Letter to unknown asking for job once released on parole (23); Final Release and Restoration Certificate from Ohio Adult Parole Authority dated, June 24, 1991 (25); Copy of "Your Rights and Benefits as an Ex-Offender" (26); Letter from London Correctional Institution informing of damaged cassette (27); Pre-

---

[67] Tr. 896 (Trimpe); Tr. 1391-1394 (Gerber); Stokes Video Deposition; Oliver Video Deposition.
[68] Tr. 896 (Trimpe); Tr. 1391-94 (Gerber); Stokes Video Deposition; Oliver Video Deposition.
[69] Tr. 63, 1123-24, 1363, 1584.
[70] Tr. 123-24, 1888.
[71] Inventory of Exhibit 71, Dkt. 141.

parole planning form dated August 1987 (28); Letter from Ohio Parole Board responding to a letter written by Jones concerning employment. Dated Jan. 5, 1987 (30); and Information from Adult Parole Authority, May 29, 1990 (238). There were other matters which impermissibly attacked his credibility.[72] To further imply Mr. Jones's guilt, during testimony and argument the State introduced evidence that Mr. Jones requested an attorney while being initially interrogated by the Blue Ash Police Department.[73]

On December 11, 1996, the jury returned guilty verdicts for the aggravated murder charges and specifications. On December 12, 1996, the jury returned a verdict sentencing Mr. Jones to death.

On January 9, 1997, the trial court accepted the jury's verdict and sentenced Mr. Jones to death for the murder of Nathan. Prior to receiving his sentence, Mr. Jones addressed the trial court. In this statement, Mr. Jones explained to the trial court the State's attempt on two occasions to offer him a charge of manslaughter in exchange for a guilty plea.[74]

## C. Evidence the Jury Should have Heard.

Post-trial, subsequent counsel discovered various items of evidence that would have substantially refuted the State's case, and likely resulted in a "not guilty" verdict for Mr. Jones.

---

[72] State's Exhibit 71; Tr. 1232-37.
[73] Tr. 1349,1749.
[74] Tr. 1977.

### 1. Interviews of Nathan Family about the various other description of the pendant.

The pendant was the key piece of evidence for the Government. During the final argument on the first phase of the trial, the prosecutors almost taunted the defense, saying:

> What about the pendant? What was said to you about the pendant? Nothing. You know why? Because they can't explain the pendant. They can't explain it at all.[75]

However, it turns out that the evidence of the pendant is not so clear cut. The search warrant sought a pendant described as silver. The Government seized a gold pendant. When the gold pendant was first shown to the victim's son, he said that he was almost certain that his mother's pendant was not gold and that there was not another bar at the bottom. He consulted some family photographs and changed his testimony.[76] The trial contained considerable testimony about the uniqueness of the pendant, that it was made from a family heirloom. An uncle told police officers that he still had the heirloom. Instead the item was purchased at Micheal's Jewlery in the Bronx.[77]

Rhoda Nathan's roommate at the hotel was first interviewed on September 3, 1994.[78] Then she described the necklace as having an odd shape, a cross having a few diamonds.[79] She was next interviewed by Det. John Ladd on

---

[75] Tr. 1813.
[76] BAPD 430-31.
[77] BAPD 430-31.
[78] BAPD 494-509.
[79] BAPD 508.

September 8, 1994.[80] Then she described the necklace as having three diamonds.

> Q. If you would turn to the second page, please, and in that there is a description of part of the interview with Ms. Nathan; is that correct?
> A. There was a description --
> Q. Not Ms. Nathan, Ms. Shub?
> A. Ms. Shub.
> Q. If you would read from the third paragraph where it says she also confirmed.
> A. She also confirmed that the necklace that the victim had been wearing was now missing, had three diamonds.
> Q. And in the next paragraph, if you would, just read the next paragraph.
> A. And there is still some question as to whether or not any of the victim's rings are missing. However, . . . [81]

When she testified, via videotape, on August 4, 1996, she identified State's Exhibit No. 3, as being the necklace. According to her, the diamonds came from Rhoda Nathan's mother-in-law's wedding band. Once Rhoda Nathan had the necklace, the victim always wore it.[82] There was no cross-examination about the earlier discrepancies because the defense did not have access to the Ladd interview.

The statements that the pendant was not unique would have been explored with the jurors:

> Q. Let me stop you there. What, as a defense attorney would be the significance of that paragraph to you if you had known that?
> A. If I had known that it probably, it was no longer a custom item, if the guy went into the jewelry store and bought it from the counter, say I probably would have checked that out to make sure and ask whether it was a single item or whether it was just items that they had kept and sold.
> Q. And you did testify earlier that throughout the trial this pendant was espoused by the State as being a one of a kind custom crafted thing?

---

[80] BAPD and 392-93.
[81] Hearing, pp. 92-93.
[82] Tr. Vol. 25, Schub deposition, pp. 11-12.

A. That's right. All throughout the trial they insisted it was a custom crafted one of a kind item.

Q. And you would consider this Brady information even though it's a police report?

A. Yes.[83]

The discrepancies in the descriptions of the pendant would have been used at trial.

Q. In noting the difference, would that have been of significance to you in preparing defense on that pendant issue?

A. Yes, it would.

Q. And how would that be?

A. Well, we would have investigated it pretty thoroughly. That was the key piece of evidence and we would have investigated it thoroughly to determine how many stones should have been in it, what their memories were of the stones, and you know, and questioned them about it.

Q. As it was, you felt you didn't have anything to question about at all since everybody identified it?

A. Actually, no, because during trial and prior to trial all of the information that we had and the evidence that was presented at trial said it was three bars, it was gold, and it had these stones. The picture was there of wearing, meaning Rhoda Nathan was wearing that item. I guess it's her daughter-in-law came and testified that she saw her wearing it, that was hers and it was one of a kind item.

Q. Now, as you indicated earlier this report was done on the 8th of September, 1994. Was that --

A. Yes.

Q. And that was prior to the search warrant --

A. Yes.

Q. -- being drawn up on the 12th?

A. Yes.

Q. Would it have been useful and Brady like to have known about this sister of Rhoda's who talked about the necklace --

A. Yes.

Q. -- and gave a description?

A. Certainly.

Q. You did not have that information?

A. No, we didn't.

Q. In defending this case was this considered a, to you at least, a circumstantial case?

A. Yes.

Q. There were no eye witnesses that said Mr. Jones did any of the things --

A. No.

Q. -- that he was indicted for?

A. No, there was no direct evidence presented that Mr. Jones did it.[84]

_____

[83] Hearing, p. 90-91.

Q. But to reiterate, they weren't going to talk to you about anything at all?

A. Correct.

Q. And as a result you wouldn't know without having the information in this document that this would have been a point to ask about?

A. Correct.

Q. Now, a little farther down right after it says the recovered pendant was unsealed from the property envelope in front of Val and Elke Nathan and Sergeant Feddish, start right there and read into the record where it says Mr. Nathan stated.

A. Okay, Mr. Nathan stated he was almost certain his mother's pendant wasn't gold and there wasn't another bar across the bottom as the one he was being shown.

Q. Important, not important?

A. Yes, it's important. Again, because it provides an argument to the defense through Mr. Nathan that is not his mother's pendant.[85]


Q. If you could read that right down to where, several lines to Crosby Avenue.

A. Okay. Mrs. Nathan commented that she would be willing to call Ira Nathan, Val Nathan's uncle, and see if he knew where the pendant was crafted. Ira Nathan by phone stated that the pendant had not been custom crafted from the grandmother's engagement as originally thought because he was in possession of this ring. He thought that Robert I. Nathan, his brother and Val's father, purchased the pendant at Michael's Jewelry Store in Bronx, New York on Crosby Avenue.

Q. Would that have been significant information for you to know in the defense of –

A. Yes, it would.

Q. And why would that be?

A. Because we were told that the pendant was a custom made piece which made it hard to argue that that was not Mrs. Nathan's where, in fact, if it was not a custom made piece and he could have called a family member to state that, we would have had evidence that, again, the pendant found in Mr. Jones's car did not belong to Mrs. Nathan.

Q. Potentially an item of jewelry found at any jewelry store or something like that?

A. Correct.

Q. Did you even know about who Ira Nathan was at the time of trial?

A. Before I was shown this at my deposition, I had never heard of these people in the Nathan family other than Elke and Val and I thought

---

[84] Hearing, pp. 94-96.
[85] Hearing, pp. 207-10.

somebody named Peter. And I thought there was someone named Carol also but I might be wrong. These people I never heard of.

Q. Would you consider this, despite the fact it's a police report, this is Brady material?

A. Yes, I would.[86]

Q. Had you had this information, Ms. Adams, would you then thought to cross-examine Elke Nathan after her testimony about saying that pendant was Rhoda's?

A. Yes, if we had this information, we would have structured the entire case differently.[87]

## 2. Presence of hepatitis.

The Coroner's report shows that Rhoda Nathan tested positive for hepatitis. These results would have been investigated.[88] The supposed linkage between the wound to Petitioner's hand and the victim made this matter very important.[89] Mr. Jones tested negative for hepatitis, something that his counsel felt was very important.[90]

This information was not provided to Dr. Solomkin. The hepatitis is more dangerous than Eikenella:

Q. When you take that in connection with the fact that Dr. McDonough has said that the Eikenella in his wound was caused by the bite of the victim, is there any contradiction when you look at this hepatitis result?

A. Oh, particularly taken into consideration the statement about the HIV transmission, yes, it is. Frankly it is very remarkable. The much more likely pathogen would be the hepatitis in terms of what would indicate that was the source of the organism. Again, it's unlikely it just isn't definitive for Eikenella.

Q. And would that diminish the likelihood that this wound was caused by a bite then?

---

[86] Hearing, pp. 208-09.
[87] Hearing, p. 214.
[88] Adams Deposition, pp. 27-29.
[89] Sanks Deposition, p. 28-31.
[90] Sanks Deposition, p. 28; Adams Deposition, p. 28..

    A. In my opinion it would decrease the likelihood that was caused by a bite from someone who was antigen positive.

    Q. Now, in 1996 did you have this information, did you know about this?

    A. No.[91]

### 3. Hotel Guests and employees descriptions of other intruders.

Various employees and guests described incidents and persons who could have easily been the culprit in this case.

Hotel guests described incidents and persons. Gerald Cantor, reported on three breaches of normal, appropriate hotel security on Friday afternoon, including on involving Rhoda Nathan,[92] but did not list the details in his response. This information would have been used by the defense:

    Q. Would it have been helpful for your defense?

    A. Certainly. We are talking about a breach of security that involved Rhoda Nathan, the victim. I would certainly would like to know what that breach of security was.

    Q. Do you consider it Brady?

    A. Very much so.[93]

There were other reports that were not turned over to the defense. Sammuel Huffaker reported that around 8:45 am a man wearing a kakhi shirt, stuck his hand in the open door, a man about 5'9" tall with brown hair and a mustache. Shannon Pans complained that an African-American man tried to get into her room on Saturday afternoon by asking about a broken shower door in her room; the man did not identify himself as a maintenance worker.[94] Jeff Jones complained about a transient man who was out of place in the hotel.[95] Thomas L. Cratin complained that someone tried to enter their room between

---

[91] Hearing, p. 25.
[92] Hearing, p. 117, 239-40; BAPD 1197
[93] Hearing, p. 118; see also Hearing 240-41.
[94] BAPD 1159.
[95] BAPD 1163-64.

3:00 am and 4:00 am.[96] Tom Wellman complained about a person opening his room with a key[97]. On Friday evening Carolyn J. Turner observed a tall blond kid, in his mid-twenties roaming around during the time of the free drinks.[98] Carrie Luckett observed a white man with a mustache and long-sandy-blond hair at the cocktail the night before[99]. Another witness, Sidney Gittleman, observed two men trying to get into his room on Friday afternoon between 3:30 pm and 4:00 pm.[100] Stacey Shub reported that the maid came to her room very very early and that later another maid showed up unaware that it had been cleaned; that her room number had been given out loud; and that the back door was unlocked.[101] Linda Motashami reported lax security during the weekend.[102]

The Government took statements from three persons who presented information contradicting what was presented at trial. None of the statements was presented to defense. Robyn Williams, a guest at the hotel had been in Room 417. She told Sgt. Schaffer that between 7:45 am and 7:50 am she noted a white male in his late 20's walking rapidly toward the southwest exit of the building. The man was thin build, about 6' with medium brown hair and wearing dark clothing. The exit door had been wedged open with a yellow plastic drinking cup. The person left the hotel parking lot on foot, walking across Lake Forest Drive.[103] The defense would have followed up on this information.[104]

---

[96] BAPD 1169.
[97] BAPD 1165-66.
[98] BAPD 1171-72.
[99] BAPD 1175.
[100] BAPD 1177-78.
[101] BAPD 1846-46.
[102] BAPD 1853-54.
[103] Hearing, pp. 99-101; HamPros 1327.

27

The Government also took statements from two employees. Ryan Norman was one of the first employees on the scene. He saw a dark skinned male wearing a brown shirt with a Caucasian man outside the room.[105] This information was not presented to the defense and would have been helpful.[106]

> Q. Is there anything in that statement which you said you didn't have that would have been significant in your investigation?
> A. We would have wanted to speak with Mr. Norman about getting more details on the dark skinned male wearing a brown shirt and another Caucasian male who were in or around the room.
> Q. Do you consider it Brady type material?
> A. Yes, I do.[107]

Demetrius Williams also told officers on September 3, 1994, about a black guy and a white guy coming out of the victims room.[108] These employees knew Petitioner. Demetrius Williams testified for the Government.[109]

The Government discussed in its opening that Mr. Jones had a criminal record.[110] The Government asked one of its officers about a 1992 theft conviction.[111] Many on the staff had criminal records. The Government was much more careful with the other employee criminal records, letting the defense know only about the criminal records of the people actually testifying. Nonetheless, the investigators had compiled the criminal records for all of the employees. The list also indicated whether the employee had been subjected to a polygraph examination.[112] Counsel considered this Brady information.[113] This

---

[104] Hearing, pp. 101-02.
[105] Hearing, pp. 110-11, 223-24. HamPros pp. 1508-09, 1711-12.
[106] Hearing, p. 111.
[107] Hearing 224.
[108] Hearing, pp. 107-09; HamPros pp. 507 & 509.
[109] Tr. 1047-64.
[110] Tr. 825-26.
[111] Tr. 1578.
[112] HamPros pp. 1929-34.
[113] Adams Deposition, p. 48.

compilation would have assisted counsel. The Government also compiled a list-ing of the employee's location based upon its interviews.[114] This would have helped with witness interviews, particularly because of the length of time be-tween the opportunity to investigate and the events.[115]

These incidents point toward a gang operating in the hotel—which contra-dicts the Government theory that Petitioner was the culprit. None of this infor-mation was available to Petitioner at trial or in the state-post-conviction pro-ceeding.

### 4. Reports of Regular Similar Criminal Activity at the Embassy Suites Hotel.

Post-conviction counsel obtained Blue Ash Police Department's (BAPD) Yearly Reports of criminal activity from BAPD's Hotel Motel Interdiction Unit from the attorneys' discovery materials in the civil case brought by Mrs. Na-than's estate against the owner of the Embassy Suites Hotel. Nathan v. Wind-sor Capital Group, Case No. A-9601060 (Hamilton County, Ohio, Court of Common Pleas).[116]

One of the State's central themes of prosecution against Mr. Jones asked the jury to infer that Mr. Jones perpetrated the crimes from the fact that he was a convicted criminal employed by Embassy Suites who had access to a passkey for the guest rooms. In other words, that he had opportunity, propen-sity, and motive to commit the crimes. Mr. Jones's defense was that he did not commit the murder. This theory of defense could have been further advanced by the presentation of evidence that Embassy Suites Hotel routinely hired

---

[114] HamPros pp. 1675-79, 1915-25.
[115] Adams Deposition, p. 51-52.
[116] Post-Conviction Exhibit YY, XII App. 258-80.

many employees with criminal records; that Embassy Suites Hotel guests were routinely victims of crimes; and that Embassy Suites Hotel rooms were routinely utilized by unsavory characters involved in drugs and prostitution. The fact is that many if not most of the Embassy Suites Hotel employees were cast in the same mold struck by the State against Mr. Jones. These other employees should have been exposed as being equally likely suspects in order to undercut a substantial portion of the State's case against Mr. Jones.

The undisclosed BAPD Hotel/Motel Interdiction Unit reports include a breakdown of the types of criminal offenses that occurred in the hotels contained within the Blue Ash area. Embassy Suites Hotel was one such hotel contained in these reports. Embassy Suites Hotel was the leader during both 1994 and 1995 with criminal arrests and police runs to the Hotel. More specifically, in its 1994 Yearly Report, the BAPD described theft as the largest volume problem for the hotel. The report further details each incident that occurred in Embassy Suites, which required police intervention.[117]

Notably, following the September 3, 1994 murder of Rhoda Nathan, a similar criminal action took place on December 27th when a guest reported that someone attempted to gain entrance into her room with a key. Following an investigation, the BAPD discovered an unauthorized employee with a key to the room.

Numerous other thefts were also reported after the September 3rd incident (incidents occurring on September 4, 1994, September 6, 1994, September 7, 1994, September 15, 1994, October 9, 1994, October 10, 1994, October 12,

---

[117]Post-Conviction Exhibit YY, XII App. 258-80.

1994, October 20, 1994). The trial record reveals that Mr. Jones was no longer working at Embassy Suites when the majority of these incidents took place. The evidence contained within BAPD's Yearly Reports regarding the criminal activity in Embassy Suites subsequent to the September 3rd incident would have lent more support to for Jones's defense. Moreover, the fact that a similar crime took place only three months after Mr. Jones left the hotel supports the defense theory that someone other than Mr. Jones committed the crime.

### 5. Evidence Impeaching the Discovery of the Pendant by Officer Bray.

Post-conviction counsel also discovered documents by which the Blue Ash Police Department tracked, tagged and recorded the physical evidence taken into custody during the investigation of the death at issue here.[118] These documents would have gone a long way to impeaching Officer Bray's testimony regarding the finding of the pendant, as well as undermining the investigative techniques used by other law enforcement.

As with any criminal investigation and eventual prosecution, one of the most rudimentary yet critical issues is whether the law enforcement officials accurately documented the physical items they took into possession and accurately recorded a chain of custody for those items eventually offered into evidence at trial. When these types of documents contain evidence of irregularities, they become favorable to the defense and must be disclosed by the prosecution. This is all the more compelling when, as in Mr. Jones's case; certain physical items became central features of the prosecution's case.

---

[118] Post-Conviction Exhibit L, IX App. 32.

The property-tag documents are self-triplicating, approximately five (5) by seven (7) inch pre-printed cards bearing the name and address of BAPD. Each individual card is captioned a Property Tag, and each one has a pre-printed, sequential number appearing in the upper left-hand comer of the document. Each pre-printed Property Tag has places for recording the date and time the evidence was taken, for describing the evidence taken, from whom or where it was taken, and other general information basic to the law enforcement officials' need to record the chain of custody for physical evidence. Due to irregularities between the pre-printed sequential number of certain Property Tags and the date inserted by the Officer who acquired the property and placed it in the BAPD property room, these documents open windows onto the unreliability and questionable credibility of critical prosecution evidence and testimony that was unseen by Mr. Jones's jurors.

Reference to the Property Tag's pre-printed number and the hand-written date recording the date on which the item was taken into possession by BAPD reveals a simple but important pattern: multiple items collected on a given date (for example, during the search of Mr. Jones's residence and car) are recorded on a series of sequentially numbered Property Tags, each of which contains what purports to be the date on which the Officer came into possession of the item. Thus, upon inspection of these documents it becomes immediately obvious that any gaps in the sequentially numbered Property Tags must be explained. Likewise, it is obvious that any hand-written date entered on a Property Tag, the number of which falls outside of the sequence of the sub-set asso-

32

ciated with other items collected on or about that same date, also raises immediate suspicions.

The evident anomalies and suspicious matters contained within the BAPD property tags include the following:

1) Property Tag # 29644[119] pertains to Elaine Schub's purse (she was one of the two persons who shared the hotel room with the victim). This Tag has the highest number and is the last one in the set. Nonetheless, it is inexplicably dated September 9, 1994,. Even the date recorded is suspect: it has clearly been changed and seems to have originally read "September 6, 1994." This, of course, is ludicrous when compared to the testimony saying that the police unwisely allowed Ms. Schub to take the purse home to Florida and only much later asked to her send it back. Also of great significance is the fact the BAPD Officer Bray's name appears on this form. Bray is the Officer who, among other things, claimed to have found the all-important pendant in Mr. Jones's car. He also claimed that he found bloodstains on Mr. Jones's car that a trained forensic serologist was unable to detect. Tag #28386.[120] If Officer Bray is willing to backdate documents and record misleading if not outright false information, what else is he capable of?

2) The following Property Tags pertain to Bray's search of Mr. Jones's car: 28376, 28377, 28378, 28379, 28380, 28381, 28382, 28383, and 28386.[121] Bray testified that he searched Mr. Jones's car on September 14, 1994, after waiting for the forensic serologist to check it for blood (he did not want to disturb potential trace evidence). Tag 28376 relates to the pendant and is dated September 14, 1994. Tag 28384 is missing. Tag 28386 is ostensibly dated September 15, 1994, and relates to the blood swabs of the trace evidence Bray claimed he detected; but the criminalist was unable to detect. Moreover, the date on 28386 has clearly been altered and appears to have originally read "September 13, 1994," which would have put Bray in Mr. Jones's car alone a full day before he claimed he searched it.

3) Property Tag 29214[122] records the return to BAPD of photographs from the FBI forensic laboratory. In what again appears to be Bray's handwriting it says, "Photo evidence—negative results from FBI shoeprint exam." This was not used at trial.

---

[119] Post Conviction Exhibit L, IX App. 32.
[120] Post Conviction Exhibit L, IX App. 25.
[121] Post Conviction Exhibit L, IX App. 20-25.
[122] Post Conviction Exhibit L, IX App. 31.

4) The property tags obtained did not include tags for Mr. Jones's vehicle or the keys to his vehicle that were confiscated from him by the Blue Ash Police Department on the night of September 12, 1994. These tags were missing even though other items of evidence collected that same evening were eventually logged, tagged and placed in the BAPD Property Room. It appears the BAPD acquired two sets of keys to Mr. Jones's car on September 12, 1994, , neither of which were tagged and logged into the BAPD Property Room, and one set of which cannot be accounted for. Compare Sgt. Lilley's testimony,[123] with Officer Boyatt's testimony,[124] and Officer Bray's testimony.[125]

5) When Sgt. Lilley interrogated Mr. Jones on September 12, 1994, at the BAPD headquarters, he made him empty his pockets and confiscated the contents. Mr. Jones's possessions included at least one set of car keys and a handkerchief.[126] Although no property tag records the receipt of the car keys, Property Tag 29385[127] purports to log in a bloody handkerchief taken from Mr. Jones at the Blue Ash Police Department station on September 12, 1994. Importantly, Property Tag Number 29385[128] actually corresponds in sequence with items taken from the search of Mr. Jones's car on September 14, 1994. Thus, it is irrefutable that no BAPD employee tagged the handkerchief and deposited it into the BAPD Property Room when BAPD acquired possession of it on September 12, 1994. And there is no mention whatsoever during the trial of a "bloody" handkerchief.

The improper maintenance of the evidence by the Blue Ash Police Department impeaches the credibility and reliability of Officer Bray's testimony with respect to the pendant allegedly discovered in Mr. Jones's car. The Property Tag paper trail proving mishandling if not misconduct should have been used to impeach this testimony at trial. According to Officer Bray, Sergeant Lilley gave him the keys to Mr. Jones's car and instructed Bray to keep them; so Bray put them in his desk.[129] Officer Bray had free access to these keys, without supervision from others in the department, throughout the three days prior to the

---

[123] Tr. 1353-1355, 1366, 1372-1373.
[124] Tr. 1318-1319, 1326-1328.
[125] Tr. 168-169, 176, 1205-1210.
[126] Tr. 1353-1355,1366,1372-1373.
[127] Post Conviction Exhibit L, IX App. 32.
[128] Post Conviction Exhibit L, IX App. 32.
[129] Tr. 1205-1210.

search on Mr. Jones's car. Moreover, (1) when Officer Bray was not physically in possession of the keys, they were allegedly kept in an unlocked drawer of his desk; and (2) there was a second set of car keys that were ostensibly unaccounted for.[130] Not surprisingly, Officer Bray claimed that he discovered the victim's pendant in Mr. Jones's toolbox in the trunk of his car after obtaining possession of these keys. This exculpating, favorable impeachment evidence should have been disclosed to Mr. Jones's trial counsel and utilized by defense counsel to confront and impeach the state's case and its witnesses during Mr. Jones's trial.

### 6. Dr. Solomkin's Expert Opinion.

Post-conviction counsel contacted Joseph S. Solomkin, M.D., and had him review all the evidence relating to Mr. Jones's injury, including the complete testimony of Dr. McDonough. Dr. Solomkin testified before Dr. McDonough.[131] Dr. Solomkin did not know that Dr. McDonough would testify that the Jones's wound was a fight bite because of the presence of Eikenella Corrodens.[132] After having reviewed everything, Dr. Solomkin produced an affidavit which substantially refuted Dr. McDonough's conclusion that the Eikenella corrodens in Mr. Jones's hand injury, was likely a result of a fist-to-mouth blow. As attested to by Dr. Solomkin, defense counsel's total lack of preparation and investigation of the issues central to McDonough's testimony rendered them ineffective (1) in confronting Dr. McDonough and (2) in attempting to utilize Dr. Solomkin's expertise to rebut McDonough's testimony. Everything Dr. Solomkin says in his

---

[130] Tr. 1366, 1372-1373.
[131] Hear. 51.
[132] Hear. 58-59.

affidavit could have and should have been utilized in Mr. Jones's defense at tri-

al.

Dr. Solomkin's affidavit recounts numerous ways in which Mr. Jones's

counsel failed to effectively prepare and confront Dr. McDonough's unscientific,

ill-founded opinions. In fact, Dr. Solomkin so thoroughly exposes the many

reasons why McDonough's testimony is totally unreliable that effectively pre-

pared defense counsel could have successfully challenged the admissibility of

McDonough's testimony because his so-called opinions were not medically reli-

able enough to be admitted for the jury's consideration.

Dr. McDonough may well be an expert hand surgeon; unlike Dr. Solomkin,

McDonough is not an expert in the area of infectious diseases. As a result,

McDonough's testimony was rife with error as illustrated by the following ex-

amples pulled from portions of Dr. Solomkin's affidavit (the numbers refer to

the numbers paragraphs in the affidavit) (bold emphasis added):

> 7. Dr. McDonough's unverified and misleading claim of certainty about
> the rarity of Eikenella in his personal experience should have been ques-
> tioned, and important modifiers such as the number of infections operated
> upon (and documented, not just estimated), the number of these which
> were cultured, and the number which grew Eikenella should have been re-
> quested. **Dr. McDonough's assertions about Eikenella cannot and did
> not rise anywhere near a reasonable degree of medical certainty** be-
> cause they meant nothing without being set in the context of a reliable data
> base derived from (a) the total number of hand infections he had operated
> on; (a) the subtotal of those infections which were cultured; and (c) the sub-
> total of those cultures where Eikenella grew. . . .

At the hearing, Dr. Solomkin testified:

Q. All right. You indicated in the third paragraph that as part of Dr. McDonough's opinion that he described this Eikenella Corrodens organism as being extremely rare. You disagreed with that and why and how is that a focal point in this case?

A. Well, to start with, the organism that we are discussing lives in environments that are relatively deprived of oxygen and there are several places on the human body that are like that. Mainly in the gastrointestinal tract. There are all sorts of places in nature that are like that and bacteria combined together very often create those kind of environments. Eikenella is an organism that prospers in those kinds of environments and can survive and divide and really fulfill its evolutionary job.

To do that it's developed several mechanisms for that kind of survival. One is an ability to actually destroy oxygen in low concentrations. Another one is ability to adhere to specific proteins so that it becomes associated with living matter including our own mouths and feces and any rotting garbage, anything that has protein and is deprived or has reduced amount of oxygen.

So any infection that people get as a consequence of exposure to that kind of material where there is not much oxygen present can be, the infection can be caused by and you can culture from that this bacteria, Eikenella Corrodens. The types of infections that most commonly occur are in the GI tract where it's been recognized as relatively common pathogens in abdominal infections such as even appendicitis which is near the colon in an anaerobic environment.

The other area is in any oral infection and in any kind of bite wound or injury where the wound is inoculated with an anaerobic material, you can get an Eikenella infection. So it's not a mysterious or rare organism. We see it frequently and we see it in the range of different infections and the common denominator is contamination from an anaerobic, from material. It doesn't have to really be human material that is in an anaerobic state.[133]

Q. Essentially when you are taking exception to him saying it's extremely rare, that's in connection with his opinion that this Eikenella, which was found present in Jones, came from the mouth of the victim, correct?

A. Yes, that's correct.

Q. And would it be correct in saying that since it's not extremely rare by your opinion that Jones could have gotten this Eikenella infection from any number of sources?

A. Yes, sir. It's my opinion it's informed by several very careful scientific studies on the subject. So it's based on, far beyond my own experience in practice or my opinion. I guess it depends on the definition of opinion, but I want to make the point that it's well established in the medical literature.

---

[133] Hear. 15-17.

Q. And it's an opinion based to a scientific certainty?
A. Yes, sir.[134]


8. ... Whatever Dr. McDonough's personal experiences with Eikenella infections in the hand have been, no single medical clinician's personal experience can or should form the basis for statistical conclusions about the rarity or prevalence of any organism. Statistics by their very definition must be culled from rigorously controlled research experiments and/or carefully controlled studies of the experiences of practitioners in the field to have any scientific reliability whatsoever. Otherwise, as with Dr. McDonough's testimony, inaccurate implications are suggested and incorrect inferences are drawn from limited, untested and uncorroborated personal experiences. Even the most rudimentary familiarity with this simple principle underlying the science of statistics would have permitted an attorney to reveal this **fundamental flaw in Dr. McDonough's claimed rarity of the Eikenella.**

9. I am also concerned that the overriding failure to differentiate between Dr. McDonough's operative experience with the hand and his knowledge (or lack thereof) of the microbiology of hand infections went unchallenged when he stated that an inoculation had to occur as a result of contact between Mr. Jones's hand and another's mouth. (Transcript pages 1005, 1026). **This assertion is wrong and does not constitute an opinion rendered to a reasonable degree of scientific certainty.**


Q. Now, let me move to paragraph four of your affidavit, and you are indicating that in this case Dr. McDonough did not seem to be familiar with the medical literature and presented one article which had not much to do with this. Could you elaborate on that?
A. Yes, the only evidence that Dr. McDonough gave beyond his own personal experience was a newspaper article about HIV, AIDS, being transmitted through the human bite which may well have happened. I'm certain that it can happen, but it really has nothing to do with this particular case since HIV and AIDS are not involved in this case. And there is, on the other hand, a much more substantial scientific literature that deals with this.
Q. You also indicated in paragraph four of your affidavit that Dr. McDonough was permitted to render opinions of matters pertaining to the specialty of microbiology when he was not a microbiologist or a specialist. Had you heard his testimony, would that have allowed you to at least comment on that during the trial or give assistance to the attorneys in the case?

---

[134] Hear. 18.

A.  Yeah, I think it is really a fundamental issue because allowing that misperception to stand effectively unchallenged, I think it let's all of this testimony, it gives it an air of—

Q.  Authenticity?

A.  —accuracy.

Q.  Accuracy? Okay.

A.  Because frankly it doesn't deserve it.

Q.  To your knowledge what was the specialty of Dr. McDonough?

A.  He's a hand, he's a general surgeon and hand surgeon. He and I've worked together before he left the university right before I arrived there.

Q.  Are you saying then he was giving opinions in a microbiology area for which he was not qualified to give?

A.  Yes.

Q.  And without objection?

A.  Yes, exactly right.[135]

10. In fact, Eikenella has come to attention in my professional field precisely because of its specific virulence mechanisms which allow it to produce infection even when it contaminates wounds at low concentrations. In effect, this means that there are many potential sources of Eikenella infection like the one at issue in Mr. Jones's case, including but not limited to striking someone in the mouth (assuming that the mouth struck contains Eikenella). Therefore, it is not possible to say with a reasonable degree of medical certainty that any given possibility is in fact the source of the infection; or, conversely, that any alternative infectious source can be eliminated to a reasonable degree of medical certainty.

11. Similarly, Dr. McDonough's statement on page 1001 of the transcript that "It [Eikenella] is very rarely found in saliva. It is almost always found in the dental plaque," **is simply untrue and does not constitute an opinion rendered to a reasonable degree of medical certainty.** It is my opinion to a reasonable degree of medical certainty that this claim is wrong; as such, it cannot be characterized as merely a differing opinion rising to a reasonable degree of medical certainty.

12. .... Dr. McDonough's inference from the absence of Eikenella after aggressive antibiotic treatment that Mr. Jones had no Eikenella in his oral flora before undergoing the antibiotic treatment is **simply wrong** and cannot be characterized as a different opinion rising to a level of reasonable medical certainty.

13. I was frankly quite surprised that the slide presentation suggesting that this was a bite injury was not challenged more strenuously. The transcript states that pictures of human bites to the ear, to the fingers due to a man's putting his hand in the mouth of a seizure victim and others were introduced. (Transcript pages 992-1012). This goes to Dr. McDonough's expe-

---

[135] Hear. 18-20.

rience with hand surgery. It has nothing at all to do with the question of what caused this particular wound and the meaning of this particular culture positive for Eikenella corrodens.

15. Moreover, given what I understand to be the thrust of Dr. McDonough's testimony in the context of the prosecutors' theory that Mr. Jones struck the victim in the mouth during a lethal assault, thereby cutting his hand and inoculating the wound with Eikenella, it is impossible to make the medical link of causation connecting these two people without knowing whether or not the victim's oral cavity contained the Eikenella organism. Implicit in Dr. McDonough's testimony is either the unproven presumption that the victim's oral cavity contained Eikenella and/or the inaccurate presumption that all persons' oral cavities contain Eikenella. It is not the case that all persons' oral cavities contain Eikenella. It is my opinion to a reasonable degree of medical and scientific certainty that approximately one third of all persons' oral cavities contain the Eikenella organism. Therefore, absent a culture taken from the victim's oral cavity proving that the Eikenella organism was present and given the general prevalence variable of one-third, it is more likely than not that the victim did not have the Eikenella organism in her oral cavity (two out of three people do not have it).

16. Dr. McDonough linked a hand injury together with the presence of Eikenella to "prove" that Mr. Jones's injury came from striking someone in the mouth, not from a deep cut contaminated by his own saliva or any other infectious source. This is simply not supported by what is known about Eikenella and its impressive ability to cause infections at law inoculum levels. *It is in fact possible that an open hand wound could be inoculated with Eikenella by a person's saliva where that person causes contact between his wounded hand and his mouth.* **Dr. McDonough's testimony to the contrary is wrong and cannot be characterized as a different opinion rising to the level of reasonable medical certainty.**

17. Dr. McDonough introduced two self-serving stages of speculation: the mechanism of the injury and the cause of the infection. He used the speculative conclusions at each stage to justify the other in an errant exercise in circular logic. In effect, he said 'this is a bite wound because Eikenella is present and Eikenella is present because this is a bite wound.' Far from corroborating a medically reasonable opinion, the self-justifying circularity of Dr. McDonough's assertions compounded the unreasonable and unreliable testimony he gave on both the topic of the mechanism of the injury and the cause of the infection. **It is my opinion to a reasonable degree of medical certainty that these errors of analysis and Dr. McDonough's conclusions are simply wrong; as such, they cannot be characterized as merely differing opinions rising to a reasonable degree of medical certainty. . . .**

40

19. What concerns me is that Dr. McDonough is supposed to be a neutral teller of truth, a man possessed of special medical experience and knowledge. In fact, the only way to characterize his testimony in light of the contrary but correct medical and scientific principles addressed herein is to say that **Dr. McDonough was simply speaking and acting as an agent for the prosecution. Many of his statements were inaccurate or flat wrong**.[136]

In Dr. Solomkin's scientific opinion it was impossible to know the source of Eikenella in Mr. Jones's hand injury. The Eikenella could have come from any source because it is such a virulent organism. Dr. McDonough was simply unqualified, ill-equipped, and wrong to testify as he did at Mr. Jones's trial.

Dr. Solomkin's testimony was presented through a video deposition. The deposition was taken before Dr. McDonough testified and at a time when Dr. Solomkin thought that Dr. McDonough would be testifying only to his operative findings, not to the fight bite theory:

Q.  Dr. Solomkin, did anybody in deposing you at any time convey to you that Dr. McDonough was going to give this fight bite theory of causation of that wound?
A.  No, I thought he was just going to testify as to what his operative findings were.[137]

---

[136] Post-Conviction Exhibit G, pp. 2-5, VIII App. 370-73. Bold emphasis added.
[137] Hear. 56.

*Argument*

## First Ground for Relief: Juror misconduct during Mr. Jones's capital sentencing hearing denied him a fair and impartial determination of his sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States

*Petitioner abandons this claim.*

## Second Ground for Relief: Prosecutors introduced improper evidence and used improper arguments throughout Mr. Jones's trial. Defense counsel frequently failed to object to the prosecutors' improper tactics; they failed to challenge some constitutionally infirm evidence with a motion to suppress; and they permitted prejudicial attacks on Mr. Jones's character, going so far as to impugn their own client's character with inadmissible evidence. Throughout the pre-trial and trial proceedings, the trial court failed to ensure that only constitutionally fair and reliable evidence was admitted and arguments made. As a result, Mr. Jones's constitutional rights to effective assistance of counsel, a fair trial, and to be free from an arbitrary and capricious death sentence were violated.

Mr. Jones did not have a fair trial. Jurors relied upon constitutionally infirm, inadmissible evidence at both phases of the trial-evidence which they never should have had before them. The prosecutors managed to introduce this evidence with little if any objection by the defense; defense counsel abdicated their role as advocates for Mr. Jones; and the trial court abandoned its duty to guarantee a fair trial by guarding against the admission of improper and constitutionally infirm evidence. These violations violated the clearly established Supreme Court of *Strickland v. Washington*, 466 U.S. 668 (1984).

42

## A.  Improper Evidence Admitted and Testimony Adduced During Trial

### 1. The fact that Mr. Jones exercised his right to counsel was improperly admitted to make him look guilty.

*Standard of Review*

This item was raised Assignment of Error Three, App.[138] It was raised in the Ohio Supreme Court in the Proposition of Law No. Nine.[139] The Ohio Supreme Court overruled the issue on the merits, holding that the curative instructions solved any problems.[140] This item is reviewed under the AEDPA standard of review.

*Procedural Default*

The Government concedes that this claim is preserved for habeas review.[141]

*Clearly established United States Supreme Court law*

The clearly established United States Supreme Court law is *Doyle v. Ohio*, 426 U.S. 610 (1976).

*Merits*

Given the repeated nature of the violation, this is an unreasonable application of United States Supreme Court law to the facts.

This was not harmless error but repeated several times throughout the trial. The prosecutor improperly elicited from a police officer the fact that Mr.

---

[138] Br.19-22, III App. 74-77.
[139] Merit Brief, p. 23-27, IV App. 57-61.
[140] Opinion 16-17, IV App. 404-05.
[141] Return of Writ, p. 59.

Jones requested a lawyer during questioning.[142] The fact that Mr. Jones exercised his right to counsel appeared in a police report the prosecution offered into evidence. Defense counsel moved to redact that portion of the officer's notes of his interview with Mr. Jones before the notes were admitted into evidence. The trial court denied that motion without offering any reason for its refusal, but agreed to instruct the jury on Mr. Jones's right to silence. The officer's notes were admitted as Exhibits 87 and 88. Defense counsel renewed the objection, which was overruled again.[143] In closing argument, the prosecutor claimed that Mr. Jones consulted counsel before he was questioned by the police for the first time.[144] This claim was not only unsupported by the evidence but it constituted an attempt to impeach Mr. Jones for exercising his constitutional right to consult with counsel.

The trial court's decision to permit this evidence to come before the jury was erroneous. Defendant's exercise of his right to counsel is protected by the Fifth Amendment to the United States Constitution, and parallel Ohio constitutional provisions. It may not be used against him for any reason, nor should it be considered probative of guilt. Even though the jury was instructed not to consider the request for counsel as proof of guilt, it should not have been permitted to consider it at all. If not probative of guilt, it is not relevant evidence, and should not be admitted. The trial court should not admit irrelevant evidence and try to prevent any potential prejudicial impact with a curative instruction. The danger always exists that a curative instruction will serve only to

---

[142] Tr. 1331, 1348-1349.
[143] Tr. 1423-1424.
[144] Tr. 1749.

call the jury's attention to the improper inference which could be drawn from this evidence. No danger of prejudice exists if the court redacts irrelevant and potentially prejudicial evidence before the jury receives the exhibits.

Even if the court finds some marginal relevance to evidence that Defendant asked for an attorney, any speculative probative value is more than outweighed by the danger of unfair prejudice. The fact that the court found it necessary to give a curative instruction acknowledges the danger here. Despite the strong constitutional and historic basis for the right to counsel, and the protections afforded a criminal suspect, it cannot be denied that the public has a negative image of attorneys, and often associates a request for counsel with guilt. "I have nothing to hide" is a cliché in our culture. Silence in the face of accusation runs counter to that cultural bias.

Prior to being questioned, Defendant was read his Miranda rights.[145] Having . . received the Miranda warnings, Defendant was aware of his right to cut off the questioning procedure at any time. When he determined that he was being accused of involvement in the murder of Rhoda Nathan, and prudently decided that he wanted counsel present before making any further statement, he was acting in reliance on the express and implied assurances of Miranda. Unfortunately, these assurances were violated when the State was permitted to introduce into evidence the fact that he made such a request. It cannot be argued that this request was not being used against him. What other reason could the state have for offering such evidence? No one even suggested any possible neutral value to this evidence.

---

[145] Tr. 1340.

Both the United States and Ohio Supreme Courts have rejected such tactics as fundamentally unfair and violative of due process.[146] The overwhelming weight of precedent on this issue condemns as reversible error any adverse use of Defendant's post-arrest silence, whether it is elicited from state's witnesses on direct examination,[147] from Defendant or others on cross examination, *Doyle* or simply raised by the prosecutor during argument, *Stephens*.

It is clear that none of the exceptions to the rule apply here. Defendant never waived his constitutional privilege of silence, nor did the prosecutor's references relate to silence before Defendant received his Miranda warnings. For this reason, introduction of evidence concerning Defendant's termination of questioning were highly improper. At least one Ohio appellate court has found comments on such evidence to be plain error; so egregious and obviously prejudicial as to require reversal even when no objection was made at trial and the issue is not raised in Defendant's brief.[148] Certainly, in the case at bar, where timely objections were made, the error cannot be dismissed as harmless. Defendant is, therefore, entitled to relief. The rejection of this issue was an unreasonable application established United States Supreme Court law to the facts.

---

[146] *Doyle v. Ohio*, 426 U.S. 610 (1976); *State v. Chinn*, 85 Ohio St.3d 548, 560-561, 709 N.E.2d 1166, 1178 (1999); *State v. Stephens*, 24 Ohio St. 2d 76, 81-82, 263 N.E.2d 773 (1970).
[147] *State v. Eiding*, 57 Ohio App. 2d 111, 385 N.E.2d 1332 (1978).
[148] *Id.*

## 2. The fact that the Grand Jury indicted Mr. Jones was improperly admitted to make him look guilty.

*Standard of Review*

This item was raised Assignment of Error One, 11 in the Application for Reopening Pursuant to App. R. 26(B), p. 3, XV App. 22. The Court of Appeals disposed of the failings of appellate counsel by saying that the issue had been, "raised by [direct] appellate counsel in some manner."[149] It was raised in the Ohio Supreme Court in Proposition of Law No. Two, G, Merit Brief from the denial of the Reopening, p. 29-30, XVI App. 49-50. The Ohio Supreme Court denied the appeal without separately addressing the issue. The last court to review the item did not adjudicate it on the merits.

The pre-AEDPA de novo standard applies to this case. The Sixth Circuit Court of Appeals has held that the pre AEDPA de novo standard applies when the state court did not assess the merits of a claim:

> But when a claim has not been "adjudicated on the merits in State court proceedings," id., and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").[150]

The State Court disposed of this claim perfunctorily on res judicata and related issues that did not discuss the claim.

*Procedural Default*

The Government asserts that this item was not raised in state court. Return of Writ, p. 59. The failure to object at trial and to assert error on direct

---

[149] Opinion, p. XX.
[150] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

appeal were failings of trial and appellate counsel that have been presented to the state courts in the *Murnahan* proceedings.[151] The Court of Appeals rejected this issue of procedural grounds.[152] This Item and the summary disposition were presented to the Ohio Supreme Court.[153] The Ohio Supreme summarily denied review. Thus under *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005), this Court should review the procedural default under the pre-AEDPA de novo standard.

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

### Merits

Mr. Jones's trial counsel sat silent when the prosecutor improperly adduced the fact that Mr. Jones's had been indicted by the Grand Jury.[154] What might seem to be an innocuous reference to this fact on that single page of the transcript looms much larger when placed in the context of the of the line of questioning preceding it. The prosecutor had his chief investigating police officer on the stand and had been leading him through the events that, from the State's perspective, explained why they had waited for more than a year to arrest Mr. Jones In this context, the prosecutor's culminating question which elicited testimony about the Grand Jury's judgment placed an improper seal of approval on the State's entire case in chief. This maneuver was improperly de-

---

[151] Motion to Reopen, p. 3, XV App. 23.
[152] Entry Denying Application, etc., p. 1-2, XV App. 191-92.
[153] Memorandum in Support of Jurisdiction, p. 10, 29, XVI App. 30, 49.
[154] Tr. 1359.

signed to sway the Petit Jury with evidence that another body of citizens had accepted the State's case. This evidence stripped Mr. Jones of the presumption of innocence to which he was constitutionally entitled.[155]

By failing in their duty to object to this improper evidence, Mr. Jones's trial counsel were ineffective. This error fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the culpability and sentencing phases of his trial; violated his right to effective assistance of counsel; and violated his right to be free from cruel and unusual punishment. His appellate counsel failed to effectively raise this error on appeal. These egregious violations prejudiced Mr. Jones and rendered unreliable the outcome of the culpability and sentencing phases of his trial and of the appellate review of his trial.[156]

Thus Petitioner is entitled to relief on this item.

### 3. The fact that Mr. Jones had prior criminal convictions was improperly admitted to make him look guilty.

*Standard of Review*

Petitioner first presented this information in his Post-Conviction Petition, Fourteenth Ground for Relief, pp. 35-36, V App. 40-41. It was raised in the Court of Appeals in the Amended Brief, First Assignment of Error, pp. 14-15, XIII App. 108-09. The Court of Appeals reviewed this claim under a fundamen-

---

[155] *In re Winship*, 397 U.S. 358 (1970).
[156] U.S. CONST. amends. V, VI, VIII, XIV; *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998); *Penson v. Ohio*, 488 U.S. 75 (1989); *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984); *Gregg v. Georgia*, 428 U.S. 153 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *In re Winship*, 397 U.S. 358 (1970); *Anders v. California*, 386 U.S. 738 (1967); *Griffin v. Illinois*, 351 U.S. 12 (1956).

tally unfair standard.[157] The Court of Appeals cited *State v. Combs*, 100 Ohio App.3d 90, 101, 652 N.E.2d 205, 211 (1995), which in turn cited *Lockhart v. Fretwell*, 506 U.S. 364 (1993). The Court of Appeals also held that the claim was barred by *res judicata*.[158] The United States Supreme Court has held the fundamentally-unfair standard to be an unreasonable interpretation of United States Supreme Court law.[159] And it was raised in the Ohio Supreme Court. Proposition of Law One, Memorandum in Support of Jurisdiction, p. 29-30, XIV App. 37-38. The Ohio Supreme Court summarily declined to hear the case.[160]

The pre-AEDPA de novo standard applies to this case. The Sixth Circuit Court of Appeals has held that the pre AEDPA de novo standard applies when the state court did not assess the merits of a claim:

> But when a claim has not been "adjudicated on the merits in State court proceedings," id., and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").[161]

The State Court disposed of this claim perfunctorily on res judicata and related issues that did not discuss the merits.

### Procedural Default

The Government asserts that this item was not raised in state court. Return of Writ, p. 59. We have set forth where the item was presented to the Ohio Courts. Thus under *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005), this

---

[157] Court of Appeals Opinion on Post-conviction, p. 15, XIII App. 417.
[158] Court of Appeals Opinion on Post-conviction, p. 20, XIII App. 422.
[159] *Williams v. Taylor*, 529 U.S. 362, 392 1495 (2000).
[160] Entry, XIV App. 151.
[161] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

Court should review the procedural default under the pre-AEDPA de novo standard.

<em>Clearly established United States Supreme Court law</em>

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

<em>Merits</em>

Mr. Jones's counsel were constitutionally ineffective when they informed the jury of his prior criminal record and when they failed to object when the prosecutor and trial court did the same. This was in fact contrary to the strategy that they were following.[162] No reasonable defense trial strategy could possibly explain this conduct: Mr. Jones did not testify, thereby insulating his prior record from being revealed under OHIO R. EVID. 609 (certain prior criminal convictions admissible when person testifies to question that person's credibility); through counsel, Mr. Jones elected to have the judge, not the jury, adjudicate the specifications on his indictment that enhanced the potential sentence upon proof of certain types of prior criminal convictions.

Mr. Jones's trial counsel failed to object to the trial court's statement to a juror during voir dire that referred to Mr. Jones's prior criminal convictions.[163]

Mr. Jones's trial counsel were ineffective for informing the prospective jurors that he had been previously convicted of other crimes which were inadmissible given the fact that Mr. Jones did not testify.[164] This error was com-

---

[162] Deposition of Catherine Adams, March 14, 2006, pp. 53-54.
[163] Tr. 710.
[164] Tr. 463.

pounded throughout the trial when defense counsel cross-examined a police officer on the topic of Mr. Jones's prior convictions,[165] and it conflicted with the position they took regarding removing from the jurors' purview the existence of the prior offenses in the indictment.[166] Additionally, defense counsel failed to object effectively, if at all, when the state commented on Mr. Jones's prior convictions and adduced testimony about the priors.[167]

The prosecutor improperly commented during opening statements about Mr. Jones's history of aggravated burglary convictions,[168] and improperly elicited evidence of Mr. Jones's prior theft conviction from a police officer.[169]

Mr. Jones himself never had any conversations with his trial counsel concerning whether his counsel should inform or permit others to inform the jurors of his criminal past criminal record, but he adamantly opposed such a notion. When he objected to his own counsel informing the jurors of his criminal record, counsel rebuffed Mr. Jones with the threat that the trial court would have him bound and gagged if he did not remain quiet at counsel table.[170]

Without objection, the prosecution offered and the trial court admitted Mr. Jones's briefcase, State's Exhibit 71, the contents of which were irrelevant, prejudicial and inadmissible.[171] The briefcase contained documents related to Mr. Jones's prior criminal convictions,[172] This briefcase included a variety of documents identifying Jones as a convicted felon:  Letter to unknown asking for job

---

[165] Tr. 1363.
[166] Tr. 1123-24.
[167] Tr. 825-26, 1578-80.
[168] Tr. 825-26.
[169] Tr. 1578.
[170] Post-conviction Petition Exhibit K, p. 2, IX App. 3.
[171] Tr. 1232-37.
[172] Inventory of Exhibit 71, Dkt. 141.

once released on parole (23); Final Release and Restoration Certificate from Ohio Adult Parole Authority dated, June 24, 1991 (25); Copy of "Your Rights and Benefits as an Ex-Offender" (26); Letter from London Correctional Institution informing of damaged cassette (27); Pre-parole planning form dated August 1987 (28); Letter from Ohio Parole Board responding to a letter written by Jones concerning employment. Dated Jan. 5, 1987 (30); and Information from Adult Parole Authority, May 29, 1990 (238). There were other documents the prosecution improperly used to attack his character during closing argument.[173] Petitioner was never able to confront this evidence because its existence was unknown.

Officer Bray found the briefcase in the trunk of Mr. Jones's car: it contained no admissible evidence material to the crimes alleged in the indictment. Defense counsel failed to inspect the contents of the briefcase. Permitting jurors to see evidence of Mr. Jones's prior convictions contradicted defense counsel's pre-trial election to have the trial judge, not the jurors, adjudicate "prior offense of violence" specifications attached to his indictment; and it undermined the choice Mr. Jones made not to testify, a decision based at least in part on the fact that if he took the stand most of his prior criminal convictions would have been properly admissible under OHIO R. EVID. 609.

The trial strategy was to keep the knowledge of Mr. Jones's criminal record from the jury. That is the reason that he did not take the stand.[174]

As learned through an interview with Juror Kenneth Brewer, five jurors changed their minds as to Mr. Jones's sentence upon learning of the material

---

[173] Tr. 1822-23.
[174] Deposition of Catherine Adams, March 14, 2006, p. 53.

contained within the briefcase. Post-Conviction Exhibit N, IX App. 35. As expected, the jury concluded that if Mr. Jones committed a similar crime in the past, he was likely to have committed the crime involved in this case. In light of this evidence, it is clear that trial counsel's deficient performance violated Mr. Jones's constitutional rights to effective assistance of counsel and a fair trial conducted according to established rules of evidence.

In a similar vein, the prosecutor improperly attacked the credibility of defense witness Johnson by eliciting evidence of his criminal history through a police officer,[175] which evidence was not otherwise admissible and was not admitted when Johnson took the stand.[176]

Petitioner's rights were violated.[177]

### 4. Inadmissible and unreliable medical opinions and other evidence related to Mr. Jones's hand injury was admitted.

*Standard of Review*

Petitioner raised this issue in a timely Application for Reopening of the direct appeal on Mr. Jones's behalf pursuant to Ohio R. App. P. 26(B).[178] The Court of Appeals disposed of it summarily.[179] It was raised in the Ohio Supreme Court in the Proposition of Law No. Five, O,[180] The Ohio Supreme Court

---

[175] Tr. 1606.
[176] Tr. 1588-90.
[177] U.S. CONST., amends. V, VI, VIII, IX and XIV. *Strickland v. Washington*, 466 U.S. 668 (1984); *Kentucky v. Stincer*, 482 U.S. 730 (1987); *Davis v. Alaska*, 415 U.S. 308 (1974).
[178] Assignment of Error Three, 1, in the Application for Reopening Pursuant to APP. R. 26(B), p. 5, XV App. 27.
[179] Entry Denying Application, etc., pp. 1-2, XV App. 191-92.
[180] Merit Brief from the denial of the Reopening, p. 37, XVI App. 57.

denied the appeal without separately addressing the issue. The last court to re-view the item did not adjudicate it on the merits.

Thus under *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005), this Court should review the procedural default under the pre-AEDPA de novo standard.

### Procedural Default

The Government does not allege that Petitioner failed to present this claim to the state court.[181]

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984) and *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); and *Darden v. Wainwright*, 477 U.S. 168 (1986).

### Merits

The prosecutor adduced inadmissible and unreliable evidence from Dr. McDonough regarding the Eikenella corrodens infection in Mr. Jones's hand wound; without the predicate proof that the decedent's oral cavity contained this bacterium. As a result, the evidence and the arguments based this argu-ment were inadmissible.[182]

Dr. McDonough presented an irrelevant and prejudicial slide show during his testimony for the State.[183]

---

[181] Answer, p. 141.
[182] Tr. 976-1006.
[183] Tr. 993-1000.

Without objection, the prosecution presented what was at least double hearsay testimony elicited from Officer Lilley who testified that Dr. McDonough told Lilley that McDonough asked Mr. Jones if he had hurt his hand by punching someone and Mr. Jones said "no" to McDonough who repeated that to Lilley who repeated all of this at trial as Lilley's reason for impermissibly testifying that he was of the opinion that Mr. Jones was a liar.[184] The prosecutor compounded this error by highlighting this testimony in closing argument.[185]

This violates clearly established United States Supreme Court law in *Strickland v. Washington*, 466 U.S. 668 (1984); and in *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); and *Darden v. Wainwright*, 477 U.S. 168 (1986).

### 5. Inadmissible and unreliable evidence was admitted under the guise of "forensic expert testimony" about bruises on Mrs. Nathan's body.

*Standard of Review*

Petitioner raised the issue regarding Stokes and Oliver in Assignment of Error No. Seven in the Court of Appeals.[186] The Court of Appeals overruled the Assignment of error, saying that the testimony was not prejudicial to Petitioner.[187] It was raised in Proposition of Law Thirteen.[188] The Ohio Supreme Court held that there was no abuse of discretion.[189]

Petitioner raised this issue regarding Trimpe and Garber in a timely Application for Reopening of the direct appeal on Mr. Jones's behalf pursuant to

---

[184] Tr. 1336, 1349-50.
[185] Tr. 1808.
[186] Merit Brief, pp. 31-34, III App. 86-89.
[187] Court of Appeals Opinion, August 28, 1998, pp. 11, III App. 344.
[188] Merit Brief, pp. 69-72, IV App. 35-72
[189] Ohio Supreme Court Opinion, pp. 19-20, IV App, 407-08.

Ohio R. App. P. 26(B).[190] The Court of Appeals disposed of it summarily.[191] It was raised in the Ohio Supreme Court in the Proposition of Law No. Five, O,[192] The Ohio Supreme Court denied the appeal without separately addressing the issue. The last court to review the item did not adjudicate it on the merits.

Thus under *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005), this Court should review the merits of the first part under the post-AEDPA and the second part under pre-AEDPA de novo standard.

### Procedural Default

The Government does not allege that Petitioner failed to present this claim to the state court.[193]

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984) and *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); and *Darden v. Wainwright*, 477 U.S. 168 (1986).

### Merits

The importance of the expert testimony at issue here cannot be overstated. The prosecution presented far less than overwhelming evidence that Mr. Jones murdered Mrs. Nathan. Without the patchwork of purported expert testimony, the State's case was anemic. In addition to the fatal problems with Dr. McDo-

---

[190] Assignment of Error Three, 1, in the Application for Reopening Pursuant to APP. R. 26(B), p. 5, XV App. 27.
[191] Entry Denying Application, etc., pp. 1-2, XV App. 191-92.
[192] Merit Brief from the denial of the Reopening, p. 38, XVI App. 58.
[193] Answer, p. 141.

nough's testimony (outlined in more detail elsewhere), the prosecutors presented improper evidence regarding the alleged similarity between bruise patterns on Mrs. Nathan's body and certain objects they attempted to circumstantially link to Mr. Jones.

Four purported experts were permitted to render opinions about the ostensible similarity between bruise patterns on Mrs. Nathan's body and physical objects the prosecutor suggested were in Mr. Jones's control when she was attacked (viz., a pair of shoes and a walkie-talkie). Trimpe,[194] Gerber,[195] Stokes (Video Deposition Transcript passim); and Oliver (Video Deposition Transcript passim). By this testimony, the prosecution tried to prove that Mr. Jones beat and stomped the victim to death his walkie-talkie and his shoes.

The first problem with this testimony was that not a single one of these four witnesses rendered the opinion that the objects at issue had imprinted the patterns on the victim's body either to a reasonable degree of scientific certainty or to any other legal standard consistent with Mr. Jones's constitutional due process rights: Trimpe,[196] Gerber,[197] Stokes,[198] and Oliver.[199]

The second fatal flaw with this testimony is the absence of foundation facts for the purported opinions rendered. Without these foundational facts, the opinions expressed were inadmissible and the jury was lured into stacking inferences upon inferences to use this evidence in support of finding Mr. Jones guilty and sentencing him to death. All of the evidence and argument presented

---

[194] Tr. 896
[195] Tr. 1391-94.
[196] Tr. 896
[197] Tr. 1391-94.
[198] Video Deposition Transcript passim.
[199] Video Deposition Transcript passim.

by the prosecution regarding the purported comparison between the replicate walkie-talkie they used during trial and the shoes with the bruise pattern on the decedent ultimately had no foundational factual basis in the record. This entire corpus of evidence and argument violated the fundamental prohibition of drawing inferences from inferences to "prove" facts by circumstantial evidence and deprived Mr. Jones of any viable ability to confront this evidence. The prosecution's circumstantial chain of inference first depends on the inference that Mr. Jones had a walkie-talkie like the one used by the State's so-called experts; that Mr. Jones attacked the decedent with it; and that as a result of the attack the bruises left on the body matched the patterns of the walkie-talkie case. The same is true for the shoes.

The third problem with this line of evidence (with or without prior proof of foundational facts) was that neither Dr. Gerber nor Michael Trimpe were quali-fied to render opinions comparing bruise patterns on a victim's body to the al-leged weapons used to cause the death.[200] The prosecution also adduced in-admissible blood splatter evidence from a law enforcement officer who was not qualified as an expert in this field.[201]

The prosecution never should have offered this evidence; defense counsel should have raised well-researched, effective objections; and the trial court should have blocked the inadmissible testimony from these putative expert witnesses whether or not defense counsel objected. The trial court's failure to block this testimony violated Mr. Jones's constitutional rights to the equal pro-tection of law, due process of law, a fair trial, effective assistance of counsel,

---

[200] Tr. 1391-94; 886-912.
[201] Tr. 1131-32.

the right to confront the State's case and its witnesses, and the right to be free from cruel and unusual punishment.[202]

**6. Defense counsel failed to challenge the use of evidence acquired in violation of Mr. Jones's constitutional right to be free from unlawful searches and seizures.**

*Petitioner abandons this claim.*

## B. Prosecutors' Improper Closing Argument during the Culpability Phase

*Standard of Review*

The Ohio Supreme Court addressed items 7-11. Thus this Court reviews them under the AEDPA standard.

The Government argues that items 1-6 should be ignored because they were not objected to at the time of trial. The failure to object at trial and to assert error on direct appeal were failings of trial and appellate counsel that have been presented to the state courts in the *Murnahan* proceedings. Motion to Reopen, p. 3, XV App. 23. The Court of Appeals rejected this issue of procedural grounds. Entry Denying Application, etc., p. 1-2, XV App. 191-92. This Item and the summary disposition were presented to the Ohio Supreme Court. Memorandum in Support of Jurisdiction, p. 10, 29, XVI App. 30, 49. The Ohio Supreme summarily denied review. Thus under *Hill v. Mitchell*, 400 F.3d 308,

---

[202] U.S. CONST. amends. V, VI, VIII, XIV, *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998); *Penson v. Ohio*, 488 U.S. 75 (1989); *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984); *Gregg v. Georgia*, 428 U.S. 153 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Davis v. Alaska*, 415 U.S. 308 (1974); *Anders v. California*, 386 U.S. 738 (1967); *Griffin v. Illinois*, 351 U.S. 12 (1956); *Kumho Tire Co,. Inc. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); OHIO R. EVID. 104, 401, 402, 602, 702, 703, & 705.

313 (6th Cir. 2005), this Court should review the procedural default under the pre-AEDPA de novo standard. The Court should also review these items on the merits under the pre-AEDPA de novo standard.

### Procedural Default

The Government concedes that items 7-11 were raised on direct appeal and in the Ohio Supreme Court and that items 1-6 were raised in the *Murnahan* proceeding[203].

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); and *Darden v. Wainwright,* 477 U.S. 168 (1986).

### Merits

The prosecutor's argument must make the trial fundamentally unfair. An evaluation under this standard requires a careful analysis of the specifics of each case. The Court should look at whether the comments manipulated or misstated the evidence, or implicated other specific rights of the accused, and what opportunity the defendant had to respond to the improper argument.

The Sixth Circuit applied the facts of this case to its well established law on prosecutorial misconduct, *Angel v. Overberg*, 682 F2d 605, 608 (6th Cir.1982), which has been interpreted in the context of *Donnelly v. DeChristoforo*, and

---

[203] Answer p. 69.

*Darden v. Wainwright.*[204] The issue whether the prosecutor's remarks had a tendency to mislead the jury and to prejudice the accused; whether they were isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the government's burden of proving to each of the twelve jurors that the aggravating circumstances outweighed the mitigating factors.[205]

In addition to the items raised earlier and set forth below, the Government relied on testimony about the pendant that it knew was incorrect.

1. The prosecutor almost taunted the defense by referring to the pendant: What about the pendant? What was said to you about the pendant? Nothing. You know why? Because they can't explain the pendant. They can't explain it at all. [206]

The Government did this while having a variety of descriptions of the pendant and of different stories its history from the persons that they had interviewed. Rather than produce this material, the Prosecutors told the defense that there was a clerical mistake.[207]

2. The prosecutor improperly expressed his opinion that Mr. Jones was guilty and vouched for the credibility of the State's entire case.[208]

3. The prosecutor claimed that Mr. Jones consulted counsel before he was questioned by the police for the first time.[209] This claim was not only un-

---

[204] *See Roe v. Baker*, 316 F.3d 557, 565-66 (6th Cir. 2002); *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000); and *Paprocki v. Foltz*, 869 F.2d 281, 288 (6th Cir. 1989).
[205] *See State v. Brooks*, 75 Ohio St. 3d 148, 661 N.E.2d 1030 (1996), where the Ohio Supreme Court held that a single juror could prevent a death sentence.
[206] Tr. 1813.
[207] Adams Deposition, March 14, 2006, p. 64.
[208] Tr. 1793-94.
[209] Tr. 1749.

supported by the evidence but it constituted an attempt to impeach Mr. Jones for exercising his constitutional right to consult with counsel.

4. The prosecutor made improper comments during the culpability phase closing argument. The prosecutor made the powerful but totally unproven claim in closing that the victim had tested positive for the Eikenella corrodens bacterium.[210] There was absolutely no testimony on this pivotal point. Without any proof on this point, the prosecutor could not properly argue that there was an incriminating circumstantial connection between Dr. McDonough's claim that Mr. Jones's hand wound was infected by this bacterium and that he contracted this infection when he injured his hand by striking the victim in the mouth.

5. The prosecutor further argued without any support in the record that Mr. Jones had angrily confronted Susan Friend, a fellow employee of the hotel that employed Mr. Jones and where the victim was attacked.[211] If true, this would have cast suspicion on Mr. Jones and advanced the State's case. It was not in the record.

6. The prosecutor argued an unproven link between bruise patterns on the victim and objects circumstantially connected with Mr. Jones, which alleged link was not supported by any reliable, admissible testimony in the record.[212]

7. The prosecutor improperly diminished the State's burden of proof and improperly placed a burden of proof on the defense by arguing that the

---

[210] Tr. 1824.
[211] Tr. 1798.
[212] Tr. 1743.

63

jurors had to deliberate upon the question of whether Mr. Jones was guilty or innocent—a question much different than the jurors' proper determination of whether the State carried its burden of proving Mr. Jones's guilt beyond a reasonable doubt.[213]

8. The prosecutor argued without reliable evidence in the record that Mr. Jones's department at Embassy Suites had radios similar to ones capable of making the marks found on the victim's body, a claim that misstated the evidence. Defense counsel objected. No ruling was made[214].

9. The prosecutor alluded to Mr. Jones's alleged girlfriend, Earlene Metcalf, who never testified at trial. In argument, however, the prosecution asserted that Ms. Metcalf had lied for the Mr. Jones. Defense counsel's objection was sustained, but the State ignored the judge's ruling and continued to characterize Ms. Metcalf as a liar, to assert that she lied for Mr. Jones because she was his girlfriend, that the relationship showed that Mr. Jones was taking advantage of his wife, that he was spending substantial time with Ms. Metcalf, and that a pair of men's shoes found in her home belonged to him. None of this information was properly in the record as evidence necessary to justify these arguments.[215]

This was raised in Proposition of Law No. Six. Merit Brief p.16, IV App. 50. The Ohio Supreme Court determined that items 7 & 8 were not "outcome determinative." Ohio Supreme Court Decision, p. 26, IV App. 414.

---

[213] Tr. 1734.
[214] Tr. 1812.
[215] Tr. 1799-1800.

1. The prosecutor denigrated the role of defense counsel, suggesting that they were attempting to hide the truth and unfairly accuse others when in fact they did no more than suggest the reasonable theory that other employees had an opportunity to commit the murder.

This was raised in Proposition of Law No. Seven. Merit Brief p. 18, IV App. 50. The Ohio Supreme Court held that the "remark, not objected to, was not outcome determinative and did not deprive appellant of a fair trial." Ohio Supreme Court Decision, p. 26, IV App. 414.

2. The prosecutors argued that defense counsel accused others of Mrs. Nathan's murder. The prosecution appealed to jurors' passions by arguing that defense counsel's suggestion that there were a number of other employees in a position to commit the crime, but who were overlooked because the police hastily focused on Mr. Jones, was tantamount to publicly accusing those others of murder. "It's unfortunate. Their names have been dragged through the mud in front of the cameras, in front of the press, as being accused of murder. A murder that Elwood Jones did."[216] Defense counsel objected, since no accusation was made against any of the individuals in question, but the court failed to rule, stating to the jury, "I'll let you decide what was said."[217] Regarding employee Bill McCall, the prosecutor argued:

> Why didn't they check him out? Why didn't they ask him where he was between 7 and 8? Because they knew that they were going to come in here and argue to you, he could have done it. A false accusation in front of all these people [against] Bill McCall.

---

[216] Tr. 1819.
[217] Id.

65

But because we were quick enough to call him, that has been done, and that defense has been dropped. A search for doubt, not a search for the truth.[218]

3. In addition to this comment, the State suggested improper collusion between defense counsel and the expert witness appointed at their request to counter the testimony of Dr. McDonough. First, the State referred to Dr. Solomkin's testimony, on cross-examination, that he had reviewed Mr. Jones's medical records the morning of his deposition. "But it's asked, did you see these? I know that you've looked at these ahead of time. Implying to you that he's done a great deal of research and thought about these documents but that's not the case. And remember, he's a paid defense expert." The prosecutor went on to make an even more damaging implication:

> In opening statement the defense told you their evidence would show certain things about this hand injury, different from what the State was going to show you. How did Dr. Solomkin or either of these two defense attorneys know what their evidence was going to show different from the State's on the hand injury if they had never reviewed that material with Doctor Solomkin prior to opening statement? How?[219]

Defense counsel objected vigorously, but the trial court overruled the objection, permitting the jury to infer that defense counsel knew what the witness would say because their hired gun would say anything counsel paid him to say. This is an improper argument castigating defense counsel and improperly attacking the testimony of a defense witness.

---

[218] Tr. 1820-21.
[219] Tr. 1802.

These items were raised in Proposition of Law No. Seven. Merit Brief p. 18, IV App. 52, The Ohio Supreme Court said, "However, these comments were made during argument. Given the substantial evidence submitted in this case, we find that these isolated comments made during argument were nonprejudicial." Ohio Supreme Court Decision, p. 26, IV App. 414.

### C. Prosecutors' Improper Closing Argument during the Mitigation Phase

#### Standard of Review

Petitioner raised these items on direct appeal. They were reviewed by the Ohio Supreme Court. Thus they are examined under the AEDPA standard.

#### Procedural Default

The Government does not allege any failure to present the claim in state court for them.

#### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); and *Darden v. Wainwright*, 477 U.S. 168 (1986).

#### Merits

In addition to comments during the first phase of trial, the prosecution argued during mitigation closing that defense counsel were essentially trying to mislead the jurors regarding the legal standards applicable to their deliberations:

> But one thing both sides stressed when we started this case, when you get to this part of the case can you set aside your personal feelings and follow the law as the judge gives it to you? I'm not just the one asking that; they asked you that also. Now all of a sudden you are given different instructions from the defense and I'm not going to. I'm going back to what we asked you right off the bat, what Judge Winkler tells you to do. If you do that, we will be satisfied.[220]

The prosecutor went on to inform the jury that defense counsel could have put on mitigation evidence from family members or doctors. Defense counsel objected repeatedly to this line of argument. Those objections were overruled.[221]

Prosecutor's advanced the clearly inappropriate argument during mitigation closing that jurors could and should consider the nature and circumstances of the crimes they had convicted Mr. Jones of as factors weighing in favor of selecting the death penalty for him:

> What is worth more to him at that point, the life of this lady who has absolutely done nothing to him or a trinket? He could have left her alive. What's his choice? Right here. (indicating.) . . . . That's the value he put on that lady's life. I trust when you weigh that aggravating circumstance you will give Miss Nathan's life more worth than he did.[222]

Defense counsel objected several times to this line of argument; all objections were overruled.[223] Thus, the jury was effectively instructed to consider the nature and circumstances of the offense, and the loss of life, as aggravating circumstances, contrary to OHIO REV. CODE § 2929.04, the statute that purports to narrow the class of murders eligible for the death penalty to conform to the requirements of the Constitution.[224] By violating Ohio's clear procedures for

---

[220] Tr. 1942.
[221] Tr. 1946-47.
[222] Tr. 1951.
[223] Tr. 1949-51.
[224] See *State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311 (1996) ("It is improper for prosecutors in the penalty phase of a capital trial to make any

weighing aggravating circumstances against mitigating factors when deliberating upon the appropriateness of selecting death for Mr. Jones, the prosecutors and the trial court transgressed federal constitutional barriers which require states to articulate rational, non-arbitrary guidelines for capital jurors.

### D. Conclusion

The prosecutors' misconduct, defense counsel ineffectiveness, and the trial court's irrational application of appropriate legal principles permitted the jurors to review constitutionally infirm evidence and hear improper arguments. Taken separately or together, these errors fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the culpability and sentencing phases of his trial; violated his right to effective assistance of counsel and confrontation of the prosecution's evidence; and violated his right to be free from cruel and unusual punishment.[225] These violated Jones's rights under U.S. CONST. amend. V, VI, VIII, and XIV.

---

comment before a jury that the nature and circumstances of the offense are aggravating circumstances").

[225] U.S. CONST. amends. V, VI, VIII, XIV; *Ohio Adult Parole Authoritv v. Woodard*, 523 U.S. 272 (1998); *Schlup v. Delo*, 513 U.S. 298, 328 (1995); *Penson v. Ohio*, 488 U.S. 75 (1989); *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984); *Gregg v. Georgia*, 428 U.S. 153 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *In re Winship*, 397 U.S. 358 (1970); *Anders v. California*, 386 U.S. 738 (1967); *Griffin v. Illinois*, 351 U.S. 12 (1956); *Godfrey v. Georgia*, 446 U.S. 420 (1990); *Gardner v. Florida*, 430 U.S. 349 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); *Beraer v. United States*, 295 U.S. 78 (1935); *Doyle v. Ohio*, 426 U.S. 610 (1976); *Edwards v. Arizona*, 451 U.S. 477 (1981).

**Third Ground for Relief: The fairness of Mr. Jones's trial and the relia-
bility of his convictions and death sentence were undermined by
the absence of exculpatory and impeachment evidence that the
prosecution should have disclosed. In the alternative, defense
counsel were ineffective for failing to discover the exculpatory and
impeachment evidence.**

The defense requested discovery early including favorable evidence.[226] De-
fense counsel asked for the all of the information discovered by the Blue Ash
Police Department in its investigation.[227] The Government responded but did
not disclose the information discussed below.[228] A second motion for exculpa-
tory evidence was filed.[229] The Government provided a supplemental response
on November 30, 1995.[230] On December 8, 1995, citing *Brady*, the Government
represented the following:

> It is the intention of the State to fully and liberally comply with all appro-
> priate rules and cases. The Defendant shall receive all information to which
> is lawfully entitled. [231]

The defense requested an order requiring the Blue Ash Police Department to
turn over the information to the prosecutor.[232] In response the Government rei-
terated its intention to fully and liberally comply with its obligation to provide
the required information.[233]

The information discussed below was not provided to trial counsel.

---

[226] Docs. 5, 6, & 14, I App. 30-31, 42.
[227] Doc. 13, I App. 39.
[228] Doc. 21, I App. 52-57.
[229] Doc. 28, I App. 65-69.
[230] Doc. 32, I App. 135.
[231] Doc. 35, I App. 141.
[232] Doc. 76, I App. 283.
[233] Doc. 88, I App. 337.

## A. Evidence of Serious Irregularities with the Blue Ash Police Department's Evidence Records

*Standard of Review*

Petitioner raised these matters in his Thirtieth and Thirty-first Grounds for relief, XII App. 198-200, and Exhibit L, IX App. 5-32; Exhibit YY, XII App. 257-80. The Trial Court determined described the Thirtieth claim as a chain of custody matter that could have been raised on direct appeal and that it did not go to the admissibility of the evidence.[234] The matter was raised in the Merit Brief in the Court of Appeals.[235] The Court of Appeals addressed the Thirtieth Ground concluding that the property tags were of marginal impeachment value and that withholding them did not undermine the confidence in the trial.[236] The Court of Appeals addressed the Thirty-first Ground concluding summarily that, "the evidence failed to support a substantive claim of ineffective assistance."[237] The matter was then raised in the Memorandum in Support of Jurisdiction.[238] The Ohio Supreme Court summarily declined to hear the case.[239] This is an unreasonable application of the facts to existing law.

*Procedural Default*

The Government does not assert any failure to present the claim in state court on this issue.[240]

---

[234] Findings of Fact, etc., p. 13-4, XII App. 383-84.
[235] Court of Appeals Merit Brief Post-conviction, p. 13-14, XIII App. 32-33.
[236] Court of Opinion Post-conviction, p. 9, XIII App. 411.
[237] Court of Opinion Post-conviction, p. 17-18, XIII App. 419-20.
[238] Post-conviction, pp. 19-22, XIV App. 27-30.
[239] Entry, XIV App. 151.
[240] Answer, p. 84.

*Clearly established United States Supreme Court law*

The clearly established United States Supreme Court law is *Brady v. Maryland*, 373 U.S. 83 (1963), and it its progeny.

*Merits*

The prosecution failed to disclose to Mr. Jones's trial counsel the documents by which the Blue Ash Police Department, the primary law enforcement agency involved in Mr. Jones's prosecution, tracked, tagged and recorded the physical evidence taken into custody during the investigation of the death at issue here.[241] Post-conviction counsel discovered this evidence as a result of litigating the State's motion to destroy all evidence. Only after the trial court revised its order permitting the destruction of evidence was counsel given access to the property tags. As a result, the jurors never learned of irregularities in these documents which, when coupled with other evidence, would have seriously undermined the credibility and reliability of the prosecution's evidence regarding Mrs. Nathan's pendant.

As with any criminal investigation and eventual prosecution, one of the most rudimentary yet critical issues is whether the law enforcement officials accurately documented the physical items they took into possession and accurately recorded a chain of custody for those items eventually offered into evidence at trial. Any irregularities evident in these types of documents immediately cast doubt on the integrity of the prosecution's case. Thus, when these types of documents contain evidence of irregularities, they become favorable to the defense and must be disclosed by the prosecution. This is all the more

---

[241] Post-Conviction Exhibit L, IX App. 5-32.

compelling when, as in Mr. Jones's case; certain physical items became central features of the prosecution's case. Here, the irregularities evident on the fact of the BAPD property records were far more than mere "chain of custody" or "authentication" evidentiary issues; rather, they rose to the level of undisclosed exculpatory and impeachment evidence favorable to Mr. Jones. And, since BAPD readily made these documents available to Mr. Jones's post-conviction counsel, there is every reason to believe that they would have done the same for trial counsel had them simply taken the time to investigate.

To understand the reason why these evidence-tracking documents were favorable to Mr. Jones and material to either guilt or punishment, it is necessary to describe the standardized forms utilized by BAPD.[242] The originals of these documents are self-triplicating, approximately five (5) by seven (7) inch pre-printed cards bearing the name and address of BAPD. Each individual card is captioned a Property Tag, and each one has a pre-printed, sequential number appearing in the upper left-hand comer of the document. Each pre-printed Property Tag has places for recording the date and time the evidence was taken, for describing the evidence taken, from whom or where it was taken, and other general information basic to the law enforcement officials' need to record the chain of custody for physical evidence. Due to irregularities between the pre-printed sequential number of certain Property Tags and the date inserted by the Officer who acquired the property and placed it in the BAPD property room, these documents opened windows onto the unreliability and questiona-

---

[242] Post Conviction Exhibit L, IX App. 5-32.

ble credibility of critical prosecution evidence and testimony that was unseen by Mr. Jones's jurors.

Post-conviction counsel acquired copies of what purported to be a complete set of these documents from the Blue Ash Police Department. Specifically, post-conviction counsel received twenty-eight (28) separate sheets of 8 1/2 by 11 inch paper which contained copies of fifty-five (55) separate Property Tags. 27 of these sheets of paper each contained copies of 2 different Property Tags, one replicated at the top of the sheet and one at the bottom. One sheet of 8 1/2 by 11 inch paper contained a copy of a single, centered Property Tag, which was numbered 28383. Tag 28384 was not provided. The copies as delivered to post-conviction counsel were replicated sequentially from the lowest Property Tag number (28385) to the highest number (29644).[243] The earliest date recorded was September 3, 1994. The latest date recorded was March 6, 1996.

Reference to the Property Tag's pre-printed number and the hand-written date recording the date on which the item was taken into possession by BAPD reveals a simple but important pattern: multiple items collected on a given date (for example, during the search of Mr. Jones's residence and car) are recorded on a series of sequentially numbered Property Tags, each of which contains what purports to be the date on which the Officer came into possession of the item. Thus, upon inspection of these documents it becomes immediately obvious that any gaps in the sequentially numbered Property Tags must be explained. Likewise, it is obvious that any hand-written date entered on a Property Tag the number of which falls outside of the sequence of the sub-set asso-

---

[243] Post Conviction Exhibit L, IX App. 5-32.

ciated with other items collected on or about that same date raises immediate suspicions. Any anomalous, irregular, or suspicious entry is favorable to the defense and essential to Mr. Jones's ability to confront the prosecution's case and cast doubt upon the credibility and reliability of its evidence.

Glaring anomalies surface from even a cursory inspection of the Property Tags at issue in Mr. Jones's case, anomalies which render these documents evidence favorable to Mr. Jones. The evident anomalies and suspicious matters include the following:

Property Tag # 29644[244] contains information directly contradicted by the testimony that should have been used to attack the state's case. This Tag pertains to Elaine Schub's purse (she was one of the two persons who shared the hotel room with the victim). Ms. Schub said money was missing from her purse, meaning the perpetrator had touched it. It is the highest number and last Property Tag in the set. Logically, it should record the receipt of an item at the very end of the process; but it records one of the earliest dates instead. It is inexplicably dated September 9, 1994. Even the date recorded is suspect: it has clearly been changed and seems to have originally read "September 6, 1994." There are no other Property Tags dated September 9, 1994,. There are three sequentially numbered Property Tags recording items on September 6, 1994: 28347,[245] 28348[246] and 28349.[247] The information recorded as circumstances says: "Process for latent prints." This, of course, is ludicrous when compared to the testimony saying that the police unwisely allowed Ms. Schub to take the

---

[244] Post Conviction Exhibit L, IX App. 32
[245] Post Conviction Exhibit L, IX App. 11.
[246] Post Conviction Exhibit L, IX App. 11.
[247] Post Conviction Exhibit L, IX App. 12.

purse home to Florida and only much later asked to her send it back—clearly, no latent prints would be left by then. Also of great significance is the fact the BAFD Officer Bray's name appears on this form (and it appears to be his handwriting). Bray is the Officer who, among other things, claimed to have found the all important pendant in Mr. Jones's car. He also claimed that he found bloodstains on Mr. Jones's car that a trained forensic serologist was unable to detect. See Tag #28386.[248] If Officer Bray is willing to backdate documents and record misleading if not outright false information, what else is he capable of!

The following Property Tags pertain to Bray's search of Mr. Jones's car: 28376, 28377, 28378, 28379, 28380, 28381, 28382, 28383, and 28386.[249] Bray testified that he searched Mr. Jones's car on September 14, 1994, after waiting for the forensic serologist to check it for blood (he did not want to disturb potential trace evidence). Tag 28376[250] relates to the pendant and is dated September 14, 1994. Tag 28384 is missing. Tag 28386[251] is ostensibly dated September 15, 1994, and relates to the blood swabs of the trace evidence Bray claimed he detected. Moreover, the date on 28386 has clearly been altered and appears to have originally read "September 13, 1994," which would have put Bray in Mr. Jones's car alone a full day before he claimed he searched it.

Property Tag 29214[252] records the return to BAFD of photographs from the FBI forensic laboratory. In what again appears to be Bray's handwriting it says,

---

[248] Post Conviction Exhibit L, IX App. 25.
[249] Post Conviction Exhibit L, IX App. 20-25.
[250] Post Conviction Exhibit L, IX App. 20.
[251] Post Conviction Exhibit L, IX App. 25
[252] Post Conviction Exhibit L, IX App. 31.

"Photo evidence—negative results from FBI shoeprint exam." Why was not this used at trial?

The property tags obtained did not include tags for Mr. Jones's vehicle or the keys to his vehicle that were confiscated from him by the Blue Ash Police Department on the night of September 12, 1994. These tags were missing even though other items of evidence collected that same evening were eventually logged, tagged and placed in the BAPD Property Room. In fact, the BAF'D acquired two sets of keys to Mr. Jones's car on September 12, 1994, , neither of which were tagged and logged into the BAPD Property Room, and one set of which cannot be accounted for. Compare Sgt. Lilley's testimony,[253] with Officer Boyatt's testimony,[254] and Officer Bray's testimony,[255] Defense counsel's failure to exploit this issue as it appears on the record is fully revealed in the context of the evidence de hors the record of the Property Tags.

When Sgt. Lilley interrogated Mr. Jones on September 12, 1994, at the BAPD headquarters, he made him empty his pockets and confiscated the contents. Mr. Jones's possessions included at least one set of car keys and a handkerchief.[256] Although no property tag records the receipt of the car keys, Property Tag 29385[257] purports to log in a bloody handkerchief taken from Mr. Jones at the Blue Ash Police Department station on September 12, 1994. Importantly, Property Tag Number 29385[258] actually corresponds in sequence with items taken from the search of Mr. Jones's car on September 14, 1994. By

---

[253] Tr. 1353-1355, 1366, 1372-1373.
[254] Tr. 1318-1319, 1326-1328.
[255] Tr. 168-169, 176, 1205-1210.
[256] Tr. 1353- 1355, 1366, 1372-1373.
[257] Post Conviction Exhibit L, IX App. 32.
[258] Post Conviction Exhibit L, IX App. 32.

reference to this number in the context of the pre-printed and sequentially numbered Property Tags, it is irrefutable that no BAFD employee tagged the handkerchief and deposited it into the BAPD Property Room when BAPD acquired possession of it on September 12, 1994. And there is no mention whatsoever during the trial of a "bloody" handkerchief.

The improper maintenance of the evidence by the BAPD impeaches the credibility and reliability of Officer Bray's testimony with respect to the pendant allegedly discovered in Mr. Jones's car. The Property Tag paper trail proving mishandling if not misconduct should have been used to impeach this testimony at trial. According to Officer Bray, Sergeant Lilley gave him the keys to Mr. Jones's car and instructed Bray to keep them; so Bray put them in his desk.[259] Bray allegedly was the only police officer in possession of the keys to Mr. Jones's vehicle from the time his vehicle was confiscated until he discovered the pendant in the trunk. Id. Officer Bray had free access to these keys, without supervision from others in the department, throughout the three days prior to the search on Mr. Jones's car. Moreover, (1) when Officer Bray was not physically in possession of the keys, they were allegedly kept in an unlocked drawer of his desk; and (2) there was a second set of car keys that were ostensibly unaccounted for.[260] Not surprisingly, Officer Bray claimed that he discovered the victim's pendant in Mr. Jones's toolbox in the trunk of his car after obtaining possession of these keys. This exculpating, favorable impeachment evidence should have been disclosed to Mr. Jones's trial counsel and utilized by defense

---

[259] Tr. 1205-10.
[260] Tr. 1366, 1372-73.

counsel to confront and impeach the state's case and its witnesses during Mr. Jones's trial.

Equally compelling is Bray's claim on Property Tag 29835[261] that Mr. Jones's handkerchief was bloody. The trial transcript contains no reference to this bloody handkerchief or any forensic tests conducted on what at first blush would seem to be incriminating evidence. If it were really bloody, then forensic tests certainly would have been conducted on the handkerchief. If it were not bloody, then the prosecution owed this evidence to defense to further impeach Bray who, among other things, claimed he discovered blood on Mr. Jones's car that a trained criminalist had not detected. Compare Bray's testimony,[262] with that of Joan Dawson-Burke.[263] The State should have disclosed all details pertaining to this allegedly bloody handkerchief to Mr. Jones's trial counsel.

## B.  *Evidence of Criminal Acts and Suspicious Employees at the Embassy Suites Hotel.*

*Standard of Review*

Petitioner raised this matter in his Thirty-Fifth Ground for relief, XII App. 254-56, and the Exhibit YY, XII App. 257-80. The Trial Court determined that this was only second guessing the trial counsel and did not address the *Brady* allegations.[264] The matter was raised in the Merit Brief in the Court of Appeals.[265] The Court of Appeals concluded that the reports were not exculpatory

---

[261] Post Conviction Exhibit L, IX App. 32
[262] Tr. 1128-29.
[263] Tr. 931-934.
[264] Findings of Fact, etc., p. 15, XII App. 385.
[265] Court of Appeals Merit Brief Post-conviction, p. 14, XIII 33.

or material.[266] The matter was then raised in the Memorandum in Support of Jurisdiction. [267] The Ohio Supreme Court summarily declined to hear the case.[268] This is an unreasonable application of the law to the facts.

### Procedural Default

The Government does not claim any failure to present the claim in state court on this issue.[269]

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Brady v. Maryland,* 373 U.S. 83 (1963), and it its progeny.

### Merits

The prosecution failed to disclose copies of the Blue Ash Police Department's (BAPD) Yearly Reports of criminal activity from BAPD's Hotel/Motel Interdiction Unit. These reports were obtained by post-conviction counsel from the attorneys' discovery materials in the civil case brought by Mrs. Nathan's estate against the owner of the Embassy Suites Hotel. *Nathan v. Windsor Cavital Group. Inc.*, Case No. A-9601060 (Hamilton County, Ohio, Court of Common Pleas).[270] Defense counsel made no independent attempt to acquire this information through diligent, effective investigation and trial preparation.

---

[266] Court of Opinion Post-conviction, p. 9, XIII App. 411.
[267] Post-conviction, pp. 49-50, XIV App. 57-58.
[268] Entry, XIV App. 151.
[269] Answer, p. 84.
[270] Post-Conviction Exhibit YY, XII App. 258-80.

One of the State's central themes of prosecution against Mr. Jones asked the jury to infer that Mr. Jones perpetrated the crimes from the fact that he was a convicted criminal employed by Embassy Suites who had access to a passkey for the guest rooms. In other words, that he had opportunity, propensity and motive to commit the crimes. Mr. Jones's defense was that he did not commit the murder. To support this theory, the defense presented testimony of Embassy Suites employees who detailed the availability of master keys to numerous individuals in the hotel. Charles O'Banion testified about part of his job was to prepare replacement keys;[271] the maintenance department had a machine for this purpose.[272] This theory of defense could have been further advanced by the presentation of evidence that Embassy Suites Hotel routinely hired many employees with criminal records; that Embassy Suites Hotel guests were routinely victims of crimes; and that Embassy Suites Hotel rooms were routinely utilized by unsavory characters involved in drugs and prostitution. The fact is that many if not most of the Embassy Suites Hotel employees were cast in the same mold struck by the State against Mr. Jones. These other employees should have been exposed as being equally likely suspects in order to undercut a substantial portion of the State's case against Mr. Jones. All of this evidence of the patterns and practices at Embassy Suites Hotel was exculpatory and material to Mr. Jones's defense, and it would have been deemed admissible to rebut one of the State's central themes of prosecution.

The undisclosed BAPD Hotel/Motel Interdiction Unit reports undermined the State's case and were exculpatory and material to Mr. Jones's defense.

---

[271] Tr. 1484.
[272] Tr. 1485.

These reports include a breakdown of the types of criminal offenses that occurred in the hotels contained within the Blue Ash area. Embassy Suites Hotel was one such hotel contained in these reports. Embassy Suites Hotel was the leader during both 1994 and 1995 with criminal arrests and police runs to the Hotel. More specifically, in its 1994 Yearly Report, the BAPD described theft as the largest volume problem for the hotel. The report further details each incident that occurred in Embassy Suites, which required police intervention.

Notably, following the September 3, 1994 murder of Rhoda Nathan, a similar criminal action took place on December 27th when a guest reported that someone attempted to gain entrance into her room with a key. Following an investigation, the BAPD discovered an unauthorized employee with a key to the room. Numerous other thefts were also reported after the September 3rd incident (incidents occurring on September 4, 1994, September 6, 1994, September 7, 1994, September 15, 1994, October 9, 1994, October 10, 1994, October 12, 1994, October 20, 1994). The trial record reveals that Mr. Jones was no longer working at Embassy Suites when the majority of these incidents took place. The evidence contained within BAPD's Yearly Reports regarding the criminal activity in Embassy Suites subsequent to the September 3rd incident would have lent more support to Mr. Jones's defense. Moreover, the fact that a similar crime took place only three months after Mr. Jones left the hotel supports the defense theory that someone other than Mr. Jones committed the crime. The State had an obligation to disclose this evidence to the defense prior to Mr. Jones's capital trial because it was material to the determination of his guilt.

The Court of Appeals' determination that these were not material is an unreasonable application of *Brady.* The Government's entire case rested on the pendant, and here is evidence that the BAPD has mishandled the pendant. The materiality must be weighed with the additional evidence about the pendant that the Government failed to disclose until after the Court of Appeals reviewed the matter.

### C. Other Undisclosed Materials Cast Further Doubt on the Reliability of the Outcome of Mr. Jones's Trial and Suggest that Additional Undisclosed Information May Still Exist.

*Standard of Review*

The state court has not reviewed the evidence discussed below, so there is not state discussion to defer to. Thus the pre-AEDPA de novo standard applies.

*Procedural Default*

These items were not turned over to the defense during the state-court proceedings. They were turned over only in this proceeding. Thus Petitioner has shown cause for failing to raise the matter earlier.[273]

*Clearly established United States Supreme Court law*

The clearly established United States Supreme Court law is *Brady v. Maryland*, 373 U.S. 83 (1963), and it its progeny.

---

[273] *Strickler v. Greene*, 527 U.S. 263, 282-89 (1999).

*Merits*

During the course of this litigation, this Court has ordered Hamilton County Prosecutor files (HamPros) and Blue Ash Police Department files (BAPD) turned over to defense counsel. These files have revealed a myriad of material that contradicted the evidence presented at trial.

### 1. *The pendant*

The Pendant was the key piece of evidence.[274] The injury to the hand was a close second.[275] Two items that would have dimmed its importance were not provided to the defense: the interview of Val Nathan, where he described the necklace differently; the phone-interview of his uncle, who indicated that the necklace did not come from any engagement ring; and finally the interview of Rhoda Nathan's roommate, who described a necklace different from the one that she identified at trial. During the final argument on the first phase of the trial, the prosecution almost taunted the defense, saying:

> What about the pendant? What was said to you about the pendant? Nothing. You know why? Because they can't explain the pendant. They can't explain it at all. [276]

The defense could not explain the pendant because the Government had only revealed the evidence consistent with what was presented at trial. The other information was not revealed until this Court ordered the files presented.

The Government had a variety of descriptions and histories about the pendant. The search warrant had officers looking for a necklace with seven rows of tubular metal, silver in color, containing three diamonds.[277] The Government

---

[274] Peipmeier deposition, February 1, 2006, p. 19 (Peipmeier depo. III).
[275] Peipmeier depo. III, p. 19.
[276] Tr. 1813.
[277] HamPros 1871.

explained to one of the attorneys that the discrepancies were the result a mistake.[278]

Val Nathan, the son of the victim, and his wife, Elka Nathan—who testified at trial—told Sgt. Schaffer on September 16, 1994, that the pendant had three bars staggered, three diamonds, and was silver.[279] He told Sgt Schaffer that his father, Robert I. Nathan had the necklace custom for his wife made from his mother's (Val Nathan's grandmother's) engagement ring in 1980 or 1981.[280] Upon seeing the pendant, Val Nathan said that he was almost certain that his mother's pendant was not gold and that there was not another bar at the bottom. He consulted some family photographs and changed his testimony.

Ira Nathan, an uncle of Val Nathan, told Sgt. Schaffer in a telephone interview, that the pendant had not been custom designed from the grandmother's engagement ring because he still had the ring.[281] Ira Nathan also indicated that it was not custom made but purchased at Michael's Jewelry Store on Crosby Avenue in Bronx, New York. The owner of the store in the early 1980's did not recall any such transaction but did remember Robert I. Nathan.[282] Sgt. Schaffer's notes show that he was told that the item was purchased—not custom made—from a store in Pellam Bay.[283] It was not custom made:

The statements that the pendant was not unique would have been explored with the jurors:

---

[278] Sanks Deposition, p. 10.
[279] BAPD 798-99.
[280] BAPD 430.
[281] BAPD 431.
[282] BAPD 431.
[283] BAPD 799.

Q. Let me stop you there. What, as a defense attorney would be the significance of that paragraph to you if you had known that?

A. If I had known that it probably, it was no longer a custom item, if the guy went into the jewelry store and bought it from the counter, say I probably would have checked that out to make sure and ask whether it was a single item or whether it was just items that they had kept and sold.

Q. And you did testify earlier that throughout the trial this pendant was espoused by the State as being a one of a kind custom crafted thing?

A. That's right. All throughout the trial they insisted it was a custom crafted one of a kind item.

Q. And you would consider this Brady information even though it's a police report?

A. Yes.[284]

At trial Elka Nathan, the victim's daughter-in-law, testified that the pendant came from the mother's wedding band and that diamonds from it. She was present for the interview with her husband but was not quoted except to get Ira Nathan on the telephone.[285] The pendant was made with bars. She testified that Rhoda Nathan never took the pendant off for bathing or swimming.[286] Elka Nathan identified the pendant as Exhibit 3.[287] Without the above contradictions, the cross-examination consisted of a brief expression of sympathy for her loss and not questions.[288] With this information, the cross-examination of Ms. Nathan would have been different:

Q. Had you had this information, Ms. Adams, would you then thought to cross-examine Elke Nathan after her testimony about saying that pendant was Rhoda's?

A. Yes, if we had this information, we would have structured the entire case differently.[289]

---

[284] Hearing, p. 90-91.
[285] BAPD 430-31.
[286] Tr. 1036.
[287] Tr. 1037.
[288] Tr. 1038.
[289] Hearing, p. 214.

The Government trial attorneys were aware of the investigatory trip to New York. The trip was specifically noted in their reprimand letter to Chief Allen.[290]

Ms. Schub was Rhoda Nathan's roommate at the hotel. She was first interviewed on September 3, 1994.[291] Then she described the necklace as having an odd shape, a criss-cross having a few diamonds.[292] She was next interviewed by Det. John Ladd on September 8, 1994.[293] Then she described the necklace as having three diamonds. When she testified, via videotape, on August 4, 1996, she identified State's Exhibit No. 3, as being the necklace. According to her, the diamonds came from Rhoda Nathan's mother-in-law's wedding band. Once Rhoda Nathan had the necklace, the victim always wore it.[294] There was no cross-examination about the earlier discrepancies because the defense did not have access to the Ladd interviews. Had these earlier statements been available, the investigation they would not have accepted the government statements about a mistake in the warrant:

> Q. Would you consider it Brady in the light of the fact that the prosecution had told you it was just a mistake in the warrant?
> A. Yes.[295]

## 2. *Complaints of Guests about intruders*

Much was made of Mr. Jones's criminal history. Noting was presented to the jury about the various complaints that residents of the hotel had about other criminal activity that night. These were developed in late September from

---

[290] Letter, May 25, 1995, HamPros 394-95.
[291] BAPD 494-509.
[292] BAPD 507.
[293] BAPD 392-93.
[294] Tr. Vol. 25, Shub deposition, pp. 11-12.
[295] Hearing, p. 202.

a questionnaire sent by the Blue Ash investigators to all of the guests. BAPD 1090-1231. Several complained about the telephones in the rooms being out of order.[296] And many more heard the screams.[297] Defense counsel would have wanted to speak with each of these potential witnesses.[298]

One witness, Gerald Cantor, reported on three breaches of normal , appropriate hotel security on Friday afternoon, including on involving Rhoda Nathan,[299] but did not list the details in his response. This information would have been used by the defense.[300]

Samuel Huffaker reported that a man stuck his hand in the open door. He was about 5'9" tall with brown hair and a mustache. He was wearing a brown khaki shirt. This was approximately 8:45 am.

Shannon Pans complained that an African-American man tried to get into her room on Saturday afternoon. She said that he asked about a broken shower door in her room. The two extra locks were latched; otherwise, the man would have gotten into the room. The man did not identify himself as a maintenance worker.[301]

Jeff Jones complained about a transient man who was out of place in the hotel.[302]

---

[296] BAPD 1104, 1109, & 1209.
[297] BAPD 1095, 1098, 1100, 1106, 1109, 1118, 1122, 1124, 1130, 1142, 1161, 1164, 1176, 1185, 1187, 1193, 1207, 1212, 1213, 1215, 1217, 1221, 1229, 1810, 1812, 1814, 1820, 1828, 1830, 1835, 1836, 1843, 1847, 1853, 1857 & 1869.
[298] Adams Deposition, p. 32.
[299] BAPD 1197,
[300] Hearing, p. 118; *see also* Hearing 240-41.
[301] BAPD 1159.
[302] BAPD 1163-64.

Thomas L. Cratin complained that someone tried to enter their room between 3:00 am and 4:00 am. After questioning the person left. They were then informed that the water was turned off.[303]

Tom Wellman complained about a person opening his room with a key. The latching of the chain stopped the person. The person had no identification but he assumed that it was the maid.[304]

On Friday evening Carolyn J. Turner observed a tall blond kid, in his mid-twenties. He was wearing a ball cap, tattered blue jeans, a white tee shirt, and worn-out tennis shoes. He was roaming around during the time of the free drinks. He was out of place.[305]

Carrie Luckett observed a white man with a mustache and long-sandy-blond hair at the cocktail the night before. He was with a well-dressed man.[306]

Another witness, Sidney Gittleman, observed to men trying to get into his room on Friday afternoon between 3:30 pm and 4:00 pm. He also reported that someone called his room between 1:00 am and 2:00 am, and then the person hung up when he picked up the phone.[307]

Stacy Schub noted that the maid came to her room very very early on Friday morning. Later that day a different maid came unaware that the room had already been cleaned.[308] She also noted problems with a door being unlocked and check-in clerk that gave her room number out loud.[309]

---

[303] BAPD 1169.
[304] BAPD 1165-66.
[305] BAPD 1171-72.
[306] BAPD 1175.
[307] BAPD 1177-78.
[308] BAPD 1845.
[309] BAPD 1846.

Linda Motashami noted problems with the absence of security and lax security when she was admitted to the hotel by a security guard who did not check identification.[310] She also complained that the police had not questioned her earlier when her memory was fresher.[311]

Catherine Adams, one Petitioner's trial counsel, had no idea that such a survey had been conducted.[312]

These incidents point toward a gang operating in the hotel—which contradicts the Government theory that Petitioner was the culprit. None of this information was available to Petitioner at trial or in the state-post-conviction proceeding.

### 3. *Potential Witnesses*

The Government took statements from two persons who presented information contradicting what was presented at trial. Neither statement was presented to defense.

Ryan Norman was one of the first employees on the scene. He had heard the screaming from the second floor. As an employee, he knew Petitioner and would not have confused him with someone else. Norman saw a dark skinned male wearing a brown shirt with a Caucasian man outside the room. HamPros pp. 1508-09, 1711-12. The interview was not shared with the defense team.[313] This information would have been useful to the defense team:

> Q.  If you had this information, might it have been useful in defending him?
> A.  Yes.
> Q.  How?

---

[310] BAPD 1853-54.
[311] BAPD 1854.
[312] Adams Deposition, p. 30.
[313] Adams Deposition, p. 54-55.

A. We would have asked Mr. Deiterman to investigate to try and identify who the individual was. If anyone had seen him, if he had been seen by anyone else in the hotel, if he had legitimate business there, those types of things.

Q. Was it significant that the person just walked away from the hotel, you think?

A. It could be, yes.

Q. Something that you would want to inquire about?

A. Yes.

Q. Would you consider it Brady information even though it's a supplementary police report?

A. Yes.[314]

Demetrius Williams also told officers on September 3, 1994, about a black guy and a white guy coming out of the victim's room.[315] He knew Petitioner and would not confuse him with someone else. Williams testified for the Government.[316]

Q. Is there anything significant in that statement?

A. Again, the black and white guy in the room.

Q. Is this coming out of the room?

A. I'm sorry, black and white guy come out of the room.

Q. Now, of course, we are reading it. Now, you don't know exactly what it means but if you had that statement at the time, what would you have done as a defense lawyer of Mr. Elwood Jones?

A. We would have talked to Mr. Williams who made the statement and got more information from him, clearer description. We would have had Deiterman talk to him and track down who the individuals were and see if anybody had seen them.

Q. Brady type you think?

A. Yes.

Q. Maybe it's not a statement and maybe not allowed under Rule 16 after testimony?

A. Correct.

Q. Now, during the course of the investigation of the, before trial, did you at any time learn that the Blue Ash police department had done questionnaires of people who stayed at the Embassy Suites around the time of the homicide?

A. No.[317]

---

[314] Hearing, pp. 216-18.
[315] HamPros pp. 507 & 509.
[316] Tr. 1047-64.
[317] Hearing, pp. 225-26.

On September 26, 1994, Sgt. Schaffer received a phone call from Robyn Williams, who had been in Room 417. She told Sgt. Schaffer that between 7:45 am and 7:50 am she noted a white male in his late 20's walking rapidly toward the southwest exit of the building. The man was thin build, about 6' with medium brown hair and wearing dark clothing. The exit door had been wedged open with a yellow plastic drinking cup. The person left the hotel parking lot on foot, walking across Lake Forest Drive.[318]

The Government discussed in its opening that Mr. Jones had a criminal record.[319] The Government had one of its officers testify about a 1992 theft conviction.[320] Many on the staff had criminal records. The Government was much more careful with the other employee criminal records, letting the defense know only about the criminal records of the people actually testifying. Nonetheless, the investigators had compiled the criminal records for all of the employees. The list also indicated whether the employee had been subjected to a polygraph examination.[321] Counsel considered this Brady information. Adams Deposition, p. 48. This compilation would have assisted counsel. The Government also compiled a listing of the employee's location based upon its interviews.[322] This would have helped with witness interviews, particularly because of the length of time between the opportunity to investigate and the events.[323]

---

[318] HamPros 1327.
[319] Tr. 825-26.
[320] Tr. 1578.
[321] HamPros pp. 1929-34.
[322] HamPros pp. 1675-79, 1915-25.
[323] Adams Deposition, p. 51-52.

### 4. *Hepatitis*

The Coroner's report shows that Rhoda Kaplan tested positive for hepatitis. These results would have been investigated.[324] This was Brady material.[325] The supposed linkage between the wound to Petitioner's hand and the victim made this matter very important.[326] Mr. Jones tested negative for hepatitis, something that his counsel felt was very important.[327]

### D. *Conclusion*

The prosecutors' failure to disclose evidence under *Brady* and its progeny and the defense counsel ineffectiveness prevented the jury from considering relevant facts. Taken separately or together, these errors fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the culpability and sentencing phases of his trial; violated his right to a fair trial, to effective assistance of counsel; and violated his right to be free from cruel and unusual punishment.  These violated Jones's rights under U.S. CONST. amend. V, VI, VIII, and XIV.

---

[324] Adams Deposition, pp. 27-29.
[325] Id.
[326] Sanks Deposition, p. 28-31.
[327] Sanks Deposition, p. 28; Adams Deposition, p. 28..

**Fourth Ground for Relief: Mr. Jones's defense counsel were ineffective when they failed to adequately investigate and prepare to confront state's witness, Dr. McDonough, and when they failed to effectively prepare their own expert, Dr. Solomkin, regarding Mr. Jones's hand injury and the nature of Eikenella corrodens.**

*Standard of Review*

Petitioner raised these issues in his Post-Conviction Petition, Claim No. 7. Post-conviction Petition, pp. 17-19, V App. 24. And Petitioner raised the other two in Claims Nos. 33 and 34.[328] The Government proposed findings of fact and conclusions of law, XII App. 338-52, which the state trial court accepted. The Court of Appeals disposed of Claims 7 and 33 saying:

> The evidence presented either was available at the time of trial, was cumulative to what was presented at trial, failed to meet the minimum level of cogency, failed to advance his claims, or failed to show that Hones could not have raised this claim on direct appeal. Thus, Jones's claims are barred by *res judicata*. [329]

The Court of Appeals disposed of Claim 34 by saying that the Worker's Compensation records failed to defeat the application of *res judicata*.[330] The issues were presented to the Ohio Supreme Court.[331] And the Ohio Supreme Court summarily refused to review the case.[332]

The pre-AEDPA de novo standard applies to this claim. The Sixth Circuit Court of Appeals has held that the pre AEDPA de novo standard applies when the state court did not assess the merits of a claim:

---

[328] Amended Petition, p. 10-15, XII App. 206-11.
[329] Opinion, p. 17, XII App. 419.
[330] Opinion, p. 26-27, XII App. 428-29.
[331] Memorandum in Support of Jurisdiction, pp. 18-19, 47-48, XIV App. 26-27, 55-56.
[332] Entry, XIV App. 151.

But when a claim has not been "adjudicated on the merits in State court proceedings," id., and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").[333]

The State Court disposed of this claim perfunctorily on res judicata and related issues that did not discuss the claim.

### Procedural Default

The Government makes no allegations of failure to present the claim in state court.

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

### Merits

Mr. Jones's trial counsel abdicated their duty to investigate and present a defense against the prosecutions medical evidence regarding a hand wound Mr. Jones sustained around the time Mrs. Nathan was attacked. Defense counsel failed to prepare to confront Dr. McDonough's testimony for the prosecution; they failed to prepare to present the type of compelling evidence Dr. Solomkin outlined in his post-conviction affidavit.

Even without defense counsels' constitutional deficiencies, the trial court should have operated as a gatekeeper and kept out much if not all of the prosecution's hand-injury evidence due to the fact it was inherently unreliable.

---

[333] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

Both the trial court and defense counsel abdicated their constitutional duties. As a result, prejudicial testimony went to the jury, which deprived Mr. Jones of a fair trial and resulted in unreliable verdicts and death sentences.

Mr. Jones's trial counsel failed to prepare to confront the two central claims Dr. McDonough's advanced for the prosecution. First, Dr. McDonough said that Mr. Jones sustained a hand injury the nature of which revealed that the injury had been caused by Mr. Jones punching another person in the mouth (a so-called "fight bite"). Mr. Jones told McDonough that he twice innocently injured his hand on September 3, 1994, once on a dumpster and again while moving tables.[334] The record reflects that Mr. Jones provided essentially the same explanation of his hand injury to an investigating officer. See direct testimony of Sgt. Lilley.[335] McDonough contested Mr. Jones's explanation with the opinion that the injury was caused by Mr. Jones's hand forcefully striking another person's mouth.

Second, McDonough asserted that Mr. Jones's hand wound was infected with Eikenella corrodens, which, according to McDonough, further corroborated his conclusion that the injury was caused by contact between Mr. Jones's fist and another person's mouth because of McDonough's inaccurate opinion about the prevalence of that bacterium in the human population. Defense counsel managed to muster an objection to Dr. McDonough's qualifications as an expert in the field of infectious diseases; the objection was overruled.[336]

---

[334] McDonough's testimony, passim, Tr. 976-1032.
[335] Tr. 1332-1361.
[336] Tr. 1004-05.

Dr. Solomkin testified through deposition but had he had sufficient notice he would have rearranged his schedule to testify live.[337] This would have given him notice of the range of Dr. McDonough's wide-ranging opinions, specifically about his conclusion that the presence of Eikenella was evidence of a "fight bite:"

> Q. When you take that in connection with the fact that Dr. McDonough has said that the Eikenella in his wound was caused by the bite of the victim, is there any contradiction when you look at this hepatitis result?
> A. Oh, particularly taken into consideration the statement about the HIV transmission, yes, it is. Frankly it is very remarkable. The much more likely pathogen would be the hepatitis in terms of what would indicate that was the source of the organism. Again, it's unlikely it just isn't definitive for Eikenella.
> Q. And would that diminish the likelihood that this wound was caused by a bite then?
> A. In my opinion it would decrease the likelihood that was caused by a bite from someone who was antigen positive.
> Q. Now, in 1996 did you have this information, did you know about this?
> A. No.[338]

### A. Dr. Solomkin Thoroughly Refutes McDonough's Opinions and Renders McDonough's Testimony Constitutionally Unreliable.

Trial counsel's constitutionally defective preparation is revealed by the affidavit of Joseph S. Solomkin, M.D.[339] Defense counsel actually called Dr. Solomkin as a defense witness at trial. However, as attested to by Dr. Solomkin in his post-conviction affidavit, defense counsel's total lack of preparation and investigation of the issues central to McDonough's testimony rendered them ineffective (1) in confronting McDonough and (2) in attempting to utilize Dr. Solomkin's expertise to rebut McDonough's testimony. Everything Dr. Solomkin

---

[337] Hearing 43-44.
[338] Hearing, p. 25.
[339] Post-Conviction Exhibit G, VIII App. 369.

says in his affidavit could have and should have been utilized in Mr. Jones's defense at trial.

Dr. Solomkin's affidavit recounts numerous ways in which Mr. Jones's counsel failed to effectively prepare and confront Dr. McDonough's unscientific, ill-founded opinions. In fact, Dr. Solomkin so thoroughly exposes the many reasons why McDonough's testimony is totally unreliable that effectively pre-pared defense counsel could have successfully challenged the admissibility of McDonough's testimony because his so-called opinions were not medically reli-able enough to be admitted for the jury's consideration.[340]

Unlike Dr. Solomkin, Dr. McDonough is not an expert in the area of infec-tious diseases. Dr. Solomkin's testimony demonstrates this. The most concise statement remains his earlier affidavit in the state post-conviction proceedings. Dr. McDonough's errors are illustrated by the following examples pulled from that affidavit (the numbers refer to the numbers paragraphs in the affidavit):

7.  Dr. McDonough's unverified and misleading claim of certainty about the rarity of Eikenella in his personal experience should have been ques-tioned, and important modifiers such as the number of infections oper-ated upon (and documented, not just estimated), the number of these which were cultured, and the number which grew Eikenella should have been requested. **Dr. McDonough's assertions about Eikenella cannot and did not rise anywhere near a reasonable degree of med-ical certainty** because they meant nothing without being set in the context of a reliable data base derived from (a) the total number of hand infections he had operated on; (a) the subtotal of those infections which were cultured; and (c) the subtotal of those cultures where Eikenella grew. . . .

8.  Moreover, it is rudimentary that any scientifically reliable conclusions about the incidence of an infectious disease or organism must be drawn from data beyond the bounds of any one practitioner's clinical expe-

---

[340] U.S. CONST., amends. V, VI, VIII, IX and XIV. *See Valentine v. Conrad*, 110 Ohio St.3d 42, 850 N.E.2d 683 (2006); see.*also Kumho Tire Co., Inc. v. Carmi-chael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharmaceuticals. Inc.*, 509 U.S. 579 (1993).

rience; otherwise, any opinion offered is merely personal and anecdotal and cannot form the basis for opinions rendered to a reasonable degree of medical and scientific certainty. Whatever Dr. McDonough's personal experiences with Eikenella infections in the hand have been, no single medical clinician's personal experience can or should form the basis for statistical conclusions about the rarity or prevalence of any organism. Statistics by their very definition must be culled from rigorously controlled research experiments andlor carefully controlled studies of the experiences of practitioners in the field to have any scientific reliability whatsoever. Otherwise, as with Dr. McDonough's testimony, inaccurate implications are suggested and incorrect inferences are drawn from limited, untested and uncorroborated personal experiences. Even the most rudimentary familiarity with this simple principle underlying the science of statistics would have permitted an attorney to reveal this **fundamental flaw in Dr. McDonough's claimed rarity of the Eikenella.**

9. I am also concerned that the overriding failure to differentiate between Dr. McDonough's operative experience with the hand and his knowledge (or lack thereof) of the microbiology of hand infections went unchallenged when he stated that an inoculation had to occur as a result of contact between Mr. Jones's hand and another's mouth. (Transcript pages 1005, 1026). **This assertion is wrong and does not constitute an opinion rendered to a reasonable degree of scientific certainty.**

10. In fact, Eikenella has come to attention in my professional field precisely because of its specific virulence mechanisms which allow it to produce infection even when it contaminates wounds at low concentrations. In effect, this means that there are many potential sources of Eikenella infection like the one at issue in Mr. Jones's case, including but not limited to striking someone in the mouth (assuming that the mouth struck contains Eikenella). Therefore, it is not possible to say with a reasonable degree of medical certainty that any given possibility is in fact the source of the infection; or, conversely, that any alternative infectious source can be eliminated to a reasonable degree of medical certainty.

11. Similarly, Dr. McDonough's statement on page 1001 of the transcript that "It [Eikenella] is very rarely found in saliva. It is almost always found in the dental plague," **is simply untrue and does not constitute an opinion rendered to a reasonable degree of medical certainty.** It is my opinion to a reasonable degree of medical certainty that this claim is wrong; as such, it cannot be characterized as merely a differing opinion rising to a reasonable degree of medical certainty.

12. I am also quite concerned about Dr. McDonough's statement that the failure of cultures of Mr. Jones's mouth on October 19, 1994, to reveal Eikenella supported that conclusion that his own flora did not contain this organism in early September of 1994. (Transcript page 1004). I have reviewed Mr. Jones's medical records and note that this culture was taken approximately a month after the infection was aggressively treated with multiple antibiotics. Dr. McDonough himself testified about the aggressive antibiotic treatment. (Transcript page 1001.) If the Eike-

nella organism had been present in Mr. Jones's oral flora in early September, I would be amazed that it would have persisted in the face of the antibiotic therapy this patient was given. This aggressive course of antibiotic treatment would, to a reasonable degree of medical certainty, have eliminated all Eikenella organism, including any that may have been in Mr. Jones's oral cavity. Dr. McDonough's inference from the absence of Eikenella after aggressive antibiotic treatment that Mr. Jones had no Eikenella in his oral flora before undergoing the antibiotic treatment is **simply wrong** and cannot be characterized as a different opinion rising to a level of reasonable medical certainty.

13. I was frankly quite surprised that the slide presentation suggesting that this was a bite injury was not challenged more strenuously. The transcript states that pictures of human bites to the ear, to the fingers due to a man's putting his hand in the mouth of a seizure victim and others were introduced. (Transcript pages 992-1012). This goes to Dr. McDonough's experience with hand surgery. It has nothing at all to do with the question of what caused this particular wound and the meaning of this particular culture positive for Eikenella corrodens.

15. Moreover, given what I understand to be the thrust of Dr. McDonough's testimony in the context of the prosecutors' theory that Mr. Jones struck the victim in the mouth during a lethal assault, thereby cutting his hand and inoculating the wound with Eikenella, it is impossible to make the medical link of causation connecting these two people without knowing whether or not the victim's oral cavity contained the Eikenella organism. Implicit in Dr. McDonough's testimony is either the unproven presumption that the victim's oral cavity contained Eikenella and/or the inaccurate presumption that all persons' oral cavities contain Eikenella. It is not the case that all persons' oral cavities contain Eikenella. It is my opinion to a reasonable degree of medical and scientific certainty that approximately one third of all persons' oral cavities contains the Eikenella organism. Therefore, absent a culture taken from the victim's oral cavity proving that the Eikenella organism was present and given the general prevalence variable of one-third, it is more likely than not that the victim did not have the Eikenella organism in her oral cavity (two out of three people do not have it).

16. Dr. McDonough linked a hand injury together with the presence of Eikenella to "prove" that Mr. Jones's injury came from striking someone in the mouth, not from a deep cut contaminated by his own saliva or any other infectious source. This is simply not supported by what is known about Eikenella and its impressive ability to cause infections at law inoculum levels. *It is in fact possible that an open hand wound could be inoculated with Eikenella by a person's saliva where that person causes contact between his wounded hand and his mouth.* **Dr. McDonough's testimony to the contrary is wrong and cannot be characterized as a different opinion rising to the level of reasonable medical certainty.**

17. Dr. McDonough introduced two self-serving stages of speculation: the mechanism of the injury and the cause of the infection. He used the speculative conclusions at each stage to justify the other in an errant

100

exercise in circular logic. In effect, he said 'this is a bite wound because Eikenella is present and Eikenella is present because this is a bite wound.' Far h m corroborating a medically reasonable opinion, the self-justifymg circularity of Dr. McDonough's assertions compounded the unreasonable and unreliable testimony he gave on both the topic of the mechanism of the injury and the cause of the infection. **It is my opinion to a reasonable degree of medical certainty that these errors of analysis and Dr. McDonough's conclusions are simply wrong; as such, they cannot be characterized as merely differing opinions rising to a reasonable degree of medical certainty. . . .**

19. What concerns me is that Dr. McDonough is supposed to be a neutral teller of truth, a man possessed of special medical experience and knowledge. In fact, the only way to characterize his testimony in light of the contrary but correct medical and scientific principles addressed *d* herein is to say that **Dr. McDonough was simply speaking and acting as an agent for the prosecution. Many of his statements were inaccurate or flat wrong**.

20. I am frankly not surprised to see from the transcript that defense counsel Sanks failed to expose very basic flaws in Dr. McDonough's testimony. I met once with counsel Sanks. He called me on time to schedule my deposition, which occurred on a weekend shortly after he called me. At the time of the deposition, I knew very little about the case and nothing about Dr. McDonough's purported medical opinion. I was however singularly unimpressed with Mr. Sank's evident unfamiliarity with the basic medical science about which he questioned me. Now that I have had an opportunity to read the transcript of Dr. McDonough's testimony, I am appalled that Mr. Sanks failed to challenge Dr. McDonough and expose the fundamental flaws in his testimony as I have outlined in this Affidavit. In fact, after being deposed and as Mr. Sanks and the prosecutor were leaving, I distinctly recall commenting to the prosecuting attorney that you simply cannot prove anything about the mechanism of an injury and the source of an Eikenella infection from the date they had provided me during the deposition. [341]

Dr. Solomkin reiterated these errors[342] in his testimony, where it was subject to cross examination. The Government has not countered this testimony or the information from his earlier affidavit.

---

[341] Post-Conviction Exhibit G. Bold emphasis added.
[342] Hearing, pp. 4-60.

**B. No Foundational Facts for Dr. McDonough's Opinion about Whether Mr. Jones or Mrs. Nathan Were Infected with Eikenella.**

The prosecution never adduced foundational facts regarding whether the victim's oral cavity contained the Eikenella corrodens bacterium. This failure rendered inadmissible all of the testimony and argument pertaining to Dr. McDonough's claim that Mr. Jones's hand wound was infected with that bacterium. Nonetheless, without court intercession, Dr. McDonough was permitted to testify at length about his opinion that Eikenella is an infection found in the human oral cavity and that Mr. Jones's Eikenella infection in his hand wound meant that he contracted this infection by striking a person in the mouth.

Mr. Jones's trial counsel failed to impeach the reliability and credibility of McDonough's testimony as it relates to his claim that Mr. Jones's hand was infected with Eikenella when he was treated from September 6, 1994, to September 10, 1994. McDonough's trial testimony, passim,[343] Mr. Jones's counsel failed to confront McDonough with documents trial counsel had in their possession that cast significant doubt on whether Mr. Jones even had an Eikenella infection.

Mr. Jones's counsel unwittingly admitted as Mr. Jones's Exhibit 6, a laboratory document detailing the analysis of the culture taken by McDonough from Mr. Jones's hand wound on September 6, 1994. These results show only that there was "moderate probable Eikenella species." By contrast, this same document verifies the existence of other organisms without the "probable" modifier. Similarly, Mr. Jones's counsel had in their trial file other documents that impeached McDonough's claim that Mr. Jones's hand wound had an Eikenella

---

[343] Tr. 976-1032.

infection. Among Mr. Jones's' medical records, there appears a two-page "Consultation Report" by infectious disease specialist Dr. Syivania Ng, M.D. As confirmed by McDonough's two-page Discharge Summary, he requested this specialist's consultation to review the results of the culture taken from Mr. Jones's hand and to recommend medicine to treat the infections at issue. This consulting infectious disease expert specifically refers to the result of the cultures, noting only "moderate probable Eikenella species" while referring without the "probable" modifier to several other organisms. McDonough, in turn, dropped the "probable" modifier when he wrote his Discharge Summary and during his testimony. Why did he delete "probable"? Why wasn't he cross-examined on this?

Mr. Jones's trial counsel committed an equally egregious error when they failed to impeach McDonough's claim that, when re-tested on October 19, 1994, Mr. Jones's oral culture contained no Eikenella.[344] The prosecution used this testimony to impeach the proposition that Mr. Jones had inoculated himself with Eikenella by placing his innocently wounded hand into his mouth. But the laboratory report that counsel had in their file said "mixed culture suggests contamination. Consult with director of microbiology if additional identification is clinically warranted." There is no evidence that McDonough sought further testing. Defense counsel not only failed to impeach McDonough with this evidence, but they failed to use it to block the admissibility of this whole line of unfounded "opinion" testimony from Dr. McDonough.

---

[344] Tr. 1004.

**C. Failure to Confront with Evidence That Ohio's Bureau of Worker's Compensation Paid Mr. Jones's Claim based on Dr. McDonough's Records.**

Mr. Jones's trial counsel failed to impeach the reliability and credibility of McDonough's testimony with the evidence pertaining to Mr. Jones's application to the Bureau of Workers' Compensation. Among other deficiencies, Mr. Jones's trial counsel failed to prepare to confront McDonough's claim that Mr. Jones's hand wound was not caused by the reasons he gave McDonough. Mr. Jones told McDonough that he twice innocently injured his hand on 9-3- 94: once on a dumpster and again while moving tables. McDonough's testimony, passim, Tr. 976-1032. The record reflects that Mr. Jones provided essentially the same explanation of his hand injury to an investigating officer. See direct testimony of Sgt. Lilley, Tr. 1332-1361. McDonough contested Mr. Jones's explanation with the opinion that the injury was caused by Mr. Jones's hand forcefully striking another person's mouth. The prosecution bolstered this aspect of McDonough's testimony by presenting evidence of Mr. Jones's application to the Bureau of Workers' Compensation and other testimony related thereto. Essentially, the State combined McDonough's testimony with that of persons listed on the Workers' Compensation application as witnesses to Mr. Jones's injury to attack Mr. Jones's explanation for the injury. See State's Exhibit 50; and the State's presentation of the testimony of Mareo Reid, Tr. 1038-1046, and Brenda Wallace, Tr. 1107-1119.

Mr. Jones's trial counsel failed to employ readily available evidence that would have substantially stanched the prosecution's attack on Mr. Jones's credibility while at the same time bolstering his trial position. No matter what the prosecution did to attack Mr. Jones's version of the injury, the simple and po-

werful fact remained that the Bureau of Workers' Compensation honored Mr. Jones's claim. This basic fact would have proven that another branch of Government—other than the prosecution—had evaluated the same evidence and found it credible. Moreover, McDonough's own medical records formed the basis for the Workers' Compensation claim.

Defense counsel should have confronted McDonough with his failure to follow through with the logical implications of his position by alerting the Bureau of Workers' Compensation that he clearly--albeit wrongly--believed that Mr. Jones was defrauding them. McDonough took no such action, which undermines the reliability and credibility of the claims he made in front of Mr. Jones's jury. On a related front, defense counsel should have confronted Dr. McDonough with the fact that he failed to report Mr. Jones's injury to law enforcement officials, which Dr. McDonough should have done according to the Ohio Supreme Court's resolution of Mr. Jones's claimed violation of his physician-patient privilege.

### D. Conclusion

The defense counsel ineffectiveness prevented the jury from considering the faulty scientific evidence properly. Taken separately or together, these errors fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the culpability and sentencing phases of his trial; violated his right to a fair trial, to effective assistance of counsel; and violated his right to be free from cruel and unusual punishment.  These violated Jones's rights under U.S. CONST. amend. V, VI, VIII, and XIV.

**Fifth Ground for Relief: Mr. Jones's trial counsel violated his right to effective assistance of counsel by failing to effectively investigate, discover, research, and utilize exculpatory and impeachment evidence and legal arguments which would have seriously undermined the prosecution's ability to carry its burden of proof and procure a death sentence.**

Defense counsel have a duty to make reasonable investigations or to make reasonable, informed decision that makes particular investigations unnecessary.[345] Only decision made after counsel conducts a reasonable investigation can be labeled "strategic decisions"-anything less is at best negligence.[346] Mr. Jones's counsel's failure to discover the critical evidence outlined above violated any objectively reasonable standard of effective capital defense counsel and prejudiced Mr. Jones.[347]

### A.  Defense Counsel Failed to Adequately Investigate and Prepare to Confront Key Medical Testimony from State's Witness Dr. McDonough, and When They Failed to Effectively Prepare Their Own Expert, Dr. Solomkin.

*Standard of Review*

This issue was raised in the Post-conviction Petition, Claim Seven.[348] The Common Pleas Court[349] determined that the issue could have been raised on direct appeal and that the addition information did not indicate that the evidence was false or inaccurate. The issue was addressed in the First Assignment

---

[345] *Groseclose v. Bell*, 130 F.3d 1 161 (6th Cir. 1997); *Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997).

[346] *Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992); *Groseclose*, 130 F.3d at 1167-68.

[347] *Strickland v. Washington*, 466 U.S. 668 (1984); U.S. Const., amends V, VI, XIV.

[348] Post-Conviction Petition, pp. 17-19, V App. 22-24.

[349] Findings of Fact, etc., pp. 4-5, XII App. 374-75.

of Error.[350] The Court of Appeals reviewed this claim under a fundamentally unfair standard.[351] The Court of Appeals cited *State v. Combs*, 100 Ohio App.3d 90, 101, 652 N.E.2d 205, 211 (1995), which in turn cited *Lockhart v. Fretwell*, 506 U.S. 364 (1993). The Court of Appeals also held that the claim was barred by *res judicata*.[352] The United States Supreme Court has held the fundamentally-unfair standard to be an unreasonable interpretation of United States Supreme Court law.[353] And it was raised in the Ohio Supreme Court. Proposition of Law One, Memorandum in Support of Jurisdiction, p. 29-30, XIV App. 37-38. The Ohio Supreme Court summarily declined to hear the case.[354]

Thus because the Court of Appeals applied the incorrect legal standard, this Court reviews this claim under the pre-AEDPA standard.[355]

### Procedural Default

The Government does not allege any failure to present the claim in state court on this issue.[356]

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

---

[350] Post-Conviction Merit Brief, pp. 12-13, XIII App. 31-32.
[351] Court of Appeals Opinion on Post-conviction, p. 15, XIII App. 417.
[352] Court of Appeals Opinion on Post-conviction, p. 20, XIII App. 422.
[353] *Williams v. Taylor*, 529 U.S. 362, 392 1495 (2000)
[354] Entry, XIV App. 151.
[355] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005)
[356] Answer, pp. 130-51.

*Merits*

Mr. Jones's trial counsel abdicated their duty to investigate and present a defense. Absent investigation and preparation, trial counsel were ineffective for failing to exercise Mr. Jones's right to confront state witness Dr. McDonough. In addition, Mr. Jones's counsel rendered ineffective assistance of counsel by failing to properly utilize Dr. Solomkin as a defense witness.[357] Defense counsel's failure in this regard is more fully developed in a separate Third Ground for Relief identifying the flaws in McDonough's testimony in the context of Dr. Solomkin's trial testimony and post-conviction affidavit. That Ground for Relief is incorporated by reference.

## B. Failure to Investigate History of Crimes at Embassy Suites Hotel

*Standard of Review*

This issue was raised in the Post-conviction Petition, Claim Thirty-five.[358] The Trial Court determined that this was only second guessing the trial counsel and did not address the *Brady* allegations.[359] The issue was addressed in the First Assignment of Error.[360] The Court of Appeals reviewed this claim under a fundamentally unfair standard.[361] The Court of Appeals did not discuss the inadequacy of counsel aspect of this claim but it generally cited *State v. Combs*, 100 Ohio App.3d 90, 101, 652 N.E.2d 205, 211 (1995), which in turn cited *Lockhart v. Fretwell*, 506 U.S. 364 (1993). The United States Supreme Court

---

[357] *Strickland v. Washington*, 466 U.S. 668 (1984); *Kentucky v. Stincer*, 482 U.S. 730 (1987); *Davis v. Alaska*, 415 U.S. 308 (1974).
[358] Post-Conviction Petition, pp. 17-19, V App. 22-24.
[359] Findings of Fact, etc., p. 15, XII App. 385.
[360] Court of Appeals Merit Brief Post-conviction, p. 14, XIII 33.
[361] Court of Appeals Opinion on Post-conviction, p. 7-9, XIII App. 409-11.

has held the fundamentally-unfair standard to be an unreasonable interpreta-

tion of United States Supreme Court law.[362]  The Court of Appeals concluded

that the reports were not exculpatory or material;[363] however, it only balanced

the particular facts, not all of the *Brady* information. The matter was then

raised in the Ohio Supreme Court.[364] The Ohio Supreme Court summarily de-

clined to hear the case.[365]

Thus because the Court of Appeals applied the incorrect legal standard and

balanced only the particular fact, this Court reviews this claim under the pre-

AEDPA standard.[366]

*Procedural Default*

The Government does not allege any failure to present the claim in state

court on this issue.[367]

*Clearly established United States Supreme Court law*

The clearly established United States Supreme Court law is *Strickland v.*

*Washington*, 466 U.S. 668 (1984).

*Merits*

The prosecution had a duty to disclose copies of the BAPD's Yearly Reports

of criminal activity from BAPD's Hotel/Motel Interdiction Unit because those

---

[362] *Williams v. Taylor*, 529 U.S. 362, 392 1495 (2000)
[363] Court of Opinion Post-conviction, p. 9, XIII App. 411.
[364] Memorandum in Support of Jurisdiction, Post-conviction, pp. 49-50, XIV App. 57-58.
[365] Entry, XIV App. 151.
[366] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005)
[367] Answer, pp. 130-51.

records contained exculpatory and impeachment evidence favorable to Mr. Jones.[368] Likewise, for the reasons set for in greater detail in that Ground for Relief, Mr. Jones's defense counsel should have acquired these records through effective investigation. Their failure to do so constitutes an independent violation of Mr. Jones's constitutional right to effective assistance of counsel in addition to the prosecutors' breach of their duty to disclose favorable evidence. This issue is factually more fully developed in the Third Claim for Relief, part C, which is incorporated here.

### C.  Failure to Investigate a Pair of Shoes the Prosecution Tied to Mr. Jones

*Standard of Review*

This issue was raised in the Post-conviction Petition, Claim Sixteen.[369] The Common Pleas Court,[370] determined that the issue could have been raised on direct appeal. The issue was addressed in the First Assignment of Error.[371] The Court of Appeals reviewed this claim under a fundamentally unfair standard.[372] The Court of Appeals cited *State v. Combs*, 100 Ohio App.3d 90, 101, 652 N.E.2d 205, 211 (1995), which in turn cited *Lockhart v. Fretwell*, 506 U.S. 364 (1993). The Court of Appeals also held that the claim did not have sufficient evidence supporting it.[373] The United States Supreme Court has held the fundamentally-unfair standard to be an unreasonable interpretation of United

---

[368] Post-Conviction Exhibit YY, XII App. 258-80.
[369] Post-Conviction Petition, pp. 40, V App. 45.
[370] Findings of Fact, etc., pp. 4-5, XII App. 374-75.
[371] Post-Conviction Merit Brief, pp. 12-13, XIII App. 31-32.
[372] Court of Appeals Opinion on Post-conviction, p. 15, XIII App. 417.
[373] Court of Appeals Opinion on Post-conviction, p. 21, XIII App. 423.

States Supreme Court law.[374] And it was raised in the Ohio Supreme Court. Proposition of Law One, Memorandum in Support of Jurisdiction, pp. 30-31, XIV App. 38-39. The Ohio Supreme Court summarily declined to hear the case.[375]

Thus because the Court of Appeals applied the incorrect legal standard, this Court reviews this claim under the pre-AEDPA standard.[376]

### Procedural Default

The Government does not allege any failure to present the claim in state court on this issue.[377]

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

### Merits

Petitioner raised this matter in his Thirty-Second Ground for relief.[378] The Trial Court indicated that there was no evidence that Petitioner was abiding by the dress code and that he failed to "provide sufficient evidentiary documents to pass the minimum level of cogency required for postconviction relief."[379] The matter was raised in the Merit Brief in the Court of Appeals.[380] The Court of

---

[374] *Williams v. Taylor*, 529 U.S. 362, 392 1495 (2000)
[375] Entry, XIV App. 151.
[376] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005)
[377] Answer, pp. 130-51.
[378] XII App. 204-06.
[379] Findings of Fact, etc., p. 14, XII App. 384.
[380] Court of Appeals Merit Brief Post-conviction, p. 14, XIII 33.

Appeals that the trial court was wrong but that the evidence was merely cumulative.[381] The matter was then raised in the Ohio Supreme Court.[382] The Ohio Supreme Court summarily declined to hear the case.[383]

This is an unreasonable application of the law to the facts.

The prosecution presented evidence at Mr. Jones's trial that the shoes collected during the execution of a search warrant at the home of his friend Earlene Metcalf were consistent with the bruising patterns found on Mrs. Nathan's chest. Tr. 886-912. These shoes were brown, not black.[384] Defense counsel did not present any evidence to rebut the State's assumption that Mr. Jones was wearing these shoes on the day of the crime. In fact, defense counsel improperly stipulated Mr. Jones's ownership of these shoes.[385]

If counsel had conducted a reasonable investigation, the information available at the time of Mr. Jones's trial would have revealed that he was not wearing these shoes that day. A reasonable investigation would have revealed that the Banquets Department at Embassy Suites Hotel had a dress code that was imposed upon all employees. This dress code consisted of a gray Embassy Suites shirt, a pair of black pants, and a pair of black shoes. If an employee did not appear at work dressed in this uniform, he or she was sent home for the day. Mr. Jones was wearing this uniform on the day Mrs. Nathan was killed.[386]

---

[381] Court of Opinion Post-conviction, p. 24-26, XIII App. 426-28.
[382] Memorandum in Support of Jurisdiction, Post-conviction, pp. 45-47, XIV App. 53-55.
[383] Entry, XIV App. 151.
[384] State's Exhibit 70.
[385] Tr. 1724.
[386] Affidavit of Elwood J. Jones, Jr.,¶ 5, p. 2, IX App. 3.

## D.  Failure to Adequately Investigate an Alternate Suspect Theory.

### Standard of Review

This issue was raised in the Post-conviction Petition, Claim Twenty.[387] The Common Pleas Court,[388] determined that the issue could have been raised on direct appeal and that the addition information did not indicate that the evidence was false or inaccurate. The issue was addressed in the First Assignment of Error.[389] The Court of Appeals reviewed this claim under a fundamentally unfair standard.[390] The Court of Appeals cited *State v. Combs*, 100 Ohio App.3d 90, 101, 652 N.E.2d 205, 211 (1995), which in turn cited *Lockhart v. Fretwell*, 506 U.S. 364 (1993). The Court of Appeals also held:

> In our view, the majority of the examples raised in this claim are subject to the bar of *res judicata*. The remaining examples, to the extent that the evidence outside the record may be cogent, fail to demonstrate ineffective assistance of counsel.[391]

The United States Supreme Court has held the fundamentally-unfair standard to be an unreasonable interpretation of United States Supreme Court law.[392] And it was raised in the Ohio Supreme Court. Proposition of Law One, Memorandum in Support of Jurisdiction, p. 36-38, XIV App. 44-46. The Ohio Supreme Court summarily declined to hear the case.[393]

Thus because the Court of Appeals applied the incorrect legal standard, this Court reviews this claim under the pre-AEDPA standard.[394]

---

387 Post-Conviction Petition, pp. 48, V App. 53.
388 Findings of Fact, etc., pp. 4-5, XII App. 374-75.
389 Post-Conviction Merit Brief, pp. 14-15, XIII App. 33-34.
390 Court of Appeals Opinion on Post-conviction, p. 15, XIII App. 417.
391 Court of Appeals Opinion on Post-conviction, p. 24, XIII App. 426.
392 *Williams v. Taylor*, 529 U.S. 362, 392 1495 (2000)
393 Entry, XIV App. 151.
394 *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005)

*Procedural Default*

The Government does not allege any failure to present the claim in state court on this issue.[395]

*Clearly established United States Supreme Court law*

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

*Merits*

Defense counsel failed to adequately investigate the "alternate suspect" theory that they presented at trial. In the defense case, counsel attempted to shift suspicion to Bill McCall, an employee who they learned lived at the hotel and left shortly after Mrs. Nathan's death.[396] This theory boomeranged when, on rebuttal, the prosecution presented Mr. McCall's testimony and a compelling, innocent explanation for his absence. By sending up a defense theory that was so easily and thoroughly shot down, the prosecutors were able to cast doubt and shame on Mr. Jones's entire case.

## E.  Failure to Investigate a Fiber Found in Mr. Jones's Hand Wound.

*Standard of Review*

This issue was raised in the Post-conviction Petition, Claim Seventeen.[397] The Common Pleas Court,[398] the Common Pleas Court determined that the is-

---

[395] Answer, pp. 130-51.
[396] Tr. 1684.
[397] Post-Conviction Petition, pp. 41-42, V App. 46-47.
[398] Findings of Fact, etc., p. 9, XII App. 379.

sue could have been raised on direct appeal and that the addition information did not indicate that the evidence was false or inaccurate. The issue was addressed in the First Assignment of Error.[399] The Court of Appeals reviewed this claim under a fundamentally unfair standard.[400] The Court of Appeals cited *State v. Combs*, 100 Ohio App.3d 90, 101, 652 N.E.2d 205, 211 (1995), which in turn cited *Lockhart v. Fretwell*, 506 U.S. 364 (1993). The Court of Appeals also held that the claim was barred because Petitioner did not demonstrate inadequacy of counsel, that the evidence did not show that the choice not to have an expert was ineffective, and that the evidence was speculative at best.[401] The United States Supreme Court has held the fundamentally-unfair standard to be an unreasonable interpretation of United States Supreme Court law.[402] And it was raised in the Ohio Supreme Court. Proposition of Law One, Memorandum in Support of Jurisdiction, pp. 32-33, XIV App. 39-40. The Ohio Supreme Court summarily declined to hear the case.[403]

Thus because the Court of Appeals applied the incorrect legal standard, this Court reviews this claim under the pre-AEDPA standard.[404]

*Procedural Default*

The Government does not allege any failure to present the claim in state court on this issue.[405]

---

[399] Post-Conviction Merit Brief, pp. 14-15, XIII App. 33-34.
[400] Court of Appeals Opinion on Post-conviction, pp. 21-22, XIII App. 426-24.
[401] Court of Appeals Opinion on Post-conviction, pp. 21-22, XIII App. 423-24.
[402] *Williams v. Taylor*, 529 U.S. 362, 392 1495 (2000)
[403] Entry, XIV App. 151.
[404] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005)
[405] Answer, pp. 130-51.

*Clearly established United States Supreme Court law*

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

*Merits*

Defense counsel failed to move the trial court for the appointment of an independent expert to analyze a fiber Dr. McDonough claimed he found in Mr. Jones's hand wound. The fiber at issue provided a missed opportunity to present the jury with an alternative explanation for the hand injury and infection. For example, if the fiber proved to be inconsistent with any fibers found in Mrs. Nathan's hotel room, that evidence would have bolstered Mr. Jones's account (admitted through Dr. McDonough) as to how he injured his hand. Defense counsel most certainly could not have made a strategic decision not to use any scientific fiber evidence because they failed in the first instance to spot this critical issue much less request funds to have the fiber examined.

## F.  Failure to Utilize an Opportunity for Ongoing Investigation During Trial

*Standard of Review*

This issue was raised in the Post-conviction Petition, Claim Twenty.[406] The Common Pleas Court[407] determined that the issue could have been raised on direct appeal. The issue was addressed in the First Assignment of Error.[408] The Court of Appeals reviewed this claim under a fundamentally unfair standard.[409]

---

[406] Post-Conviction Petition, p. 48, V App. 53.
[407] Findings of Fact, etc., p. 11, XII App. 381.
[408] Post-Conviction Merit Brief, pp. 14-15, XIII App. 33-34.
[409] Court of Appeals Opinion on Post-conviction, p. 15, XIII App. 417.

The Court of Appeals cited *State v. Combs*, 100 Ohio App.3d 90, 101, 652 N.E.2d 205, 211 (1995), which in turn cited *Lockhart v. Fretwell*, 506 U.S. 364 (1993). The Court of Appeals also held:

> In our view, the majority of the examples raised in this claim are subject to the bar of *res judicata*. The remaining examples, to the extent that the evidence outside the record may be cogent, fail to demonstrate ineffective assistance of counsel.[410]

The United States Supreme Court has held the fundamentally-unfair standard to be an unreasonable interpretation of United States Supreme Court law.[411] And it was raised in the Ohio Supreme Court. Proposition of Law One, Memorandum in Support of Jurisdiction, p. 36-38, XIV App. 44-46. The Ohio Supreme Court summarily declined to hear the case.[412]

Thus because the Court of Appeals applied the incorrect legal standard, this Court reviews this claim under the pre-AEDPA standard.[413]

### Procedural Default

The Government does not allege any failure to present the claim in state court on this issue.[414]

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

---

[410] Court of Appeals Opinion on Post-conviction, p. 24, XIII App. 426.
[411] *Williams v. Taylor*, 529 U.S. 362, 392 1495 (2000)
[412] Entry, XIV App. 151.
[413] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005)
[414] Answer, pp. 130-51.

*Merits*

Defense counsel failed to effectively utilize Ohio R. Crim. P. 16(B)(l)(g) to review any prior statements of prosecution witnesses immediately following their direct examination. This powerful procedural tool in Ohio permits defense counsel to effectively confront prosecution witnesses during cross-examination with prior inconsistent statements. There is no objectively sound reason for any defense attorney in Ohio to bypass this critical device for effective confrontation. But Mr. Jones's counsel nearly always failed to make any request under this rule, and when they did remember to make the request they failed to insist on their right to take part in the trial court's inspection of the statement; thereby rendering ineffective assistance of counsel and violating Mr. Jones's constitutional right to confront witnesses against him.[415]

## G. Conclusion

The defense counsel ineffectiveness prevented the jury from considering the faulty scientific evidence properly. Taken separately or together, these errors fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the culpability and sentencing phases of his trial; violated his right to a fair trial, to effective assistance of counsel; and violated his right to be free from cruel and unusual punishment.  These violated Jones's rights under U.S. Const. amend. V, VI, VIII, and XIV.

---

[415] Tr. 871, 1006, 1042, 1056, 1071, 1112, 1151, 1238, 1321, 1361, 1407.

## Sixth Ground for Relief: Elwood Jones was denied the right to counsel when Attorney Sanks abdicated his role as defense counsel.

*Petitioner abandons this claim.*

## Seventh Ground for Relief: Mr. Jones's constitutional right to a fair, non- arbitrary and reliable capital sentencing hearing were violated by his counsel's failure to investigate mitigation evidence and the trial court's refusal to permit the presentation of a viable "residual doubt" mitigation argument.

*Standard of Review*

Petitioner raised the issue of the failure to investigate mitigation on direct appeal, both in the Court of Appeals, Assignment of Error No. One (D), Ct. App. Brief p. 11, and the Ohio Supreme Court, Proposition of Law No. Four, Sup. Br. p. 14. The Ohio Supreme Court addressed the issue on the merits, Sup. Ct. Op. p. 11. So this Court should review the issue under the AEDPA standard. Petitioner raised the failure to instruct on residual doubt at trial;[416] in the Court of Appeals in Assignment of Error No. Eight; [417]and the Ohio Supreme Court, Pr. Law No. Fourteen.[418] The Ohio Supreme Court addressed the issue on the state-law merits.[419] So this Court should review the issue under the AEDPA standard.

---

[416] Tr. 1912.
[417] Ct. App. Brief p. 11.
[418] Sup. Br. p. 38.
[419] Sup. Ct. Op. p. 22, IV App. 410.

*Procedural Default*

The Government does not assert any failure to present the claim in state court on this ground.[420]

*Clearly established United States Supreme Court law*

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

*Merits*

Petitioner abandons the part of the claim relating to the inadequacy of his counsel.

The trial court violated Mr. Jones's constitutional rights when it denied his counsel's request for an instruction on residual doubt. The prosecution then "instructed" the jury during closing argument to ignore what the defense said about residual doubt and listen only to the instructions given by the court. Since residual doubt was never mentioned in those instructions, Mr. Jones was denied the right to have his jurors consider residual doubt. The prosecutor's improper argument coupled with the trial court's refusal to either instruct on residual doubt or at least make it clear to the jurors they should consider defense counsel's residual doubt argument denied Mr. Jones's his constitutional right to have his sentencing jurors entertain relevant and meaningful information in his mitigation hearing.

As a result, the jurors had no mitigation to weigh against the aggravating factors the prosecution had proved to the jurors' satisfaction during the first

---

[420] Answer, p. 93.

phase of trial. In light of the court's refusal to instruct on residual doubt, counsel should have presented some mitigation to the jury. Failure to do so led the state to argue that Mr. Jones had "forfeited" the right to any consideration of a life sentence. The trial court endorsed this view by overruling defense counsel's objection to that characterization.[421] The result that the jury's sense of responsibility for the ultimate sentence was reduced.[422]

The failure to provide the jury with a residual-doubt instruction. Taken separately or together, these errors fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the culpability and sentencing phases of his trial; violated his right to a fair trial and violated his right to be free from cruel and unusual punishment.  These violated Jones's rights under U.S. Const. amend. V, VIII, and XIV.

---

[421] Tr. 1947-49.
[422] *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

**Eighth Ground for Relief: Systematic flaws in Hamilton County's methods for selecting grand jurors, grand jury forepersons, and petit jury venires yielded racial, gender, and socio-economic biases inimical to Mr. Jones's constitutional rights. His rights were further violated when the prosecution excluded all African-Americans from his jury. Mr. Jones's counsel failed to effectively challenge these unconstitutional systemic factors; failed to raise an obvious challenge; failed to conduct an effective voir dire; and failed to raise effective challenges to venire persons.**

## A.  The Composition of the Grand Jury that Indicted Mr. Jones Failed to Comply with Constitutional Requirements

*Standard of Review*

Petitioner raised this issue in his Second Ground for Relief in his Post Conviction Petition.[423] Petitioner also asserted that his trial counsel were ineffective when they failed to raise the matter of the discriminatory nature of the makeup of the Grand Jury at trial.[424]

The Trial Court repeated verbatim the proposed findings of fact and conclusions of law by the Hamilton County Prosecutor.[425] The Trial Court also repeated verbatim the proposed findings of fact and conclusions of law by the Hamilton County Prosecutor on the inadequacy of counsel claim, namely that they were barred by res judicata.[426]

The Court of appeals held that this claim was barred by res judicata and could have been raised at trial and direct appeal and that the evidence was irrelevant to the claim, available at trial and did not demonstrate that Hamilton

---

[423] Post-conviction Petition, 5-6, V App. 10-11.
[424] Post-conviction Petition, pp. 48-49, V App. 53-54.
[425] Amended Proposed Findings, etc., p. 2, XII, App. 339; Trial Court Findings of Fact, Conclusions of Law, etc., p. 2, XII App. 372.
[426] Amended Proposed Findings, etc., pp. 10-11, XII App. 347-48; Trial Court Findings of Fact, Conclusions of Law, etc., p. 11, XII App. 381.

County excludes distinctive groups from serving as Grand Jurors.[427] The Court of Appeals dealt with the inadequacy of counsel claims raised in the Twentieth Claim in state court collectively, saying, "In our view, the majority of the examples raised in this claim are subject to the bar of *res judicata*. The remaining examples, to the extent that the evidence outside the record may be cogent, fail to demonstrate ineffective assistance of counsel."[428]

These matters were raised in the Ohio Supreme Court,[429] but that Court refused to hear the case.[430]

The pre-AEDPA de novo standard applies to this case. The Sixth Circuit Court of Appeals has held that the pre AEDPA de novo standard applies when the state court did not assess the merits of a claim:

> But when a claim has not been "adjudicated on the merits in State court proceedings," id., and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").[431]

The State Court disposed of this claim perfunctorily on res judicata and related issues that did not discuss the claim.

*Procedural Default*

The Government asserts that these are defaulted. However, the failure to object is excused by the inadequacy of counsel. As noted above, the last state court to review the matter disposed of the inadequacy of counsel on this item

---

[427] Court of Appeals Opinion, App. Vol. XIII pp. 408-09.
[428] Court of Appeals Opinion, App. Vol. XIII, pp. 425-26.
[429] Memorandum in Support of Jurisdiction, App. Vol. XIV, pp. 21-22.
[430] Entry, App. Vol. XIV, p. 151.
[431] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

on procedural grounds. Thus the pre AEDPA de novo standard also applies to the review of the inadequacy of counsel.

*Clearly established United States Supreme Court law*

The clearly established United States Supreme Court law is *Carter v. Texas*, 177 U.S. 442, 449 (1900); and *Castaneda v. Partita*, 430 U.S. 482, 492 (1977).

*Merits*

The controlling United States Supreme Court case law barring racial discrimination in the composition of grand juries is *Carter v. Texas*, 177 U.S. 442, 449 (1900). *See also Castaneda v. Partita*, 430 U.S. 482, 492 (1977).

The Grand Jury that indicted Petitioner was heavily skewed by being over-populated with residents of the northwestern part of Hamilton County. The distribution shown by the sample indicates that the jury selection process in Hamilton County is purposefully and overly represented by wealth white members of the upper class to an extent that is statistically impossible to have been random given the demographic composition of the area. This skewing resulted in the selection of the biased grand jury that indicted Petitioner. Such a biased process discourages citizens accused of crimes from exercising their right to a jury trial. The information supporting these assertions was attached to the Petition in three appendices.[432] The grand jury must be made up of a fair cross section of the community.[433]

---

[432] App. Vol. VI.
[433] *Campbell v. Louisiana*, 523 U.S. 392, 397 (1998).

The Fourteenth Amendment prohibits the selection of grand jury panes in a discriminatory manner, which gives rise to disproportionately unrepresentative results.[434]

## B. The Selection of the Foreperson of the Grand Jury that Indicted Mr. Jones Failed to Comply with Constitutional Requirements

*Standard of Review*

Petitioner raised this issue in his Third Ground for Relief in his Post Conviction Petition.[435] Petitioner also asserted that his trial counsel were ineffective when they failed to raise the matter of the discriminatory nature of the makeup of the Grand Jury at trial.[436]

The Trial Court repeated verbatim the proposed findings of fact and conclusions of law by the Hamilton County Prosecutor.[437]

The Court of appeals held that this claim was barred by res judicata and could have been raised at trial and direct appeal and that the evidence was irrelevant to the claim, available at trial and did not demonstrate that Hamilton County excludes distinctive groups from serving as forepersons of the Grand Jury.[438] The Court of Appeals dealt with the inadequacy of counsel claims raised in the Twentieth Claim in state court collectively, saying, "In our view, the majority of the examples raised in this claim are subject to the bar of *res*

---

[434] *Castaneda v. Partida*, 430 U.S. 482, 492 (1977).
[435] Post-conviction Petition, App. Vol. V pp. 14-15.
[436] Post-conviction Petition, App. Vol. V pp. 54.
[437] Amended Proposed Findings, etc., App. Vol. XII, pp. 339-40, 347-48; Trial Court Findings of Fact, Conclusions of Law, etc., App. Vol. XII, p. 372-73, 381.
[438] Court of Appeals Opinion, App. Vol. XIII pp. 408-09.

*judicata*. The remaining examples , to the extent that the evidence outside the record may be cogent, fail to demonstrate ineffective assistance of counsel."[439]

The pre-AEDPA de novo standard applies to this case. The Sixth Circuit Court of Appeals has held that the pre AEDPA de novo standard applies when the state court did not assess the merits of a claim:

> But when a claim has not been "adjudicated on the merits in State court proceedings," id., and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").[440]

The State Court disposed of this claim perfunctorily on res judicata and related issues that did not discuss the claim.

Thus the pre AEDPA de novo standard also applies to the review of the inadequacy of counsel.

### Procedural Default

The Government asserts that these are defaulted. Answer, p. 94. However, the failure to object is excused by the inadequacy of counsel. As noted above, the last state court to review the matter disposed of the inadequacy of counsel on this item on procedural grounds.

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Rose v. Mitchell*, 443 U.S. 545 (1979),

---

[439] Court of Appeals Opinion, App. Vol. XIII, pp. 425-26.
[440] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

*Merits*

In *Rose v. Mitchell*, the United States Supreme Court held that racial discrimination in selection of grand jury is a valid ground for setting aside criminal conviction even where defendant has been found guilty beyond a reasonable doubt by a properly constituted petit jury.

A review of the demographic characteristics of grand jury foremen that have returned capital indictments in Hamilton County shows that they are heavily skewed towards the north-western section of Hamilton County. Exhibit C.[441] In addition, the same persons repeatedly appear as foremen even in cases that are separated by several years. Exhibit C[442]. This occurs because the administrative judge is provided with the responsibility of choosing which foreperson to utilize during their term. Exhibit A.[443] As a result of this selection process, and as demonstrated by the demographic characteristics, the grand jury foremen in capital cases, far too often white conservative members of the upper class, are people who have a "proven track record" of returning capital indictments to an extent that the assignment of foremen is statistically impossible to have been random.

These violations of federal constitutional rights prejudiced Petitioner Jones in that he was denied a fair and impartial grand jury foreman in violation of the Equal Protection Clause. *Rose v. Mitchell*, 443 U.S. 545 (1973). Petitioner's grand jury foreman was purposefully selected in such a manner that the proceedings were heavily in favor of returning a capital indictment. The patterns and practices of the selection of Grand Jury Forepersons in Hamilton County

---

[441] App. Vol. VI.
[442] App. Vol. VI.
[443] App. Vol. VI.

127

Ohio, and the means used to select the Foreperson of the Grand Jury that returned the capital indictment against Petitioner, violates Petitioner's constitutional rights to due process and equal protection of the laws. U.S. Const. amend. XIV;

The information supporting these assertions was attached to the Petition in three appendices.[444]

The Fourteenth Amendment prohibits the selection of the Grand Jury foreperson in a discriminatory manner.

### C. The Composition of the Petit Jury Venire and the Jurors Empanelled for Mr. Jones's Trial Failed to Comply with Constitutional Requirements

*Standard of Review*

Petitioner raised this issue in his Post Conviction Petition in his Fourth Ground for Relief.[445] Petitioner also asserted that his trial counsel were ineffective when they failed to raise the matter of the discriminatory nature of the makeup of the Grand Jury at trial.[446]

The Trial Court repeated verbatim the proposed findings of fact and conclusions of law by the Hamilton County Prosecutor.[447]

The Court of appeals held that this claim was barred by res judicata and could have been raised at trial and direct appeal and that the evidence was irrelevant to the claim, available at trial and did not demonstrate that Hamilton

---

[444] App. Vol. VI.
[445] Post-conviction Petition, App. Vol. V pp. 14-15.
[446] Post-conviction Petition, App. Vol. V pp. 53.
[447] Amended Proposed Findings, etc., App. Vol. XII, pp. 340, 347; Trial Court Findings of Fact, Conclusions of Law, etc., App. Vol. XII, p. 373, 381.

County excludes distinctive groups from serving as Grand Jurors.[448] The Court of Appeals dealt with the inadequacy of counsel claims raised in the Twentieth Claim in state court collectively, saying, "In our view, the majority of the examples raised in this claim are subject to the bar of *res judicata*. The remaining examples , to the extent that the evidence outside the record may be cogent, fail to demonstrate ineffective assistance of counsel."[449]

The pre-AEDPA de novo standard applies to this case. The Sixth Circuit Court of Appeals has held that the pre AEDPA de novo standard applies when the state court did not assess the merits of a claim:

> But when a claim has not been "adjudicated on the merits in State court proceedings," id., and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").[450]

The State Court disposed of this claim perfunctorily on res judicata and related issues that did not discuss the claim.

*Procedural Default*

The Government asserts that these are defaulted. Answer, p. 94. However, the failure to object is excused by the inadequacy of counsel. As noted above, the last state court to review the matter disposed of the inadequacy of counsel on this item on procedural grounds. Thus the pre AEDPA de novo standard also applies to the review of the inadequacy of counsel.

---

[448] Court of Appeals Opinion, App. Vol. XIII pp. 408-09.
[449] Court of Appeals Opinion, App. Vol. XIII, pp. 425-26.
[450] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

*Clearly established United States Supreme Court law*

The clearly established United States Supreme Court law is *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975).

*Merits*

In *Taylor v. Louisiana*, the United States Supreme Court held that Sixth Amendment requires that a person is entitled to a jury made up of a fair cross section of the community.

The failure to provide a fair cross-section of the community for the base for selecting a jury violates the Sixth Amendment to the United States Constitution. The prospective jury panel drawn for Mr. Jones's capital trial was not a fair cross-section of the community. First, the panel significantly lacked a distinctive group in the community-African-Americans. Second, the representation of African-Americans in Mr. Jones's venire is not statistically consistent with their numbers and percentage of the general population of Hamilton County, Ohio.

Of the sixty prospective jurors summoned for duty in Mr. Jones's case, only six were African-American. The remaining fifty-four were white. This skewing resulted in the selection of a presumptively biased jury that convicted Mr. Jones.

A prima facie violation of the fair-cross-section command requires Mr. Jones to demonstrate: (1) that the group alleged to be excluded is a distinctive group within the community; (2) that the representation of this group on the venire from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the under-

representation is due to a systematic exclusion of this group in the jury selection process.[451] The facts in Petitioner's record demonstrate a prima facie violation.

The failure to provide a fair cross-section of the community denied Petitioner's Rights under the Sixth Amendment.

### D. The Prosecution's Use of Peremptory Challenges to Exclude all African-American Citizens from Mr. Jones's Petit Jury Creates a Strong Presumption of Racial Animus.

*Standard of Review*

Petitioner raised this issue in his Post Conviction Petition in his Fifth Ground for Relief.[452] Petitioner also asserted that his trial counsel were ineffective when they failed to raise the matter of the discriminatory nature of the makeup of the Grand Jury at trial.[453]

The Trial Court repeated verbatim the proposed findings of fact and conclusions of law by the Hamilton County Prosecutor.[454]

The Court of appeals held that this claim was barred by res judicata and could have been raised at trial and direct appeal and that the evidence was available at trial but did not address the fact that the jury questionnaires were not part of the trial court record on direct appeal.[455] The Court of Appeals dealt with the inadequacy of counsel claims raised in the Twentieth Claim in state

---

[451] *Duren v. Missouri*, 439 U.S. 357, 364 (1979).
[452] Post-conviction Petition, App. Vol. V pp. 16-18.
[453] Post-conviction Petition, App. Vol. V pp. 53.
[454] Amended Proposed Findings, etc., App. Vol. XII, pp. 340, 347; Trial Court Findings of Fact, Conclusions of Law, etc., App. Vol. XII, p. 373, 381.
[455] Court of Appeals Opinion, App. Vol. XIII pp. 408-09; Post-Conviction Exhibit E, App. Vol. VIII., pp. 1-368.

court collectively, saying, "In our view, the majority of the examples raised in this claim are subject to the bar of *res judicata*. The remaining examples, to the extent that the evidence outside the record may be cogent, fail to demonstrate ineffective assistance of counsel."[456]

The pre-AEDPA de novo standard applies to this case. The Sixth Circuit Court of Appeals has held that the pre AEDPA de novo standard applies when the state court did not assess the merits of a claim:

> But when a claim has not been "adjudicated on the merits in State court proceedings," id., and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").[457]

The State Court disposed of this claim perfunctorily on res judicata and related issues that did not discuss the claim.

### Procedural Default

The Government asserts that these are defaulted. Answer, p. 94. However, the failure to object is excused by the inadequacy of counsel. As noted above, the last state court to review the matter disposed of the inadequacy of counsel on this item on procedural grounds. Thus the pre AEDPA de novo standard also applies to the review of the inadequacy of counsel.

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Batson v. Kentucky*, 476 U.S. 79 (1986).

---

[456] Court of Appeals Opinion, App. Vol. XIII, pp. 425-26.
[457] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

*Merits*

Petitioner is African American. Mrs. Nathan was Caucasian. On the face of this record, it appears that the prosecution used its peremptory challenges in a manner designed to prevent any African American from serving on Petitioner's Petit Jury.

Sixty jurors were summoned for Petitioner's capital trial. Of those sixty, only six prospective jurors were African-American.[458] Because two African-American jurors were excused prior to individual voir dire, four remained on the prospective panel (Juror No. 39-Blair; Juror No. 43-Gaines; Juror No. 51-Sanders; Juror No. 52-Oglesby).

Each party had six peremptory challenges for the selection of the petit jury. Prior to exercising these challenges, the trial court permitted the parties to conduct individual voir dire on the prospective jurors through Juror Schafer (Juror No. 27). Both parties exercised four peremptory challenges before realizing that additional jurors beyond Juror Schafer would be needed for positions on both the petit jury and as alternates.[459] At that point, Jurors Herman and Schaefer (Jurors No. 26 and 27) were in the first and second alternate positions.[460]

Juror Blair was the first of four jurors examined at this time, which placed her as the third alternate juror.[461] Up to this point, Juror Blair was the only African-American individually questioned by the parties. Upon completing this voir dire, the State waived its two final peremptory challenges with respect to

---

[458] Tr. 415; see also Post-Conviction Exhibit E, App. Vol. VIII., pp. 1-368
[459] Tr. 757.
[460] Tr. 757.
[461] Tr. 763.

the jury, while defense counsel exercised two peremptory challenges against jurors other than Juror Blair.[462] The State's inaction and the defense's action placed Juror Blair into a position as first alternate juror, rather than gaining a position on the petit jury.[463] If the State had exercised either remaining peremptory challenge, Juror Blair would have been placed on the petit jury without an additional opportunity for the State to exercise a challenge against her.

Once placed into the position as first alternate juror, the State exercised a peremptory challenge against Juror Blair.[464] At that time, Defense counsel failed to raise an objection to the State's challenge. The removal of Juror Blair placed Juror Brewer as first alternate juror.[465] Ultimately, Juror Brewer moved into a position as juror when another juror was unable to remain for the sentencing determination.

Petitioner has established a prima facie case of intentional discrimination; thus, the burden shifts to the State of Ohio to demonstrate a race-neutral explanation for the strike. Because Petitioner's trial counsel were ineffective, and did not raise this claim during voir dire, the State of Ohio has not been provided with an opportunity to come forward with a race-neutral explanation for the strike. For this reason, an evidentiary hearing is necessary to allow the State to present its explanation, and based upon that explanation, to allow the trial court to determine whether Petitioner has proven purposeful racial discrimination. *Batson v. Kentucky*, 476 U.S. 79 (1986)*; Purkett v. Elem*, 514 U.S. 765, 767-67 (1995).

---

[462] Tr. 797.
[463] Tr. 798.
[464] Tr. 798.
[465] Tr. 799.

*Batson v. Kentucky*, 476 U.S. 79 (1986), continues to be the basic law of the land.[466]

### E. Defense Counsel failed to Conduct an Effective Voir Dire, and They Failed to Challenge a Biased Juror.

*Standard of Review*

The Ohio Supreme Court addressed the issue on the merits. Sup. Op. pp. 11-12, IV App. 399-400. Petitioner also raised this issue in the Court of Appeals, Assignment of Error No. One(C), Ct. Br. Pp. 10-11, III App. 65; and in the Ohio Supreme Court, Proposition of Law No. Three, Sup. Br. P. 13-14, IV App. 47-48. Thus the AEDPA standard of review applies to this item.

*Procedural Default*

The Government does not assert that there is any failure to present the claim in state court. Answer, pp. 135-37.

*Clearly established United States Supreme Court law*

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

*Merits*

The 2004 edition of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases provides:

Guideline 10.10.2 Voir Dire and Jury Selection

---

[466] *See also Miller-El v. Dretke*, 545 U.S. 231 (2005).

A.  Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender), whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge. Such challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire.

B.  Counsel should be familiar with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding "death qualification" concerning any potential juror's beliefs about the death penalty. Counsel should be familiar with techniques: (1) for exposing those prospective jurors who would automatically impose the death penalty following a murder conviction or finding that the defendant is death-eligible, regardless of the individual circumstances of the case; (2) for uncovering those prospective jurors who are unable to give meaningful consideration to mitigating evidence; and (3) for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable.

The 1989 edition of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases provides similar requirements on void dire:

A.  Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case, whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge.

B.  Counsel should be familiar with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding "death qualification" concerning any potential juror's beliefs about the death penalty. Counsel should be familiar with techniques for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable.

These are the standards to which the Courts have looked for determining the conduct of trial counsel in capital cases.[467]

Trial counsel was deficient during jury selection for failure to attempt rehabilitation of jurors who opposed the death penalty,[468] and their failure to challenge for cause a juror who admitted that he might be unable to put aside his

---

[467] *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).
[468] Tr. 515, 519, 629, 673,685, 687.

experience and training as a police officer and objectively consider the evidence presented.[469] Voir dire is a vital part of the process in any criminal jury trial, but in capital cases the importance of voir dire is multiplied, because the jury decides punishment as well as guilt or innocence. If counsel makes no attempt to rehabilitate jurors who express a preference for life imprisonment over the death penalty, the jury will automatically be stacked in favor of death. For the same reason, failure to conduct adequate voir dire of a prospective juror employed as a police officer, especially in light of his admission that he might be unable to ignore his training and experience, deprives Mr. Jones of a potential challenge for cause of a biased juror.

Thus Petitioner's right to adequate counsel was violated when his trial counsel failed to adequately voir dire the jurors.

### F. Defense Counsel Violated Mr. Jones's Constitutional Rights by Failing to Raise an Obvious Challenge, and by Failing to Challenge the Systemic Deficiencies in the Way Hamilton County Selects Grand Jurors, Grand Jury Forepersons, and the Venire for Petit Juries.

*Standard of Review*

Petitioner raised the inadequacy of his trial counsel regarding the conduct of Voir Dire in Post Conviction Petition in his Twentieth Ground for Relief.[470]

The Trial Court repeated verbatim the proposed findings of fact and conclusions of law by the Hamilton County Prosecutor.[471]

---

[469] Tr. 789.
[470] Post-conviction Petition, App. Vol. V pp. 53.
[471] Amended Proposed Findings, etc., App. Vol. XII, pp. 347; Trial Court Findings of Fact, Conclusions of Law, etc., App. Vol. XII, p. 381.

The Court of Appeals dealt with the inadequacy of counsel claims raised in the Twentieth Claim in state court collectively, saying, "In our view, the majority of the examples raised in this claim are subject to the bar of *res judicata*. The remaining examples, to the extent that the evidence outside the record may be cogent, fail to demonstrate ineffective assistance of counsel."[472]

The pre-AEDPA de novo standard applies to this case. The Sixth Circuit Court of Appeals has held that the pre AEDPA de novo standard applies when the state court did not assess the merits of a claim:

> But when a claim has not been "adjudicated on the merits in State court proceedings," id., and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").[473]

The State Court disposed of this claim perfunctorily on res judicata and related issues that did not discuss the claim.

### Procedural Default

The Government asserts procedural default in this item. Answer, p. 136-37. As noted above, this item was raised on post-conviction with additional information and disposed of on procedural grounds. Thus the item has been presented to the Ohio Courts.

### Clearly established United States Supreme Court law

The clearly established United States Supreme Court law is *Strickland v. Washington*, 466 U.S. 668 (1984).

---

[472] Court of Appeals Opinion, App. Vol. XIII, pp. 425-26.
[473] *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

*Merits*

Defense counsel violated Mr. Jones's constitutional rights by failing to object to the constitutionally infirm selection system for grand jurors in Hamilton County, and specifically, to the makeup of the grand jury that returned Mr. Jones's capital indictment.

Defense counsel violated Mr. Jones's constitutional rights by failing to object to the constitutionally infirm system by which Grand Juror forepersons are selected in Hamilton County, and specifically, to selection of the Grand Jury foreperson in Mr. Jones's case.

Defense counsel violated Mr. Jones's constitutional rights by failing to object to the makeup of the Petit Jury venire panel in Mr. Jones's case. As a result, Mr. Jones was denied a fair and impartial jury because those individuals selected from his venire did not reflect a fair cross section of the community.

Defense counsel violated Mr. Jones'sconstitutiona1 rights by failing to object to the prosecutors' presumptively discriminatory use of a peremptory challenge against the only African American venire person, Juror Blair-No. 28.[474]

## G. Conclusion

The various failings in jury selection prevented the selection of a fair jury. Taken separately or together, these errors fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the culpability and sentencing phases of his trial; violated his right to a fair trial, to a jury trial, to effective assistance of counsel; and violated his right to be free from

---

[474] Tr. 757,763,797-98.

cruel and unusual punishment.  These violated Jones's rights under U.S. CONST. amend. V, VI, VIII, and XIV.

### Ninth Ground for Relief: Multiple errors in the jury instructions at both phases of Mr. Jones's trial violated his constitutional rights to a fair trial, effective assistance of counsel, and to be free from an arbitrary and capricious death sentence

Mr. Jones's trial judge made multiple mistakes in the jury instructions given at both phases of the trial. Mr. Jones's counsel violated the standards of conduct when they failed to object to many of these unlawful and unconstitutional jury instructions. The following instructional errors undermined the reliability of Mr. Jones's convictions and rendered arbitrary and capricious the death sentence imposed upon him.

Mr. Jones's jury received instructions from the trial court at both the culpability and sentencing phases of trial that violated a host of his constitutional, statutory and procedural rights. His trial counsel breached their duty to lodge proper objections to these improper instructions and also violated their duty to tender proper instructions on Mr. Jones's behalf. And his appellate counsel breached their duty to effectively raise these violations as errors on appeal. As a result, Mr. Jones's rights were violated by his trial counsel, the trial court, and his appellate counsel.

The trial court bears the final responsibility for failing to properly instruct the jury at both the culpability and penalty phases of trial. Mr. Jones was prejudiced by the trial court's errant instructions, which errors were compounded by his trial counsel's failure to effectively raise objections and his appellate

counsel's failure to assign and/or effectively argue error in connection with these improper jury instructions.[475]

> 1. The instructions improperly allowed the jury to presume purpose from the manner in which the killing was done.[476]

Petitioner abandons this claim.

> 2. The "gist of the offense" definition for "purpose" improperly relieved the State of its burden to prove each element of the aggravated murder offense.[477]

Petitioner abandons this claim.

> 3. The instructions to the jury as to cause and foreseeability improperly interjected a civil liability standard that undermined the specific intent requirement of OHIO REV. CODE § 2903.01(B)(D).[478]

Petitioner abandons this claim.

> 4. The instructions improperly allowed the jury to presume knowledge from the facts in evidence, which created a conclusive presumption of mens rea.[479]

Petitioner abandons this claim.

> 5. The instructions improperly shifted the burden of proof upon Mr. Jones to disprove the elements of the crime and prove his innocence.[480]

Petitioner abandons this claim.

---

[475] U.S. Const. amends. V, VI, VIII, XIV; *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998); *Penson v. Ohio*, 488 U.S. 75 (1989); *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984); *Gregg v. Georgia*, 428 U.S. 153 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Anders v. California*, 386 U.S. 738 (1967); *Griffin v. Illinois*, 351 U.S. 12 (1956); *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999). Each of the following errors violates the axiomatic principles embodied in the constitutional provisions and cases just cited. Additional federal and state law is cited in some of the items.
[476] Tr. 1837.
[477] Tr. 1836, 1842, 1848.
[478] Tr. 1842-43, 1848-49.
[479] Tr. 1835.
[480] Tr. 1855, 1952.

6. The jury was improperly instructed that it must consider mitigating factors not raised by Mr. Jones.[481]

Petitioner abandons this claim.

7. The jury was not properly instructed that it must independently weigh the aggravating circumstances of each count against the mitigating factors.[482]

Petitioner abandons this claim.

8. The jury was improperly instructed to consider all the evidence admitted at both proceedings when determining Petitioner's sentence.[483]

Petitioner abandons this claim.

9. The jury was improperly instructed that the nature and circumstances of the offense are equated with the aggravating circumstances.[484]

Petitioner abandons this claim.

10. The sentencing jurors were not properly informed that they need not be unanimous on a finding of a mitigating factor in order to use it in their weighing process,[485] that they did not have to unanimously find death inappropriate before considering the life sentences;[486] the sentencing jury was improperly instructed that a life sentence recommendation must be unanimous.[487]

Petitioner abandons this claim.

11. Ohio's statutory definition of reasonable doubt is constitutionally infirm because it embodies a standard of proof below that required by the Due Process Clause of the Fourteenth Amendment. The "firmly convinced" language in Ohio's statutory definition of reasonable doubt operates to lower the standard form "proof beyond a reasonable doubt" to "clear and convincing evidence." The "willing to act" language is too lenient to satisfy the stringent Due Process standard for criminal conviction and has been criticized by the United States Su-

---

[481] Tr. 1957.
[482] Tr. 1959-60.
[483] Tr. 1961.
[484] Tr. 1955.
[485] Tr. 1952-64.
[486] Tr. 1958;
[487] Tr. 1958,1962.

preme Court when used as a component of defining "beyond reason-
able doubt."

This item was raised Assignment of Error Fifteen.[488] It was raised in the
Ohio Supreme Court in the Proposition of Law No. Twenty-Three,[489] The Ohio
Supreme Court overruled the issue on the merits.[490]

During guilt phase instructions in this case, the trial judge charged the ju-
rors on the state's burden to prove, beyond a reasonable doubt, every element
of each offense. In defining reasonable doubt for the jurors, the judge read the
statutory definition in OHIO REV. CODE § 2901.05(D).

> Now, reasonable doubt is present when, after you've carefully considered
> and compared all the evidence, you cannot say you are firmly convinced of
> the truth of the charge.
> Reasonable doubt is a doubt that is based on reason and common sense.
> Reasonable doubt is not mere possible doubt, because everything relating
> to human affairs or depending on moral evidence is open to some possible
> or imaginary doubt.
> Proof beyond a reasonable doubt is proof of such character that an ordinary
> person would be willing to rely and act upon it in the most important of his
> or her own affairs.[491]

These instructions were erroneous for two reasons. First, the jury was told
that reasonable doubt depended on whether they were firmly convinced of the
truth of the charge, a definition that is tantamount to an instruction to the jury
to vote for death, because the jury has already determined the truth of the
charge before the penalty phase begins. Second, Ohio's statutory definition of
reasonable doubt is constitutionally infirm because it embodies a standard of

---

[488] App. Br. 61-64, III App. 116-19.
[489] Merit Brief, p. 65-69, IV App. 99-103.
[490] Opinion 22-23, IV App. 410-11.
[491] Tr. 1957-58.

proof below that required by the Due Process Clause of the Fourteenth Amendment.

In this case, the jury's penalty phase verdict was compromised by the defective instructions the trial judge gave on reasonable doubt. This instruction gave the definition of reasonable doubt contained in OHIO REV. CODE § 2901.05(D). The statutory definition allowed the state to obtain a death sentence based on a degree of proof below that required by the Due Process Clause.

The instruction is also defective because of the "firmly convinced" language. The United States Supreme Court in *In re Winship*, 397 U.S. 358 (1970), addressed the fundamental nature of the concept of reasonable doubt. The Court stressed that "[i]t is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned."[492] In order for the public to maintain confidence in our system of laws, the Court continued, proof beyond a reasonable doubt must be held to be proof of guilt "with utmost certainty."[493] The Court has remained vigilant in enforcing the beyond a reasonable doubt standard; recently, it reversed a defendant's capital death sentence because the reasonable doubt instruction in the case could have led the jurors to find guilt "based on a degree of proof below that required by the Due Process Clause."[494]

The jurors in Elwood Jones's case never grasped the gravity of the reasonable doubt standard. OHIO REV. CODE § 2901.05(D), taken as a whole, does not

---

[492] *Winship*, 397 U.S. at 364.
[493] *Winship*, 397 U.S. at 364.
[494] *Cage v. Louisiana*, 498 U.S. 39, 41 (1992).

144

adequately convey to jurors the stringency of this burden. Indeed, the "firmly convinced" language in the first sentence of the statute is not reasonable doubt at all, but rather represents only a clear and convincing evidence standard. The statutory definition of proof beyond a reasonable doubt and the definition of clear and convincing proof are strikingly similar. This apparent from an examination of the opinion in *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), where the Ohio Supreme Court defined clear and convincing evidence as that degree of proof "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Id., paragraph three of the syllabus (emphasis added). The likeness of this definition to OHIO REV. CODE § 2901.05(D) is quite notable, where reasonable doubt is present if jurors "cannot say they are ***firmly convinced*** of the truth of the charge." (Emphasis added).

The "firmly convinced" language of the first sentence is not the only defect in OHIO REV. CODE § 2901.05(D). The "willing to act" language in the last sentence of the statute is also too lenient to satisfy the stringent Due Process standard for criminal conviction.

The United States Supreme Court has specifically disapproved of the "willing to act" language when defining proof beyond a reasonable doubt.[495] As the Court stated, "the charge should have been in terms of the kind of doubt that would make a person ***hesitate to act***. . . rather than the kind on which he would be willing to act."[496] While the Ohio Supreme Court has upheld the OHIO

---

[495] *Holland v. United States*, 348 U.S. 121 (1954).
[496] *Holland* 348 U.S. at 140 (emphasis added).

REV. CODE § 2901.05(D) charge,[497] many federal courts and even other Ohio courts have joined the United States Supreme Court in condemning the "willing to act" formulation.

In *Scurry v. United States*, 347 F.2d 468 (D.C. Cir. 1965), the federal appeals court pinpointed the danger in the "willing to act" charge:

> Being convinced beyond a reasonable doubt cannot be equated with being "willing to act * * * in the more weighty and important matters in your own affairs." A prudent person called upon to act in an important business or family matter would certainly gravely weigh the often neatly balanced considerations and risks tending in both directions. But, in making and acting on a judgment after so doing, such a person would not necessarily be convinced beyond a reasonable doubt that he had made the right judgment. Human experience, unfortunately, is to the contrary.[498]

The *Scurry* court recognized that "there is a substantial difference between a juror's verdict of guilt beyond a reasonable doubt and a person making a judgment in a matter important to him. To equate the two in the juror's mind is to deny the defendant the benefit of a reasonable doubt."[499] Other federal courts, as in Holland and m, have disapproved the 'willing to act" phrase and adopted a preference for defining proof beyond a reasonable doubt in terms of a prudent person who would hesitate to act when confronted with such evidence.[500]

---

[497] *State v. Nabozny*, 54 Ohio St. 2d 195, 375 N.E.2d 784 (1978),
[498] *Scurry*, 347 F.2d at 470.
[499] Id.
[500] *United States v. Pinckney*, 551 F.2d 1241 (D.C. Cir. 1976); *United States v. Noon*, 913 F.2d 20 (1st Cir. 1990); *United States v. Colon*, 835 F.2d 27 (2d Cir. 1987); *United States v. Conley*, 523 F.2d 650 (8th Cir. 1975); *Monk v. Zelez*, 901 F.2d 885 (10th Cir. 1990).

The fact is that ordinary people, such as jurors, are frequently required to make important decisions based upon proof of a lesser nature by choosing the most preferable course of action.

The trial court's charge on reasonable doubt was constitutionally flawed. The "firmly convinced" language in the first sentence of OHIO REV. CODE § 2901.05(D) defined reasonable doubt in terms nearly identical to the accepted definition of clear and convincing evidence. Further, as many courts have recognized, the "willing to act" language in the last sentence of OHIO REV. CODE § 2901.05(D) represented a standard of proof below that required by Due Process. As such, the reasonable doubt instruction in Elwood Jones's case allowed the jury to convict him "based on a degree of proof below that required by the Due Process Clause."[501]

> 12.    The penalty phase reasonable doubt instruction was constitutionally defective. It said: "reasonable doubt is present when, after you've carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge." Tr. 1957. (emphasis added). The jurors could not by definition have had any reasonable doubt about the sentence based on this definition. They were already firmly convinced of the truth of the charge, since they had returned convictions on the death-eligible counts of the indictment. This instruction operated as a mandatory presumption in the state's favor, a presumption which relieved the state of its penalty phase burden of proof. Such presumptions are illegal, and violate the Due Process Clause of the Fourteenth Amendment.[502] Moreover, because these jurors were already firmly convinced of the truth of the "charge" against Elwood Jones, they were compelled to return a death verdict against him at the penalty phase because OHIO REV. CODE § 2929.03(D)(2) states that a death sentence "shall" be imposed if the state carries its burden of proof at the mitigation phase. Instructions like these, which make death the mandatory sentence, have long been held to offend the Eighth Amendment.[503]

---

[501] *Cage*, 498 U.S. at 41.
[502] *Sandstrom v. Montana*, 442 U.S. 510 (1979); *Francis v. Franklin*, 471 U.S. 307 (1985).
[503] *Woodson v. North Carolina*, 428 U.S. 280 (1976).

This item was raised Assignment of Error Sixteen.[504] It was raised in the Ohio Supreme Court in the Proposition of Law No. Twenty-four.[505] The Ohio Supreme Court overruled the issue on the merits[506].

The penalty phase reasonable doubt instruction was constitutionally defective reasons as well. By law, the state had the burden to show its entitlement to a death verdict. In Elwood Jones case the prosecution had to prove, beyond a reasonable doubt, that the aggravating circumstances outweighed all the mitigating factors. OHIO REV. CODE § 2929.03(D)(1-2).The instruction the trial judge gave on reasonable doubt made the state's burden considerably lighter. In defining reasonable doubt, the judge stated, "reasonable doubt is present when, after you've carefully considered and compared all the evidence, you cannot say you are firmly convinced of the ***truth of the charge***."[507]

The jurors could not have had any reasonable doubt about the sentence based on this definition. The jurors were already firmly convinced of the truth of the charge, since they had just convicted Defendant of all charged offenses. Jurors would therefore have taken this instruction to mean they should conclude the state had also met its burden of proof for the death penalty. This instruction operated as a mandatory presumption in the state's favor, a presumption which relieved the state of its penalty phase burden of proof. Such presumptions are illegal, and violate the Due Process Clause of the Fourteenth Amendment.[508]

---

[504] App. Br. 64-66, III App. 119-21.
[505] Merit Brief, p. 69-70, IV App. 103-04.
[506] Opinion 22-23, IV App. 410-11.
[507] Tr. 1957. Emphasis added.
[508] *Sandstrom v. Montana*, , 442 U.S. 510 (1979); *Francis v. Franklin*, 471 U.S. 307 (1985).

The instruction also effectively made the death sentence mandatory upon a finding of guilt. OHIO REV. CODE § 2929.03(D)(2) states that jurors "shall" return a death verdict if the state meets its burden of proof. Under the reasonable doubt instruction given in this case jurors had no choice but to find that the state had met its burden of proof on penalty. Because these jurors were already firmly convinced of the truth of the "charge" against Elwood Jones, they were compelled to return a death verdict against him at the penalty phase. Instructions like these, which make death the mandatory sentence, have long been held to offend the Eighth Amendment.[509] The trial court's erroneous instruction on reasonable doubt operated to relieve the state of its burden of proof, and compelled a death verdict. The consequence of the error was an unreliable death sentence which must now be overturned.

13.    The definition of mitigating factors in OHIO REV. CODE § 2929.04(B)(7) and the jury instructions violates the reliability component of the Eighth Amendment. Tr. 1957.

Petitioner abandons this claim.

14.    The trial court erred when it rejected defense counsel's request for an instruction on residual doubt at the penalty phase of trial. Tr.. 1912. It also overruled repeated objections to describing the jury's verdict at that phase as a 'recommendation.' Tr. 285, 1915. Defense counsel presented no evidence in mitigation, and argued only residual doubt as a mitigating factor, together with some discussion of the moral and religious implications of imposing a death sentence. Tr. 1890, 1925-1941. The prosecutor repeatedly emphasized the theme that the Judge would instruct the jury on everything that they were permitted to consider, that their oath as jurors limited their consideration to only those factors contained in the instructions, and that they really had little or no discretion in making the sentencing decision. See ex., Tr. 1942-1945. This argument, coupled with the judge's refusal to mention residual doubt in his instructions, had the same effect as an instruction not to consider residual doubt, or any other factor not specifically mentioned in the instructions. This vi-

---

[509] *Woodson v. North Carolina*, 428 U.S. 280 (1976).

> olated the United State's Supreme Court's mandate that the jury not
> be prohibited from considering mitigation evidence offered by a Mr.
> Jones for a sentence less than death.[510] It also had the effect of mi-
> nimizing or lessening the jurors' sense of responsibility for the ulti-
> mate sentence, a tactic condemned by the United States Supreme
> Court.[511]

This item was raised Assignment of Error Eight.[512] It was raised in the Ohio

Supreme Court in the Proposition of Law No. Fourteen.[513] The Ohio Supreme

Court overruled the issue on the merits.[514] Thus, this court must examine the

issue under the AEDPA standard.

Pursuant to Defendant's instructions, defense counsel presented no evi-

dence in mitigation, and argued only residual doubt as a mitigating factor, to-

gether with some discussion of the moral and religious implications of impos-

ing a death sentence, particularly in light of the possibility that an innocent

man might be executed. Tr. 1890, 1925-1941. In response, the prosecution

told the jury to ignore defense counsel's presentation and to consider only what

the judge instructed them to consider:

> I'm going to ask you to do something totally different than the defense just
> asked you to do. And I'm going to ask you to set aside what the defense just
> asked you to do.
>
> .  .  .  .
>
> Now all of a sudden you are given different instructions from the defense
> and I'm not going to. I'm going back to what we asked you right off the bat,
> what Judge Winkler tells you to do. If you do that, we will be satisfied.
>
> .  .  .  .

---

[510] *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104
(1982).
[511] *Caldwell v. Mississippi*, 472 U.S. 320. (1985).
[512] App. Br. 34-36, III App. 89-91.
[513] Merit Brief, p. 38-40, IV App. 72-74.
[514] Opinion 22, IV App. 410.

> That's a heavy thing to put on you, and that's why the law doesn't give you a lot of wide range here. That's why it is very precise, so you don't worry about it's me and my conscience and my religion doing this. It is the law that you all asked--that you all said that you would follow. And that's why the law is so precise. So this isn't the guilt trip the defense tried to lay on you. You are following the law that you said you would do.[515]

The prosecutor repeatedly emphasized the theme that the Judge would instruct the jury on everything that they were permitted to consider, that their oath as jurors limited their consideration to only those factors contained in the instructions, and that they really had little or no discretion in making the sentencing decision. This argument, coupled with the judge's refusal to mention residual doubt in his instructions, had the same effect as an instruction not to consider residual doubt, or any other factor not specifically mentioned in the instructions. It also had the effect of minimizing or lessening the jurors' sense of responsibility for the ultimate sentence, a tactic condemned by the United States Supreme Court.[516]

Residual doubt has long been recognized as a proper mitigating factor in Ohio death penalty cases.[517] An important element in that weighing process was the instruction to the jury that its verdict was only a recommendation. As the court noted, "...although legally proper, such an instruction indicates to the jury that the ultimate responsibility rests with the trial judge. In a case such as Watson's, where witness credibility played a crucial role in convicting the defendant, the jury may have felt that any residual doubt would be confirmed or

---

[515] Tr. 1942-45.

[516] *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

[517] *State v. Gilliard*, 40 Ohio St. 3d 226, 234,533 N.E.2d 272, 281 (1988). *See also State. v. Watson*, 61 Ohio St.3d 1, 17, 572 N.E.2d 97, 111 (1991), where the court independently weighed the aggravating factors against the sole mitigating factor of residual doubt, and reversed defendant's death sentence.

denied by the judge." In the instant case, the possibility that the jury felt relieved of the ultimate responsibility for deciding Defendant's fate in light of his continued profession of innocence is greatly enhanced by the state's arguments encouraging such a belief, and the argument that defense counsel forfeited any right to a weighing process by not presenting other mitigation evidence.[518]

As the lower court's opinion notes, the Ohio Supreme Court, in a case decided after this trial, has eliminated residual doubt as an acceptable mitigating factor in capital sentencing decisions.[519] At the time of Defendant's trial, however, he was entitled to rely on established precedent holding otherwise. There can be no doubt that this reliance affected his decision to present no other mitigation. It is prejudicial for the state to induce reliance on residual doubt as a mitigating factor, then to argue to the jury that the court's refusal to instruct the jury on residual doubt means that it cannot be considered as mitigation.

> 15.   Defense counsel failed to request and the trial court failed to give a cautionary instruction regarding the weight to be given to Dr. McDonough's testimony in light of the fact that he lacked expertise in the area of medicine that he testified about.[520]

Petitioner abandons this claim.

These improper jury instructions violated Mr. Jones's rights under both the U. S. Constitution and established Ohio capital jurisprudence. To the extent that some errors do not emanate directly from federal capital jurisprudence, these departures from Ohio law constitute a violation of Mr. Jones's federal rights. Taken separately or together, these errors fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the

---

[518] Tr.1947.
[519] *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997).
[520]

culpability and sentencing phases of his trial; violated his right to a fair trial, to effective assistance of counsel; and violated his right to be free from cruel and unusual punishment. These violated Jones's rights under U.S. CONST. amend. V, VI, VIII, and XIV.

## Tenth Ground for Relief: Mr. Jones's appellate counsel violated his right to effective assistance of appellate counsel by failing to raise obvious errors, which if raised, would have rendered his conviction and death sentence unreliable. These constitutional violations rendered Mr. Jones's conviction and death sentence unreliable.

Mr. Jones was entitled to effective counsel throughout the direct appeal process. Defense counsel's obligations as appellate counsel are generally the same as trial counsel. However, in capital cases, winnowing issues is not something that should be done at the early stages:

> As Subsection C emphasizes, it is of critical importance that counsel on direct appeal proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chances of success. "Winnowing" issues in a capital appeal can have fatal consequences. Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.[521]

Appellate counsel did not protect the record and failed to raise issues that they were required to preserve.

Mr. Jones's right to a fair trial was violated by prosecutorial misconduct, the admission of inadmissible evidence, unconstitutional rulings by the trial court, and the ineffective assistance of counsel. These multiple constitutional

---

[521] *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 118, Commentary to Guideline 10.15.1 (2003).

violations merit relief as demonstrated throughout this habeas petition. On direct appeal, Mr. Jones's appointed counsel failed to raise and argue many of the trial errors. They compounded the unreliability of Mr. Jones's conviction and death sentence by failing to provide effective assistance of counsel on direct appeal.

The constitutional deficiency of direct-appeal counsel is demonstrated by the following list of errors that they failed to raise on direct appeal. The cumulative impact of the many missed errors clearly proves a violation of the right to effective assistance of appellate counsel. Each of these missed errors merits relief. Mr. Jones's appellate counsel's failure to raise these errors on direct appeal constitutes ineffective assistance of appellate counsel. When new counsel brought these errors and appointed appellate counsel's ineffectiveness to the attention of Ohio's courts, they applied incorrect, conclusory, and opaque standards to reach the unreasonable and incorrect conclusion that no constitutional violations were transparent on this record.

All of the errors listed below were brought to the attention of the Ohio courts by separate counsel in a timely Application for Reopening of the direct appeal on Mr. Jones's behalf pursuant to OHIO R. APP. P. 26(B), Assignment of Error Four, 16, in the Application for Reopening Pursuant to APP. R. 26(B), pp. 7, XV App. 30. The Court of Appeals disposed of it saying that it had been, "raised by appellate counsel in some manner." It was raised in the Ohio Supreme Court in the Proposition of Law No. Five, O,[522] The Ohio Supreme Court

---

[522] Merit Brief from the denial of the Reopening, p. 49, XVI App. 69.

denied the appeal without separately addressing the issue. The last court to review the item did not adjudicate it on the merits.

And the omission of each and all of these errors from the record on direct appeal proves that Mr. Jones's constitutional right to effective assistance of counsel on direct appeal was violated time and time again.

***(1). The acts and omissions of Mr. Jones's trial counsel and the trial court's failure to ensure a fair trial violated his rights to effective assistance of counsel, due process, fair trial, confrontation of witnesses, and freedom from cruel and unusual punishment as guaranteed by the Sixth, Eighth and Fourteenth amendments of the United States Constitution.***

1.1. Defense counsel failed to object and or move for a mistrial when the prosecutor improperly elicited from a police officer the fact that Mr. Jones requested a lawyer during questioning and when the prosecutor improperly used the fact the Mr. Jones consulted counsel as evidence in favor of finding him guilty, including but not limited to an instance in the state's closing argument where this violation was exacerbated by arguing in direct conflict with the testimony that Mr. Jones consulted counsel before he was questioned about the murder by the police.[523]

1.2. Defense counsel failed to effectively utilize Ohio R. Crim. P. 16(B)(l)(g) to review any statements of the State's witnesses immediately following their direct examination, nearly always failing to make any request and, when made, failing to insist on taking part in the Court's inspection of the statement; thereby rendering ineffective assistance of counsel and violating Mr. Jones's constitutional right to confront witnesses against him.. Tr. 871, 1006, 1042,

---

[523] Tr. 1349, 1612, 1749; *Doyle v. Ohio*, 426 U.S. 610 (1976); *Edwards v. Arizona*, 451 U.S. 477 (1981).

1.3. Defense counsel failed to obtain a pathologist to assist in Mr. Jones's defense.[524]

1.4. Defense counsel failed to effectively prepare their expert, Dr. Solomkin, for his testimony.[525]

1. 5. Defense counsel failed to adequately investigate the blame-shifting theory (i.e. other suspect, Bill McCall) that they tried to advance at trial.[526]

1.6. Defense counsel failed to object to the trial court's statement to a juror during voir dire that referred to Mr. Jones's prior criminal convictions (Tr. 710), which reference violated basic rules of practice and deprived Mr. Jones of a fair trial.[527]

1.7. Defense counsel were ineffective for informing the prospective jurors that Mr. Jones had been previously convicted of other crimes which were inadmissible given the fact that Mr. Jones did not testify.[528] This error was compounded throughout the trial when defense counsel cross-examined a police officer on the topic of Mr. Jones's prior convictions,[529] and it conflicted with the position they took regarding removing from the jurors' purview the existence of the prior offenses in the indictment.[530] Additionally, defense counsel failed to

---

[524] *Sims v. Livesay*, 970 F.2d 1575 (6th Cir. 1992); *Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995).
[525] See Dr. Solomkin Deposition p. 16 and passim; and Post-Conviction Petition Exhibit
[526] Tr. 1684; *See Sims v. Livesay*, 970 F.2d 1575 (6th Cir. 1992); *Henderson v. Sargent*, 926 F.2d 706,711 (8th Cir. 1991).
[527] *See* OHIO R. EVID. 404(B); *State v. Wickline*, 50 Ohio St.3d 114, 552 N.E.2d 913 (1990).
[528] Tr. 463.
[529] Tr. 1363.
[530] Tr. 1123-24.

object effectively if at all when the state commented on Mr. Jones's priors and adduced testimony about the priors.[531]

1.8. Defense counsel were ineffective for not objecting to the admission of numerous items of evidence, including but not limited to Mr. Jones's briefcase, State's Ex. 71, because the items lacked evidentiary value.[532] Moreover, defense counsel failed to inspect the contents of the briefcase which were inadmissible and prejudicial to Mr. Jones for many reasons, including but not limited to those argued by the State in closing,[533] and the fact that the contents included papers documenting Mr. Jones's prior convictions and other matters which impermissibly attacked his character.[534] The briefcase contained documents related to Mr. Jones's prior criminal convictions,[535] This briefcase included a variety of documents identifying Jones as a convicted felon:  Letter to unknown asking for job once released on parole (23); Final Release and Restoration Certificate from Ohio Adult Parole Authority dated, June 24, 1991 (25); Copy of "Your Rights and Benefits as an Ex-Offender" (26); Letter from London Correctional Institution informing of damaged cassette (27); Pre-parole planning form dated August 1987 (28); Letter from Ohio Parole Board responding to a letter written by Jones concerning employment. Dated Jan. 5, 1987 (30); and Information from Adult Parole Authority, May 29, 1990 (238).

1.9. Defense counsel failed to object when the prosecutor referred to facts not in evidence during his closing argument of the culpability phase regarding

---

[531] Tr. 825-26, 1578-80. OHIO R. EVID. 404(B), 609; *State v. Wickline*, 50 Ohio St.3d 114, 552 N.E.2d 913 (1990).
[532] Tr. 1232-37; OHIO R. EVID 401, 402.
[533] Tr. 1822-23.
[534] OHIO R. EVID. 404 (B), 405, 608, 609.
[535] Inventory of Exhibit 71, Dkt. 141.

(1) the purported link between bruise patterns on the decedent and objects circumstantially connected with Mr. Jones,[536] (2) the false claim that Mr. Jones confronted Susan Friend in an "angry fashion,"[537] and (3) the wholly unfounded claim that the decedent tested positive for Eikenella.[538] Defense failed to object when the prosecutor shifted the burden of proof by arguing in closing that the jurors must decide Mr. Jones's guilt or innocence,[539] versus whether he was guilty or not guilty; when he blamed the defense for not conducting forensic tests on objects in the state's control; and when the prosecutor expressed his opinion about Mr. Jones's guilt and vouched for the state's entire case.[540]

1.10. Defense counsel failed to effectively object to the irrelevant and prejudicial slide show presented by Dr. McDonough during his direct testimony for the State.[541]

1.11. Defense counsel failed to object when the prosecution used the fact that Mr. Jones's was indicted as evidence to imply Mr. Jones's guilt and as evidence to vouch for the integrity of the State's entire case in chief.[542]

1.12. Defense counsel failed to object to what was at least double hearsay testimony elicited from Officer Lilley who testified that Dr. McDonough told Lilley that McDonough asked Mr. Jones if he had hurt his hand by punching someone and Mr. Jones said "no" to McDonough who repeated that to Lilley

---

[536] Tr. 1743 (shoes and chains), 1812 (walkie-talkie).
[537] Tr. 1798.
[538] Tr. 1824.
[539] Tr. 1734,
[540] Tr. 1793-94.
[541] Tr.. 993-1000.
[542] Tr. 1359.

who repeated all of this at trial as Lilley's reason for impermissibly testifying that he was of the opinion that Mr. Jones was a liar.[543] The prosecutor compounded this error by highlighting this testimony in closing argument.[544]

### (2). The prosecutor's misconduct during Mr. Jones's capital trial and the trial court's failure to ensure a fair trial was prejudicial and denied Mr. Jones a fair trial in violation of the Fifth, Sixth, Eighth And Fourteenth amendments to the U.S. CONST, Berger v. United States, 295 U.S. 78 (1935) and Donnelly v. DeChristoforo, 416 U.S. 637 (1974).

2.1. The prosecutor improperly elicited from a police officer the fact that Mr. Jones requested a lawyer during questioning..[545]

2.2. The prosecutor improperly attacked the credibility of defense witness Johnson by eliciting evidence of his criminal history through a police officer.[546] Such evidence was not otherwise admissible and was not admitted when Johnson took the stand.[547]

2.3. The prosecutor improperly commented during opening statements about Mr. Jones's history of aggravated burglary convictions, (Tr. 825-26), and elicited evidence of Mr. Jones's prior theft conviction from a police officer.[548]

2.4. The prosecutor argued facts not in the record during closing argument of the culpability phase regarding (1) the purported link between bruise patterns on the decedent and objects circumstantially connected with Mr.

---

[543] Tr. 1336, 1349-50.
[544] Tr. 1808.
[545] Tr. 1349. *Doyle v. Ohio*, 426 U.S. 610 (1976); *State v. Combs*, 62 Ohio St.3d 278, 581 N.E.2d 1071 (1991); *Edwards v. Arizona*, 451 U.S. 477 (1981).
[546] Tr. 1606.
[547] Tr. 1588-90.
[548] Tr. 1578. OHIO R. EVID. 404(B); *State v. Wickline*, 50 Ohio St.3d 114, 552 N.E.2d 913 (1990).

Jones.[549] (2) the false claim that Mr. Jones confronted Susan Friend in an "angry fashion,"[550] and (3) the wholly unfounded claim that the decedent tested positive for Eikenella,[551] Further, the prosecutor improperly shifted the burden of proof by arguing closing that the jurors must decide Mr. Jones's guilt or innocence,[552] and by blaming the defense for not conducting forensic tests on objects in the State's control; and the prosecutor expressed his opinion about Mr. Jones's guilt and vouched for the State's entire case. Tr. 1793-94.

**(3). The trial court's admission of purported "expert" opinion testimony that failed to meet the threshold of opinions held to a reasonable degree of medical and/or scientific certainty, and which was at best based on drawing inferences from inferences which ultimately had no factual basis in the record, and Mr. Jones's trial counsel's failure to effective challenge the admissibility of this testimony, violated Mr. Jones's rights to effective assistance of counsel, due process, fair trial, confrontation of witnesses, equal protection and freedom from cruel and unusual punishment as guaranteed by the sixth, eighth and fourteenth amendments of the united states constitution, article i, sections 2,9, 10 and 16 of the Ohio constitution.**

3.1. Without either any objection or effective objections, the trial court admitted testimony from purported experts who were permitted to render opinions that fell below the standard of opinions held to a reasonable degree of scientific or medical certainty. These constitutionally deficit opinions were rendered by three prosecution witnesses who opined about purported similarities between bruise patterns on the decedent and certain objects allegedly within Mr. Jones's control at the time of death[553]. This evidence substantially prejudiced Mr. Jones and should not have been admitted. Neither at trial nor on di-

---

[549] Tr. 1743 (shoes and chains), 1812 (walkie-talkie).
[550] Tr. 1798.
[551] Tr. 1824.
[552] Tr. 1734.
[553] Tr. 886-912 (Trimpe); Depo. Tr. 3-33 (Stokes); Depo. Tr. 4-47 (Oliver).

rect appeal did counsel for Mr. Jones effectively challenge the admissibility of this evidence.

3.2. Mr. Jones's appellate counsel failed to read, apply, and argue existing law to expose the trial court's error in admitting purported expert opinions that fell below the constitutional and evidentiary threshold for admissible expert opinions. As a result, the Ohio appellate courts overruled appellate counsel's ineffective attempts to challenge this evidence. The Ohio intermediary appellate court cited and misapplied the law missed by Mr. Jones's appellate counsel when it overruled appellate counsel's ineffective arguments. Specifically, Ohio's First District Court of Appeals overruled an assignment of error which ineffectively attacked this evidence, saying in its opinion that the Ohio Supreme Court has lowered the bar of admissibility to mere "possibilities" in criminal cases versus "reasonable degree of scientific certainty" in civil cases.[554] If the appellate court's interpretation of *D'Ambrosio* was correct, then its application violates at minimum Mr. Jones's constitutional rights to equal protection by treating evidence against him in a capital case differently than the way similar evidence is treated in civil cases. Moreover, as Mr. Jones's appellate counsel should have argued, the appellate court's application of *D'Ambrosio* in Mr. Jones's capital case directly conflicted with that same court's holding in the civil case of m, Hamilton County N0.C-950561, unreported May 29, 1996), which held that *D'Ambrosio* had been overruled by *Stinson v. England*, 69 Ohio St.3d 451, 633 N.E.2d 532 (1994). Hence, under then existing federal constitu-

---

[554] *State v. Jones*, Hamilton County No. C-970043, unreported (Aug. 28, 1998), applying *State v. D'Ambrosio*, 67 Ohio St.3d 185, 191, 616 N.E.2d 909, 915 (1993).

tional law and state court construction, to be admissible, an expert's opinion must be held to a reasonable degree of certainty, which in turn equals the standard for preponderance of the evidence. Thus, Mr. Jones's appellate counsel missed an obvious, basic argument that *D'Ambrosio* and *Stinson* barred the admission of the opinions rendered by Trimpe, Stokes and Oliver.

3.3. All the evidence and argument presented by the prosecution regarding the purported comparison between certain physical objects and the bruise patterns on the decedent ultimately had no direct factual basis in the record. This entire corpus of evidence and argument violated the fundamental prohibition of drawing inferences from inferences to "prove" facts by circumstantial evidence. As but one example, the prosecution's circumstantial chain of inference first depends on the inference that Mr. Jones had a walkie-talkie like the replicate one used by the State's so-called experts; that Mr. Jones attacked the decedent with it; and that as a result of the attack the bruises left on the body matched the patterns of the walkie-talkie case. A similar and equally egregious violation of the rule against stacking inferences exists in all of the evidence and argument on the issue of the Eikenella infection in Mr. Jones's hand. Here, the decedent was never tested to see if she carried Eikenella in her mouth. Thus, the State's case impermissibly required the jurors to first infer she had Eikenella in her mouth, then to infer that the Eikenella infection in Mr. Jones's hand came from a violent contact between his hand and the decedent's mouth.

3.4. A law enforcement official arguably qualified to render opinions about fingerprints was impermissibly allowed without objection to opine about "blood splatter" evidence.[555]

**(4). The trial court committed numerous errors in instructing the jury in the both the culpability phase and the penalty phase of Mr. Jones's capital trial, which errors were compounded by defense counsel's ineffective failure to raise timely and/or proper objections and counsel's failure to request proper jury instructions, all of which prejudiced mr. Jones, denied him a fair trial, and violated the fifth, sixth, eighth, and fourteenth amendments of the united states constitution and article i, sections 2,5,9,10 and 16 of the Ohio constitution.**

4.1. The jury instructions improperly allowed the jury to presume purpose from the manner in which the killing was done.[556]

4.2. The "gist of the offense" definition for "purpose" improperly relieved the State of its burden to prove each element of the aggravated murder offense.[557]

4.3. The instructions to the jury as to cause and foreseeability improperly interjected a civil liability standard that undermined the specific intent requirement of Ohio Rev. Code § 2903.01.[558]

4.4. The instructions improperly allowed the jury to presume knowledge from the facts in evidence, which created a conclusive presumption of mens rea.[559]

---

[555] Tr. 1131-32.

[556] Tr. 1837; In re Winship, 397 U.S. 358 (1970); Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979).

[557] Tr. 1836, 1842, 1848; *Winship*, 397 U.S. 358 (1970); *Francis v. Franklin*, 471 U.S. 307 (1985); *Sandstrom v. Montana*, 442 U.S. 510 (1979).

[558] Tr. 1842-43, 1848-49; *Francis v. Franklin*, 471 U.S. 307 (1985); *State v. Burchfield*, 66 Ohio St.3d 261, 611 N.E.2d 819 (1993); State v. Jacks, 63 Ohio App.3d 200, 578 N.E.2d 512 (1989).

[559] Tr. 1835; *In re Winship*, 397 U.S. 358 (1970); *Francis v. Franklin*, 471 U.S. 307 (1985); *Sandstrom v. Montana*, 442 U.S.510 (1979).

4.5. The instructions improperly shifted the burden of proof to Mr. Jones to disprove the elements of the crime and prove his innocence.[560]

4.6. The jury was improperly given the instruction that its verdict was merely a recommendation.[561]

4.7. The jury was improperly instructed that it must consider mitigating factors not raised by Mr. Jones.[562]

4.8. The jury was not properly instructed that it did not have to unanimously find death inappropriate before considering the life sentences.[563]

4.9. The jury was not properly instructed that it must independently weigh the aggravating circumstances of each count against the mitigating factors.[564]

4.10. The jury was improperly instructed to consider all the evidence admitted at both proceedings when determining Mr. Jones's sentence.[565]

4.11. The jury was improperly instructed that the nature and circumstances of the offense are equated with the aggravating circumstances.[566]

4.12. The jury was not properly informed that it need not be unanimous on a finding of a mitigating factor in order to use it in their weighing process.[567]

4.13. The sentencing jury was improperly instructed that a life sentence recommendation must be unanimous.[568]

---

[560] Tr. 1855,1952.
[561] Tr. 1958.
[562] Tr. 1957; *State v. DePew*, 38 Ohio St.3d 275, 289, 528 N.E.2d 542, 557-58 (1988); *State v. Hicks*, 43 Ohio St.3d 72, 77, n.3 , 538 N.E.2d 1030, 1036 (1989).
[563] Tr. 1958; *State v. Brooks*, 75 Ohio St.3d 148 (1996).
[564] Tr. 1959-60; *State v. Cooey*, 46 Ohio St.3d 20, 544 N.E.2d 895 (1989).
[565] Tr. 1961; *State v. DePew*, 38 Ohio St.3d 275, 275, 528 N.E.2d 542, 545 (1988).
[566] Tr. 1955; *State v. Wogenstahl*, 75 Ohio St. 3d 344, 662 N.E.2d 311 (1996).
[567] Tr. 1952-64; *Mills v. Maryland*, 486 U.S. 367 (1988).

4.14. The instructions to the sentencing jury improperly placed the jury's focus on what it previously found in the first proceeding when it determined whether reasonable doubt was present.[569]

4.15. The definition of mitigating factors in OHIO REV. CODE § 2929.04(B)(7) violates the reliability component of the Eighth Amendment[570].

4.16. Defense counsel failed to request a cautionary instruction regarding the weight to be given to Dr. McDonough's testimony in light of the fact that he lacked expertise in the area of medicine that he testified about.[571]

**(5). The trial court erred when it denied Mr. Jones the right to present the testimony of Mr. Vickers which prejudiced Mr. Jones and denied him a fair trial, his right to compulsory process, his right to confront the state's case against him, and violated the fifth, sixth, eighth, and fourteenth amendments of the united states constitution See Tr. pp. 1534-37; 1613; 1704-13.**

**(6). Mr. Jones's indictment was returned by an improperly constituted grand jury, including defects in (1) the biased process used to select the foremen of grand juries, (2) the manner and adequacy of the presentation of evidence which yields capital indictments with a discriminatory intent and impact on racial minorities in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.**

6.1. Mr. Jones's grand jury was improperly constituted because the make-up of the grand jury was based upon consideration of race and location within the county. Mr. Jones's appellate counsel failed to argue that his trial counsel failed to effectively litigate this issue and failed to lodge proper objections.

---

[568] Tr. 1958, 1962; Scon v. Anderson, Case No. 1:95CV2037 (N.D. Ohio Sept. 20, 1998).

[569] Tr. 1957.

[570] Tr. 1957; *Lockett v. Ohio*, 438 U.S. 586 (1978); *Penny v. Lvnaugh*, 492 U.S. 302 (1989); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

[571] *Cincinnati v. Emerson*, 20 Ohio St.2d 59 (1969); OHIO R. CRIM. P. 30(B).

6.2. The process used in Hamilton County to select foremen of grand juries that return capital indictments is biased geographically, racially, culturally, and socio-economically.

**(7). Mr. Jones's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and Batson v. Kentucky, 476 U.S. 79 (1986) were violated by the discriminatory use of a peremptory challenge by the prosecutor on a prospective juror. Moreover, Mr. Jones was denied a fair and impartial jury because those individuals selected for his venire did not reflect a fair cross section of the community.**

Mr. Jones was deprived of his right to a fair trial because the prosecutor improperly perempted Juror Blair, the only African-American on Mr. Jones's panel,[572] and because the special venire was an unrepresentative sample of the community in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

**(8). The trial court erred when it denied Mr. Jones's motion for individual sequestered voir dire in violation of his rights under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution.**

Mr. Jones was deprived of his right to a fair trial and effective use of his peremptory challenges as a result of the trial court's denial of his motion for individual sequestered voir dire.[573]

---

[572] Tr. 800-01.
[573] Tr. 270.

166

**(9). Mr. Jones was denied his right to a fair sentencing determination when the trial judge failed to remove himself as presiding judge over the mitigation hearing in violation of Mr. Jones's rights to due process, fair trial, and freedom from cruel and unusual punishment as guaranteed by the sixth, eighth and fourteenth amendments of the united states constitution.**

Mr. Jones was denied his rights to due process and a fair and reliable determination of the appropriate penalty as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution when the trial judge expressed his condolences to the victim's family prior to the mitigation hearing, as well as when he informed trial counsel, prior to the hearing, that he intended to give Mr. Jones the maximum sentences so that he would be incarcerated for a long time.

**(10). The trial court erred in replacing Juror Geiermann with Juror Brewer prior to Mr. Jones's mitigation hearing.**

Petitioner abandons this claim.

**(11). The trial court erred in denying Mr. Jones's motion to dismiss the indictment in violation of his rights as guaranteed under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.**

Petitioner abandons this claim.

**(12). The death penalty is imposed in Hamilton county in violation of the Eighth Amendment and Equal Protection Clause because the Hamilton county prosecutor seeks the death penalty in a disproportionate number of cases, compared to the rest of the state.**

Petitioner abandons this claim.

**(13). The cumulative impact of the appellate ineffectiveness errors violated Mr. Jones's constitutional rights**

Petitioner abandons this claim.

167

The various failings of appellate counsel violated Jones's right to counsel. Taken separately or together, these errors fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the culpability and sentencing phases of his trial; violated his right to a fair trial, to a jury trial, to effective assistance of counsel; and violated his right to be free from cruel and unusual punishment. These violated Jones's rights under U.S. CONST. amend. V, VI, VIII, and XIV.

## Eleventh Ground for Relief: Elwood Jones is innocent

Elwood Jones is actually and legally innocent of the offenses for which he has been convicted, sentenced to death and sent to death row.

Clearly, the Hamilton County Prosecutor harbored significant doubts about Mr. Jones's guilt. These doubts are revealed by the compelling fact the Mr. Jones was offered a plea bargain after he had been indicted for a capital offense—and the offered was reiterated even after the jury was sworn. It is a radical departure from the patterns and practices of the Hamilton County Prosecutor to ever make a plea bargain offer in an indicted capital case.

It is an equally compelling insight into the Prosecutor's assessment of the state's case that Mr. Jones was not indicted until long after the law enforcement officials had every piece of evidence they eventually marshaled against him at trial. The record proves that a senior assistant prosecutor was involved in the investigation of this case from the outset; so any delay cannot be laid at the feet of the inexperienced officers in the BAPD.[574] Why the delay in indict-

---

[574] Tr. 1611 (testimony of Judge West who, prior to becoming a Judge, represented Mr. Jones during the earlier stages of the investigation).

ment? If guilty, why did not Mr. Jones flee the jurisdiction? To use the State's own impermissible theory against it, Mr. Jones was a middle aged, convicted felon who "knew the ropes." If guilty, he would have been long gone after 9-12-94 when the BAPD released him after interrogating him, confiscating his personal belongings and his car, searching his and a close fiend's residence, and effectively run him out of his job at Embassy Suites. As it is, Mr. Jones now sits on death row. If no court grants him relief, he will eventually be executed.

The constitutional underpinnings for the prohibition against executing innocent persons (and the tandem individual right not to be executed if you are innocent) are identified by the United States Supreme Court.[575] As the Court emphasized in (emphasis added:

> The consideration in federal habeas proceedings of a broader array of evidence does not modify the essential meaning of "innocence." The *Carrier* standard reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt. *See In re Winship*, 397 U.S. 358. Indeed, even in *Sawyer*, with its emphasis on eligibility for the death penalty, the Court did not stray from the understanding that the eligibility determination must be made with reference to reasonable doubt. Thus, whether a court is assessing eligibility for the death penalty under *Sawyer*, or is deciding whether a petitioner has made the requisite showing of innocence under *Carrier*, the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence.[576]

Mr. Jones has made the requisite showing of innocence under *Carrier*, the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence.

---

[575] *Schlup v. Delo*, 513 U.S. 298 (1995), *Sawyer v. Whitley*, 505 U.S. 333 (1992), *Murray v. Canier*, 477 U.S. 478 (1986), and *Herrera v. Collins*, 506 U.S. 390 (1993).
[576] *Schlup v. Delo*, 513 U.S. 298, 328-29 (1995) (footnote omitted)

Moreover, these cases can be fairly construed as recognizing that a death-sentenced individual who raises a timely claim of actual, legal innocence has a right to a procedural remedy for fully and fairly adjudicating this claim. Mr. Jones, through counsel, asserts that he has a substantive constitutional right not to be executed because he is actually, legally innocent.

A death-sentenced individual's claim of innocence commands additional remedial measures when, as here, the claim arises from a trial infected with other constitutional errors.[577] Mr. Jones's trial was replete with prosecutorial misconduct, ineffective assistance of counsel and other errors which deprived him of a fair trial, violated his constitutional rights, and rendered both his conviction and death sentence wholly unreliable. Taken separately or together, these errors fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the culpability and sentencing phases of his trial; violated his right to a fair trial, to a jury trial, to effective assistance of counsel; and violated his right to be free from cruel and unusual punishment. These violated Jones's rights under U.S. CONST. amend. V, VI, VIII, and XIV.

---

[577] *See Schlup*, 513 U.S. at 315-316.

**Twelfth Ground for Relief: The proportionality review that the appellate courts must conduct pursuant to OHIO REV. CODE § 2929.05 is fatally flawed. Therefore, Elwood Jones's death sentence must be vacated pursuant to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.**

*Petitioner abandons this claim.*

**Thirteenth Ground for Relief: Elwood Jones's death sentence is constitutionally infirm because Ohio's capital punishment system operates in an arbitrary, capricious, and discriminatory manner in violation of the Fifth, Sixth, Eighth ,and Fourteenth Amendments.**

*Petitioner abandons this claim.*

**Fourteenth Ground for Relief: The cumulative effects of the errors and omissions presented in this habeas petition constitute constitutional violations which merit relief.**

Assuming arguendo that none of the Grounds for Relief in his habeas petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions as presented herein evidence prejudice to Mr. Jones and the violation of his constitutional rights as secured by the Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution. In the alternative to relief on each of the separate errors asserted in this habeas petition, taken together they are of significant magnitude to warrant the granting of a new trial or, at minimum, discovery and an evidentiary hearing on this Ground.

This is particularly true because the common thread of many of the claims is the evidence that the jury heard that it should not have heard and evidence that it should have heard but did not. Regardless of the particular constitu-

tional violation involved, this Court should balance all of the information that should have been heard and that should not have been heard against the evidence that the jury did hear. The test is whether there could have been a difference in the outcome.

Taken separately or together, these errors fundamentally undermined the fairness of Mr. Jones's trial; rendered unreliable the outcome of both the culpability and sentencing phases of his trial; violated his right to a fair trial, to a jury trial, to effective assistance of counsel; and violated his right to be free from cruel and unusual punishment.  These violated Jones's rights under U.S. CONST. amend. V, VI, VIII, and XIV.

172

## Conclusion

For the reasons stated above, this Court should grant Petitioner a Writ of Habeas Corpus.

**s/Michael L. Monta**

MICHAEL L. MONTA No. 0032777
Trial Counsel
3625 Old Salem Road
Dayton, Ohio 45415
(937) 890-6921

**s/ Gary W. Crim**

GARY W. CRIM (0020252)
943 Manhattan Avenue
Dayton, Ohio 45406-5141
(937) 276-5770

Attorneys for Elwood H. Jones

## Certificate of Service

I, Gary W. Crim, counsel for Elwood H. Jones, certify that on November 13, 2007, I served a copy of this Post-Hearing Traverse on Counsel for the Warden, Sarah A. Hadacek and Stephen E. Maher, by emailing it to shadacek@ag.state.oh.us; smaher@ag.state.oh.us.

**s/ Gary W. Crim**

GARY W. CRIM